Peggy Pence, PhD, RAC, FRAPS

Expert Witness Rebuttal Report
RE: Masimo Corporation Qui Tam Litigation
(Masimo Corporation referred to in this Report as Masimo)

August 30, 2013

## OUTLINE OF CONTENTS

I. CREDENTIALS AND METHODOLOGY ...................................................................1
  A. Credentials: Qualifications and Experience ....................................................1
  B. Methodology ....................................................................................................5
II. INDUSTRY STANDARDS AND PRACTICES: REGULATORY CONTEXT.................6
  A. FDA Authority and Manufacturer Regulatory Compliance .......................7
  B. Device Classifications .....................................................................................8
  C. The PreMarket Review Process: 510(k) vs. PMA .........................................9
  D. Determination of Safety and Effectiveness ..................................................11
  E. Device Label, Labeling, Advertising, and Misbranding ..............................12
    1. Applicable Definitions .............................................................................12
      *1.1 Label*: Section 201(k) [21 U.S.C. 321(k)] of the FDCA defines "label" as a ...........12
      *1.2 Labeling*: Section 201(m) [21 U.S.C. 321(m)] of the FDCA defines "labeling" as ..12
      *1.3 Indications for Use* ...........................................................................13
      *1.4 Intended Uses* .................................................................................13
      *1.5 Contraindications* ............................................................................13
      *1.6 Directions for Use (DFU) (or Instructions for Use [IFU])* ...................13
      *1.7 Fair Balance* ...................................................................................13
      *1.8 Prescription Device* .........................................................................14
    2. General Device Labeling: 21 CFR Part 801 ............................................14
    3. The Meaning of Intended Use ................................................................15
    4. Promotion and Intended Use ..................................................................15
    5. Labeling and Advertising (General Device Labeling: 21 CFR Part 801) ..........15
    6. Misbranding ...........................................................................................16
    7. False or Misleading Labeling ..................................................................17
    8. Warnings ...............................................................................................17
    9. Dear Doctor, or Dear Health Care Professional, Letters ........................17
  F. Quality System Regulation (QSR) and Design Controls ............................18
    1. Quality System Requirements ................................................................19
    2. Design Controls .....................................................................................19
    3. Complaint Files ......................................................................................20
  G. Manufacturer Serious Adverse Event Reporting Requirements .............20
    1. Historical Perspective ............................................................................20
    2. Postmarket Vigilance/Surveillance – Medical Device Reporting (MDR) Regulation: 21 CFR Part 803 ...........21
      *2.1 Applicable Definitions* .......................................................................21
    3. Overview of Manufacturer Reporting Requirements ..............................23
    4. Reporting of Adverse Events .................................................................23
      *4.1 30-Day Reports* ..............................................................................23
      *4.2 5-Day Reports* ................................................................................23
      *4.3 Mandatory Reporting Information Requirements* ...............................24
    5. When Is a Manufacturer Excused from Submitting an MDR? ................24
    6. The Submission of a MDR is not an Admission of a Causal or Contributory Relationship ...........25
    7. Requirements for Written MDR Procedures and Recordkeeping ..............25
      *7.1 Standardized Procedures* ..................................................................25

Ex_1_Page_02

*7.2 Establishing and Maintaining MDR Event Files* ...................................................25
*7.3 Records Retention* ...........................................................................................26
8. Global Harmonization Task Force (GHTF) Guidances: Postmarket Vigilance ...............26
9. Underreporting of Adverse Events ...........................................................................27
H.  Recalls ...................................................................................................................28
**III. MASIMO CORPORATE AND PRODUCT BACKGROUND** ............................................**28**
**IV. OPINIONS WITH SUPPORTING CITATIONS AND APPLICABLE STANDARDS** .....**29**
A. **Opinion #1:** The lack of issuance of a Form FDA 483 following FDA's For-Cause inspection of Masimo Corporation on February 2-11, 2011, cannot be interpreted that deficiencies did not exist.........................................................................................29
B. **Opinion #2:** Masimo improperly marketed its subject products by promoting them for intended uses beyond those covered by its applicable 510(k)s and cleared for marketing by FDA. Specifically, as regards measurement of total hemoglobin concentration (SpHb), Masimo promoted the products for diagnosis instead of the 510(k)-cleared indication for hemoglobin monitoring or spot checking..............................................................................................29
1. Improper Promotion Beyond FDA-Cleared Uses...............................................30
*1.1 Regulatory History: 510(k)-Cleared Indications for Use*............................30
*1.2* Examples in the Reviewed Materials of Promotion Beyond the Scope of Masimo's FDA Clearance................................................................................................37
C. **Opinion #3:** Masimo deviated from industry standards by improperly marketing its products as a result of failure to reveal material facts concerning product inaccuracies and, thus, Masimo marketed products dangerous to health when used in the manner recommended or suggested in the labeling...............................................................................................45
1. SpO$_2$ Inaccuracies…………………………………………….....................................46
2. SpHb Inaccuracies…………………………………………….......................................47
D. **Opinion #4: OPINION #4:**  Masimo violated industry practices by improperly marketing products as a result of labeling that made unsupported accuracy claims.............................52
E. **Opinion #5:** Masimo failed to perform product recall according to the mandatory FDA reporting requirements when warranted based on product non-performance.......................53
F. **Opinion #6: OPINION #6:**  Masimo deviated from standard industry practice  by failing to document, review, and evaluate all complaints and submit Medical Device Reports (MDRs) to the FDA where indicated..........................................................................................56
G. **Opinion #7:** Masimo improperly instructed customers on coding for billing for the subject devices...................................................................................................................59
**V. SUMMATION OF OPINIONS**………………………………………………………**63**
A. Summary List of Opinions.........................................................................................63
B. Summary Rebuttal of Masimo's Experts' Opinions....................................................64

**EXHIBIT 1 – Regulatory History**

**APPENDIX A – Curriculum Vitae of Peggy Pence, PhD, RAC, FRAPS**
**APPENDIX B – List of Materials Made Available for Review**

Ex_1_Page_03

Peggy Pence PhD, RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

**List of Key Abbreviations**

| | |
|---|---|
| AAMI | Association for the Advancement of Medical Instrumentation |
| AHWP | Asian Harmonization Working Party |
| AMA | American Medical Association |
| ARDB | Anesthesiology and Respiratory Devices Branch, FDA |
| ARMS | Accuracy Root Mean Square (ARMS Statistic) |
| BLA | Biologics License Application |
| CBC | Complete Blood Count |
| CDRH | Center for Devices and Radiological Health |
| CEO | Chief Executive Officer |
| CFR | Code of Federal Regulations |
| CLSI | Clinical and Laboratory Standards Institute |
| CMS | Centers for Medicare and Medicaid Services |
| CPT | Current Procedural Terminology |
| CRO | Contract Research Organization |
| CSUCI | California State University Channel Islands |
| CSUPERB | California State University Program for Education and Research in Biotechnology |
| CV | Coefficient of Variation |
| DDUPSA | Division of Device User Programs and Systems Analysis |
| DFU | Directions for Use |
| DHCP | "Dear Health Care Professional" |
| DIA | Drug Information Association |
| dL | Deciliter |
| EPO | Epogen® |
| EOB | Explanation of Benefits |
| ESA | Erythropoietin Stimulating Agents |
| FDA | U.S. Food and Drug Administration |
| FDAMA | FDA Modernization Act of 1997 |
| FDCA or FD&C Act | Federal Food, Drug, and Cosmetic Act |
| FAERS | FDA Adverse Event Reporting System (formerly AERS) |
| FMEA | Failure Modes and Effects Analysis |
| FP | Family Practitioner |
| FRAPS | Regulatory Affairs Professionals Society Fellow |
| FTC | Federal Trade Commission |
| g or gm | Gram |
| g/dL | Grams per Deciliter |
| GAO | Government Accountability Office |
| GCP | Good Clinical Practice |
| GHTF | Global Harmonization Task Force |
| GLP | Good Laboratory Practice |
| GMP | Good Manufacturing Practice |
| Hb or Hgb | Hemoglobin |
| HCPCS | Healthcare Common Procedure Coding System |
| HHS | Department of Health and Human Services |

iii.

*Peggy Pence PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

| | |
|---|---|
| HiCN | Hemiglobincyanide |
| HIPAA | Health Insurance Portability and Accountability Act of 1996 |
| ICD | Implantable Cardioverter Defibrillators |
| IDE | Investigational Device Exemption |
| IEC | International Electrotechnical Commission |
| IFU | Instructions for Use |
| IMDRF | International Medical Device Regulators Forum |
| ISO | International Organization for Standardization |
| IVDs | In Vitro Diagnostics |
| KOL | Key Opinion Leader |
| LMR | Limited Market Release |
| MAPP | Manual of Policies and Procedures |
| MAUDE | Manufacturer and User Facility Device Experience Database |
| MDR | Medical Device Reporting |
| MS | Master of Science |
| NDA | New Drug Application |
| NSE | Not Substantially Equivalent |
| OCRA | Orange County Regulatory Affairs Discussion Group |
| ODE | Office of Device Evaluation |
| PDP | Product Development Protocol |
| PhD | Doctor of Philosophy |
| PI | Perfusion Index |
| PMA | Premarket Approval Application |
| PR | Pulse Rate |
| P7 | Pronto-7 |
| QSR | Quality System Regulation |
| RAC | Regulatory Affairs Certification |
| Rad 57t | Masimo Rainbow SET Rad 57t Pulse CO-Oximeter |
| Rad 87 | Masimo Rainbow SET Rad 87 Pulse CO-Oximeter |
| RAMS | Raleigh Associated Medical Specialists |
| RAPS | Regulatory Affairs Professionals Society |
| SD | Standard Deviation |
| SE | Substantially Equivalent |
| SET | Signal Extraction Technology® |
| SG2 | GHTF Study Group 2 |
| SMDA | Safe Medical Devices Act of 1990 |
| SpHb | Total Hemoglobin concentration |
| $SpO_2$ | Functional Oxygen Saturation of Arterial Hemoglobin |
| SW | Software |
| thb | Total hemoglobin |
| TM | Territory Manager |

iv.

*Peggy Pence PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

| | |
|---|---|
| US | United States of America |
| U.S.C. | United States Code |
| WWMG | Western Washington Medical Group |

v.

**PEGGY PENCE, PhD, RAC, FRAPS**
**EXPERT WITNESS REBUTTAL REPORT**

**RE: MASIMO CORPORATION QUI TAM LITIGATION**

## I.     CREDENTIALS AND METHODOLOGY

### A.     Credentials:  Qualifications and Experience

I have more than 40 years of experience in the research and development of traditional pharmaceuticals, biotechnology-derived therapeutics (biopharmaceuticals), and medical devices, including in vitro diagnostics. I began my career at Eli Lilly and Company in 1970 in basic immunology research and later transitioned to clinical and regulatory affairs.  I subsequently held project management and clinical management positions, from 1983 to 1992, at a number of emerging-growth  companies, including Serono Laboratories (U.S. start-up), Triton Biosciences (acquired by Berlex Laboratories, Inc.), and Amgen, Inc.

In 1992, I founded a consulting firm that was incorporated in 1995 as Symbion Research International, Inc., a full-service contract research organization (CRO) and consulting firm. I have been President and Chief Executive Officer since that time. In this position, I provide advice, guidance, and product development services to pharmaceutical/biopharmaceutical and medical device companies in the areas of strategic planning, preclinical testing, clinical trials design and conduct, and regulatory matters involving the U.S. Food and Drug Administration (FDA), as further discussed below.  In January 2012, I co-founded Illuminostics, LLC, to provide medical imaging services for clinical trials and to aid in the diagnosis and monitoring of disease in medical practice.

Over the course of my career, I have worked with more than 80 companies and over 90 medical devices, pharmaceuticals (drugs), and biopharmaceuticals (biologic therapeutics), including combination products (e.g., device-drug combination products). I have guided and coordinated product development activities from manufacturing process development through marketing plans and have led development programs for a number of novel therapeutics and medical devices. My medical device experience encompasses all Classes of medical devices: Classes I, II and III.  I have broad experience spanning multiple therapeutic areas, including women's health, neurology, neuropsychology, oncology, hematology, infectious disease, rheumatology, nephrology, respiratory disorders, metabolic and growth disorders, gastroenterology, burns, wound healing, and ophthalmology. Examples of my professional experience particularly relevant to the subject matter of this report are provided below.

I have performed due diligence evaluations of potential new products to advise sponsor companies or research institutes on product development requirements, including preclinical and clinical testing needs and also regulatory pathway and strategy. I have managed internal and extramural preclinical research programs required for support of product development and manufacturing, clinical research, and business development activities. These have included product characterization, process improvement, stability studies, bioassay development, pharmacology, and

preclinical efficacy studies. Additionally, I have developed product-specific, preclinical toxicology testing plans and protocols and have overseen the conduct and reporting of these studies for FDA-regulated products. I have taught Good Laboratory Practice (GLP), which is the regulatory standard for conducting nonclinical (preclinical) laboratory studies to support applications submitted to FDA for research or marketing authorizations. In addition, I have conducted GLP audits of toxicology testing facilities.

Evaluation of preclinical safety and efficacy data are central considerations before initiating human use. Accordingly, I have designed clinical investigational plans and clinical protocols in consideration of preclinical study results, including both efficacy and toxicology data. As a key member of many product development teams, I have been instrumental in the assessment of preclinical data to determine whether the available safety information supported the transition from preclinical to clinical use. Similarly, I have evaluated both preclinical and available clinical safety data to determine whether product safety profiles supported application for marketing authorization and also product development for new clinical uses.

I have designed and managed or directed the conduct of numerous clinical studies, from first-in-man studies of novel therapeutics and medical devices to pivotal studies for marketing approval or clearance. This has included performing and/or directing the monitoring, data management, analysis, and reporting of the safety and effectiveness/efficacy data from these studies, ensuring that all activities were performed in compliance with applicable regulations, Good Clinical Practice (GCP), the international regulatory and quality standard for the conduct of clinical trials involving human subjects and other relevant FDA Guidances. Of note, I established, staffed, and directed the first Clinical Quality Assurance and Document Control department at Amgen, a leading biotechnology firm. Further, I have directed collaborative clinical programs with foreign affiliates to reduce overall clinical development time and costs, and enhance quality and usability of data globally for marketing applications.

I have organized and directed meetings of clinical study physicians ("investigators") at the outset of multicenter clinical trials both to obtain concurrence on complex clinical study designs and endpoints and also to instruct these physician investigators on clinical trial requirements and their obligations to comply with the clinical study protocol, all applicable regulations, and GCP. I have performed compliance (quality assurance) audits of clinical investigators' conduct of clinical trials and advised and worked with them and their clinical study staff to correct any deficiencies identified. With respect to FDA inspections of clinical studies, I have been the sponsor representative with lead responsibility for "hosting" the FDA inspection of a sponsor company and clinical investigative sites.

I have provided consultation to multiple companies to establish or evaluate their processes and procedures and, in the latter case, to implement changes necessary to achieve compliance with regulatory and industry standards. In this role, I have developed standard operating procedures and set up operations to perform all aspects of clinical studies and regulatory affairs, including the following activities, among others: clinical protocol design; writing patient informed consent forms (including all known or potential risk information); writing investigator's brochures or reports of prior investigations (the forerunner of the package insert/professional labeling); clinical study monitoring and management; data tracking and management; recordkeeping; and reporting of adverse events. Such procedures at Symbion have undergone quality assurance audits by multiple

sponsor companies successfully. Further, I have consulted with a multinational pharmaceutical company both to develop implementation strategy and also to implement a global clinical data management system.

I have managed coding of adverse events (using dictionaries designated for regulatory activities) for worldwide clinical programs for the purpose of safety evaluations and regulatory reporting and have collected, investigated, evaluated, and reported safety data to fulfill both premarketing and postmarketing regulatory obligations. I have advised physician investigators of updated safety information: (i) in the context of providing updated investigator's brochures (which contain similar contents as eventual, professional product labeling [to the extent of known information], in order to provide for safe and effective use of the investigational product); and (ii) through required serious adverse event reports to advise physicians (as well as FDA) of new, critical safety information concerning serious risks with use of the investigational product. In the postmarketing setting, I also have directed the updating of postmarketing surveillance procedures and audited postmarketing adverse reaction records for regulatory compliance. Additionally, I have evaluated post-marketing utilization data.

I have reviewed or contributed substantially to the development of product labeling, including not only adverse reaction content but also contraindications and warnings, nonclinical toxicology and clinical studies information, and product use instructions. I have prepared product launch "backgrounders" for marketing programs and critically reviewed press releases of sponsor companies and other corporate documents prior to their release to ensure any potentially misleading or improper information is excluded.

I have served as the U.S. Agent or authorized representative for FDA matters for both medical device and drug companies, with responsibility for FDA communications and, in the case of medical device companies, for establishment registration and device listing. I have prepared and made numerous regulatory submissions of multiple types to FDA, including premarketing and postmarketing submissions, both for medical devices and drugs/biologics. Additionally, I have advised sponsor companies regarding a broad scope of regulatory requirements, including adverse event reporting and corrective and preventive actions to address FDA inspectional findings. I have represented sponsor companies during many face-to-face meetings and teleconferences with FDA.

I have served on the Board of Directors or Advisory Board for multiple organizations, including the Biotechnology and Health Programs Advisory Board, California State University Channel Islands (CSUCI); the Clinical Trials Certificate Program Advisory Board, California State University Program for Education and Research in Biotechnology (CSUPERB); and CompassioNow (formerly CareNow Foundation, the purpose of which is to provide medical care to the world's least served). At CSUCI, I also have served as an Advisor for the Master of Science in Biotechnology (MS Biotech) team projects, a curriculum requirement in an academic or industrial location. I have developed and am the instructor for a graduate level course titled "Clinical Trials and Quality Assurance" in the CSUCI MS Biotech program curriculum. As part of this course, I instruct my students on ethics in medical product development and the importance of obtaining and evaluating adequate preclinical safety data before transitioning to human use and assign them case studies relevant to this topic for critical evaluation and class presentation. Additionally, I developed and was the instructor for a course titled "Clinical Trials Project Management: Managing Clinical Trials" for graduate level students enrolled in either the Program

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

for Applied Biotechnology Studies or the Certificate in Clinical Trials Project Management Program at California State University, Fullerton. I also have served as guest lecturer for the MS Biotech program, CSUCI.

I have often been an invited speaker at industry conferences or workshops on topics current to the development of medical devices, drugs and biologics and have often provided instruction on Good Clinical Practice and other medical product development topics: at sponsor-company, in-house training programs; workshops and seminars; as a guest lecturer and instructor in university graduate or professional programs (as discussed above). I founded the Drug Information Association (DIA) Sub-group and Advisory Committee on Biotechnology and chaired DIA workshops on biotechnology in 1991 and thereafter from 1993 annually through 2001. I have served on the Regulatory Training Course Faculty for the Drug Information Association. I have been an instructor on the medical device premarketing regulations (2008-2009) and postmarketing regulations (2009) for the Orange County Regulatory Affairs Discussion Group (OCRA) course for regulatory professionals preparing to take the U.S. Regulatory Affairs Certification (RAC) examination.

I am RAC-certified, which means I hold the U.S. Regulatory Affairs Certification (RAC, certifying knowledge of U.S. regulations). The RAC credential is the only certification specifically for regulatory professionals in the healthcare product sector. It is conferred by the Regulatory Affairs Professional Society (RAPS) upon successful performance on a standardized proficiency exam, and in consideration of the applicant's education, training, and overall experience. Continuing education and assumption of leadership roles in the profession are necessary to maintain recertification, which is granted every three years, upon submission of appropriate justification. In addition to maintaining the RAC credential, in 2009 I was named a RAPS Fellow (FRAPS), a peer-reviewed credential that recognizes senior regulatory professionals based on experience, contributions, and leadership in the regulatory profession.

In sum, I have the peer-reviewed qualifications of a RAPS Fellow based on professional experience, credentials, and training. Being RAPS certified[1] and a RAPS Fellow (FRAPS),[2] I have achieved the highest level experience within my profession, Level IV, as outlined in the Regulatory Affairs Professional Development Framework.[3]

I earned a Bachelor of Science degree, *magna cum laude*, in Microbiology from Louisiana Polytechnic University and a Doctor of Philosophy (PhD) degree in Toxicology, with a Pharmacology minor, from Indiana University (Medical School campus). I performed my doctoral

---

[1] I tested for and achieved RAPS's Regulatory Affairs Certification ("RAC"). The development of the RAC examination and selection process was based upon extensive research on the scope of practice and specific activities of the profession. This research has been replicated and updated several times, with studies extended to professionals involved with the European, US, and Canadian regulatory systems.

[2] The program recognizes professionals with over 15 years of regulatory experience for their significant contributions and leadership. Fellows receive a prestigious status and serve as important resources for strategic dialogue, mentoring, implementation of special initiatives, and international development. RAPS Fellows, *available at* http://www.raps.org/membership-amp-benefits/raps-fellows.aspx (last visited Feb. 24, 2012).

[3] The Regulatory Affairs Professional Development Framework offers a model for describing the basic body of knowledge and relevant skills of the RA profession across product lines, geographic locations and employer types at four major career stages. The skills, knowledge, and experience that I provide are reflected in this research-driven whitepaper.

research predominantly at the Eli Lilly Laboratory for Clinical Research in Indianapolis, Indiana. My doctoral research included the planning and hands-on conduct of all aspects of three clinical pharmacology and toxicology studies. As the prior valedictorian for my high school, I was recognized in 2008 for my career accomplishments by induction to the Bossier High School Alumni Hall of Fame.

A copy of my current Curriculum Vitae is attached as Appendix A.

**B.     Methodology**

I have been asked to address the actions of Masimo Corporation (hereinafter, Masimo) in the context of the company's regulatory responsibilities as the manufacturer of the following medical devices and, specifically, in response to Masimo's experts' reports concerning these products:

- Masimo Rainbow SET Radical-7 Pulse CO-Oximeter and Accessories (hereafter, Radical-7);
- Masimo Rainbow SET Pronto Pulse CO-Oximeter and Accessories (hereafter, Pronto); and
- Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter and Accessories (hereafter, Pronto-7).

To that end I have been asked to show how Defendant's experts' reports are incomplete, are inaccurate because they did not consider certain information; to show documents and information that refute defendant's experts' opinions; and to show how the opinions would be different had the experts considered certain pertinent information.

All of my opinions expressed in this Report are offered to a reasonable degree of scientific and professional certainty.

During the preparation of this Report, I followed the same approach I have employed for decades in a non-litigation context, adhering as closely as practically possible to the scientific method. In part, I reviewed, consulted, and relied upon the following categories of information, listings of which are provided in Appendix B:

a) Applicable industry standards including FDA-related statutes, regulations and guidance documents;
b) Masimo 510(k) Premarket Notifications and/or 510(k) Summaries, numbers K080238, K082052, K091057, K092356, K100403, K101031, K111403, BK120070, and related Masimo and FDA correspondence;
c) 510(k) Premarket Notification Summaries for HemoCue Hemoglobin 201 system, number K032203, and HemoCue Hb 301 system, number K061047;
c) Other Masimo documents of multiple types produced in this litigation;
d) Deposition transcripts/arbitration record as listed in Appendix B; and
e) Expert reports of Ann A. Graham; Peter Barton Hutt; David E. Goodman, MD, MSE; William M. Moore; Constantijn (Stan) Panis; James Nichols, PhD, DABCC, FACB; Keith Ruskin, MD; Joel Brill, MD; Leslie Norwalk; and
f) FDA website, including the searchable 510(k) database; medical device recalls; the

Manufacturer and User Facility Device Experience (MAUDE) Database for reports of serious adverse events.

I conducted independent research using the Internet and FDA website among other sources. I compared the conduct and activities documented in the record I reviewed to industry standards.

A number of the documents and testimony I reviewed are cited in footnotes throughout this Report as primary reference materials. I have endeavored to provide a comprehensive statement of the basis for my opinions, but given the vast documentation in the record, in some cases my citations are illustrative and not exhaustive.

In reaching my opinions, based on my review, critical evaluation, synthesis, integration, and analysis of the body of the record, I brought to bear my educational background, professional training, and experience in the fields of regulatory affairs and medical product research and development, including clinical testing to determine medical product safety and efficacy. I also drew upon the real world lessons learned from my industry experience.

The methodology I employed and level of scrutiny applied to the totality of the evidence in this matter and in the preparation of this report are no different than those used in my practice over the course of my career as an expert in regulatory affairs and medical product research and development, including the testing and evaluation of medical product safety and efficacy, and as a researcher, educator, and scientist in general. Essentially, I questioned the opinions of Masimo's experts, conducted background research, constructed theories, tested those theories against the additional information I reviewed and the industry standards I am aware of through my knowledge, experience, and training, analyzed my findings, and communicated my conclusions herein.

I conducted comprehensive observations and analysis of the record and my independent findings (e.g., FDA research). I employed logical reasoning to my findings and explanations, formed conclusions, and validated them through information in the record. I drew conclusions from my observations based on my extensive and specialized experience. My conclusions about Masimo's conduct are rooted in my review of pertinent portions of the regulatory history and Masimo's internal company documents and testimony.

My opinions are grounded in well-established techniques, processes, and methods. They reflect practices commonly undertaken in industry within the context of the applicable, complex federal regulatory scheme that informs and guides industry standards and conduct.


## II.      INDUSTRY STANDARDS AND PRACTICES: REGULATORY CONTEXT

The purpose of this Section is to establish the regulatory and scientific foundation on which my professional opinions are based and set forth in this report, in addition to those based on my decades of industry experience, training, and education. Thus, I will provide a brief overview of the regulatory context in which companies operate and the standards companies use to develop their own standards and practices. I will describe device classifications and the corresponding premarket submissions required in order for a manufacturer to obtain FDA's authorization to sell a medical device in the U.S. I will complete this Section with a detailed explanation of a device

manufacturer's postmarket responsibilities concerning (i) labeling and advertising and (ii) postmarket vigilance, or surveillance.

## A.      FDA Authority and Manufacturer Regulatory Compliance

The U.S. Food and Drug Administration (FDA) within the Department of Health and Human Services (HHS) is responsible for regulatory oversight of the manufacture, sale, and distribution of medical devices in the United States under authority of the Federal Food, Drug, and Cosmetic Act (FDCA). Within the FDA, the Center for Devices and Radiological Health (CDRH) is the center that has the responsibility to develop and implement regulations for the purpose of protecting the public health in the field of medical devices. Ensuring optimum safety and device effectiveness, however, requires the cooperation of all stakeholders involved in the life cycle of a medical device: the manufacturer, FDA, and the end users. Each has a specific role to play in risk management.

The medical device manufacturer means any person who designs, manufactures, fabricates, assembles, or processes a finished device.[4]   The term "person" includes individual, partnership, corporation, and association.[5] Manufacture, preparation, propagation, compounding, assembly, or processing of a device means the making by chemical, physical, biological, or other procedures of any article that meets the definition of a device in Section 201(h) of the FDCA:[6] an article intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or intended to affect the structure or any function of the body but which does not achieve its primary intended purposes through chemical action and is not dependent upon being metabolized to achieve its primary intended purposes.

The FDA does not design and conduct either nonclinical or clinical studies to support device safety and effectiveness; it will advise on the adequacy of studies proposed by the manufacturer and then review the completed study results and other information submitted to FDA to determine if the materials submitted support the safety and effectiveness of the device sufficiently to clear or approve the device for sale for the requested indication(s) for use. Importantly, the FDA's capacity to monitor every single medical device, or drug/biologic, postmarketing is limited.  There are more than 20,000 companies worldwide that produce over 80,000 brands and models of medical devices in the U.S. marketplace, according to CDRH.[7] That is why FDA depends on the cooperation and good faith of the device manufacturer to comply with FDA's regulatory decisions and applicable FDA regulations.  It is the manufacturer's responsibility to ensure its devices are labeled and marketed in compliance with applicable FDA regulations.

While the FDA maintains a passive postmarketing surveillance system for safety concerns, the limitations of such a system underscore why the manufacturer is responsible for implementing a postmarket vigilance (surveillance) program. Specifically, the manufacturer must investigate and report to the FDA all serious or life-threatening adverse events about which it becomes aware

---

[4] 21 CFR § 820.3(o).
[5] Section 201(e) of the Federal Food, Drug, and Cosmetic Act (FDCA).
[6] 21 CFR § 807.3(d).
[7] AdvaMed (Advanced Medical Technology Association). The 510(k) Process:  The Key to Effective Device Regulation, 8/19/08, p.2.

*Peggy Pence, Ph.D., RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

if there is a reasonable suggestion that the manufacturer's device may have caused or contributed to such events. Additionally, the manufacturer must investigate and report device malfunctions if the subject device or a similar device marketed by the manufacturer would be likely to cause or contribute to a serious or life-threatening injury if the malfunction were to recur. If the manufacturer becomes aware of the "need for remedial action from any information, including any trend analysis" in order "to prevent an unreasonable risk of substantial harm to the public health," the manufacturer must report such information to the FDA immediately (i.e., within five work days after becoming aware of the event).[8] The manufacturer must also maintain systems that ensure access to such adverse event information for timely follow-up and FDA inspection.[9]

In recent years, the FDA's authority and its capacity to discharge its responsibilities have been reviewed by independent agencies, including the Institute of Medicine and the Government Accountability Office (GAO). Summarily, these reports have recognized that FDA lacks the capacity to provide adequate oversight. While FDA continues efforts to address its increasingly complex public health mission of assuring medical product safety, effectiveness, and quality, the findings in these reports further emphasize why it is of critical importance for the device manufacturer to act in good faith at all times to ensure compliance with its responsibilities, as set forth in the applicable regulations, to prevent unnecessary risk to the public health.

The FDA provides multiple alternative avenues to medical device companies to assist them in interpreting any perceived grey areas in the regulations. Reasonably prudent medical device manufacturers avail themselves of these avenues provided by the FDA to ensure compliance, particularly when a question arises as to the proper course of regulatory action. These multiple alternative avenues include guidance documents and the ability to call the FDA, email the FDA, and meet with the FDA. In addition, reasonably prudent medical device manufacturers are always expected to err on the side of caution, i.e., regulatory compliance, when faced with any uncertainty or ambiguity in the regulations.

## B.    Device Classifications

FDA classifies medical devices into one of three regulatory classes based on the level of risk associated with use of the device and the level of control necessary to reasonably assure that the device is safe and effective for its intended use. Devices posing the lowest risk are placed in Class I and are subject to the least regulatory control. Class I devices, such as elastic bandages and tongue depressors, present minimal potential for harm to the user and are subject to the "General Controls" applicable to all medical devices. General Controls are the basic provisions of the 1976 Medical Device Amendments to the FDCA that provide the FDA with the means of regulating devices to ensure their safety and effectiveness. General Controls include provisions for adulteration, misbranding, establishment registration and device listing, premarket notification [510(k)], records and reports, and Good Manufacturing Practices/Quality System Regulation (QSR), among others.[10]

Class II devices pose incrementally greater risk such that the General Controls are not sufficient to provide reasonable assurance of safety and effectiveness. Class II devices are subject to "Special

---

[8] 21 CFR § 803.53(a).
[9] 21 CFR § 803.17(b)(4).
[10] 21 CFR § 860.3; Device Advice – General Controls for Medical Devices, US FDA/CDRH.

Controls" in addition to General Controls.   Special Controls may include labeling requirements, performance standards, postmarket surveillance studies, or other controls the Agency deems necessary to provide reasonable assurance of the safety and effectiveness of the device. Masimo's Radical-7, Pronto, and Pronto-7 are Class II devices for the indications for use for which these devices were 510(k)-cleared. Electrocardiographs and powered bone drills are other examples of Class II medical devices. Highest-risk devices, such as some implants and life-supporting devices, are placed in Class III and generally are subject to Premarket Approval (PMA), which is discussed below, and means that an application must be submitted to and approved by FDA before the device may be legally marketed.

## C.     The PreMarket Review Process:  510(k) vs. PMA

In general, unless exempt under FDA regulations, devices are subject to one of two types of FDA premarket review before they may be legally marketed in the United States.   Class I and II devices subject to premarket review are required to obtain FDA clearance through the premarket notification, or 510(k) process; Class III devices are required to obtain FDA approval through the more stringent PMA process.   (There is a third but infrequently used alternative, the Product Development Protocol [PDP], which combines plans for an Investigational Device Exemption [IDE] to conduct a clinical trial.)   Most Class I devices and a few Class II devices are exempt from the 510(k) requirements but are not exempt from other General Controls, which are discussed in Section II.B. above. All medical devices must be manufactured under a quality assurance program, be suitable for the intended use, be adequately packaged and properly labeled, and have establishment registration and device listing forms on file with the FDA.[11]

A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is at least as safe and effective, i.e., substantially equivalent (SE), as a legally marketed device. Legally marketed devices, in this context, include any device that was legally marketed prior to May 28, 1976 (i.e., a preamendments device), for which a PMA is not required, and any device which has been found SE through the 510(k) process.[12] To support substantial equivalence claims, the device that is the subject of a 510(k) must be compared to one or more similar legally marketed devices, commonly referred to as "predicate(s)."   A claim of substantial equivalence does not mean the new and predicate device(s) must be identical.  SE is established with respect to intended use, design, materials, manufacturing process, performance, safety, effectiveness, labeling, standards, and other characteristics, as applicable.   While clinical trials generally are not necessary for 510(k) submissions, FDA may require the conduct of clinical trials to substantiate the safety and effectiveness of a device in approximately 10-15% of cases and also may require postmarket surveillance to obtain 510(k) clearance.

In addition to the traditional method of demonstrating substantial equivalence under section 510(k) of the FDCA, there are two alternative approaches that may be used, under appropriate circumstances, to demonstrate substantial equivalence: (i) "Special 510(k): Device Modification" option, which utilizes certain aspects of the Quality System Regulation, and (ii) "Abbreviated 510(k)" option, which relies on the use of guidance documents, special controls, and FDA-recognized consensus standards to facilitate 510(k) review.   In accordance with the Quality

---

[11] Device Advice – Class I/II Exemptions, US FDA/CDRH.
[12] 21 CFR § 807.92(a)(3).

System Regulation,[13] manufacturers must establish and follow a systematic set of pre-production design controls when initially designing medical devices or when making subsequent modifications to those designs. If a manufacturer is intending to modify its own legally marketed device and the modification does not affect the intended use of the device or alter the fundamental scientific technology of the device, then summary information that results from the design control process can serve as the basis for 510(k) clearance, and the "Special 510(k): Device Modification" option may be utilized.[14]

Further, FDA has provided guidance to assist the medical device manufacturer to decide when a change to an existing device already in commercial distribution represents a significant change that requires a 510(k) premarket notification,[15] i.e., a change that could significantly affect the safety or effectiveness of the device or a major change in the intended use of the device.[16] "The type of modifications addressed in the guidance includes labeling changes, technology or performance specifications changes, and materials changes. When making the decision on whether to submit a 510(k), the manufacturer's basis for comparison of any changed device should be the device described by the cleared 510(k). The guidance includes a main flowchart to help manufacturers through the logic scheme necessary to arrive at a decision on when to submit a 510(k) for a change to an existing device. If a manufacturer's consideration of all proposed changes results in a decision that a 510(k) submission is not required, they should document the basis for the decision, including the application of the flowchart model, along with the necessary records of the validation of changes to the device. In those circumstances where the proposed change is not addressed in the flowchart or in a device-specific guidance document, manufacturers are encouraged to contact the Office of Device Evaluation in CDRH to find out whether other, specific guidance exists or if additional help is available."[17]

Following submission of a 510(k), the subject device may not be marketed in the U.S. until the 510(k) applicant receives a letter (i.e., order) declaring the device substantially equivalent, thereby "clearing" the device for marketing.  This is an important distinction in that the device is not technically "approved" by the FDA as with a PMA but instead is said to be cleared, or 510(k)-cleared, for marketing.   A substantially equivalent determination means that the new device is at least as safe and effective as the predicate(s), specifically, that the new device has:

    (1) The same intended use and the same technological characteristics as the predicate(s); or
    (2) The same intended use and different technological characteristics, and the information submitted to FDA:
        a. Does not raise new questions of safety and effectiveness; and
        b. Demonstrates that the new device is at least as safe and effective as the predicate device(s).

Importantly, if the intended use of the candidate device is different than that of the predicate(s), there cannot be a finding of substantial equivalence.

---

[13] 21 CFR Part 820: Quality System Regulation.
[14] The New 510(k) Paradigm - Alternate Approaches to Demonstrating Substantial Equivalence in Premarket Notifications - Final Guidance, US FDA/CDRH, March 20, 1998.
[15] FDA Guidance: Deciding When to Submit a 510(k) for a Change to an Existing Device (K97-1), January 10, 1997.
[16] 21 CFR § 807.81(a)(3).
[17] FDA Guidance: Deciding When to Submit a 510(k) for a Change to an Existing Device (K97-1), January 10, 1997.

Technically, by regulation[18] the FDA has 90 days to review the 510(k) and issue a SE or not substantially equivalent (NSE) determination. If the FDA determines that a device is NSE (novel), it is considered Class III and will require a PMA prior to marketing. At this point, the 510(k) sponsor has the following options: (1) cease plans to market the device; (2) request reclassification; (3) submit a request for evaluation of the automatic Class III designation; (4) present new evidence (data) in support of a 510(k) clearance; or (5) proceed to develop the device through the PMA route. A class II device that is introduced into commercial distribution without a required 510(k) clearance is considered "adulterated" and "misbranded" and subject to regulatory sanctions.

A PMA application is generally considered to be a more rigorous process than the 510(k) and is analogous to the New Drug Application (NDA) or Biologics License Application (BLA) that must be submitted for review and approval prior to marketing for drugs and biologics, respectively. The PMA is generally required for Class III devices that are determined to be either novel or that pose a significant risk of illness or injury.[19] Approval hinges on a demonstration of safety and effectiveness through the presentation of valid scientific evidence. Most often, this path requires the conduct of prospective controlled clinical trials conducted in accordance with the strict Good Clinical Practice (GCP) standards established by the FDA and the International Community. By regulation[20] the FDA has 180 days to review a PMA and issue a decision concerning approval of the application. In general, a Class III device that is introduced into commercial distribution without an approved PMA is considered "adulterated" and "misbranded" and subject to regulatory sanctions.

**D.      Determination of Safety and Effectiveness**

Although the manufacturer may submit any form of evidence to the Food and Drug Administration in an attempt to substantiate the safety and effectiveness of a device, the agency relies upon only valid scientific evidence to determine whether there is reasonable assurance that the device is safe and effective for its conditions of use. Valid scientific evidence may include evidence from well-controlled investigations, partially controlled studies, studies and objective trials without matched controls, well-documented case histories conducted by qualified experts, and reports of significant human experience with a marketed device, from which it can fairly and responsibly be concluded that there is reasonable assurance of the safety and effectiveness of a device under its conditions of use. Isolated case reports, random experience, reports lacking sufficient details to permit scientific evaluation, and unsubstantiated opinions are not regarded as valid scientific evidence to show safety or effectiveness.

**There is reasonable assurance that a device is safe when valid scientific evidence exists to support a determination that the probable benefits to health from use of the device for its intended uses and conditions of use, when accompanied by adequate directions and warnings against unsafe use, outweigh any probable risks. The valid scientific evidence used to determine the safety of a device shall adequately demonstrate the absence of unreasonable risk of illness or injury associated with the use of the device for its intended uses and conditions of use.** Types of evidence that may be submitted to FDA to demonstrate there is

---

[18] 21 CFR Part 807.
[19] 21 CFR Part 814.
[20] 21 CFR § 814.40.

reasonable assurance that a device is safe include nonclinical investigations, including both in vitro studies and also studies using laboratory animals, and clinical trials using human subjects.

## E.  Device Label, Labeling, Advertising, and Misbranding

The General Controls applicable to all devices include provisions for proper labeling and misbranding.  The Federal Food, Drug and Cosmetic Act (FDCA) is the law under which the FDA takes action against manufacturers for labeling and advertising violations concerning products it regulates, including medical devices.  The following are standard terms and principles used within industry and applied in industry practice. These form the basic building blocks for industry to establish governing standards of practice and are built upon through use of experience, training, and as circumstances dictate.

### *1.  Applicable Definitions*

The laws enacted by the U.S. Congress concerning products regulated by the FDA are implemented by the FDA as enforceable regulations.  Together, these laws and implementing regulations define the terms that are applicable to device labeling, advertising, and misbranding. Some of the terms that are significant for purposes of this Report include the following.

#### *1.1  Label:* **Section 201(k) [21 U.S.C. 321(k)] of the FDCA defines "label" as a:**

> "display of written, printed, or graphic matter upon the immediate container of any article..."

The term "immediate container" does not include package liners. Any word, statement, or other information appearing on the immediate container must also appear "on the outside container or wrapper, if any there be, of the retail package of such article," or must be "easily legible through the outside container or wrapper."

#### *1.2  Labeling:* **Section 201(m) [21 U.S.C. 321(m)] of the FDCA defines "labeling" as:**

> "all labels and other written, printed, or graphic matter
> (1) upon any article or any of its containers or wrappers, or
> (2) accompanying such article" at any time while a device is held for sale after shipment or delivery for shipment in interstate commerce.

The term "accompanying" is interpreted liberally to mean more than physical association with the product. It extends to posters, tags, pamphlets, circulars, booklets, brochures, instruction books, direction sheets, fillers, etc.  "Accompanying" also includes labeling that is brought together with the device after shipment or delivery for shipment in interstate commerce.[21] Training and instructional videos are considered labeling. Websites are also considered under this broad definition of labeling, and the statements a manufacturer makes about its product on websites are regulated as labeling and must be truthful and accurate.

---

[21] Device Advice – Labeling Requirements, US FDA/CDRH.

### 1.3    Indications for Use

The general statement of "Indications for Use" identifies the target population in a significant portion of which sufficient valid scientific evidence has demonstrated that the device as labeled will provide clinically significant results and at the same time does not present an unreasonable risk of illness or injury associated with the use of the device.[22]

### 1.4    Intended Uses

The term "intended uses" refers to the objective intent of the persons legally responsible for the labeling of the device.  The intent is determined by their expressions or may be shown by the circumstances surrounding the distribution of the device.  This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such representatives. It may be shown by the offering or the using of the device, with the knowledge of such persons or their representatives, for a purpose for which it is neither labeled nor advertised.[23]

### 1.5    Contraindications

This term refers to situations in which the device should not be used because the risk of use clearly outweighs any possible benefit.  Known hazards and not theoretical possibilities are to be listed as contraindications.  For example, if hypersensitivity to an ingredient in the device has not been demonstrated, it should not be listed as a contraindication.[24] Furthermore, should a medical device manufacturer have information that its medical device does not perform well in certain patient populations, it should list that information in the contraindications section.

### 1.6    Directions for Use (DFU) (or Instructions for Use [IFU])

This means the providing of directions to the practitioner or layman (e.g., patient), as appropriate, so that s/he can use the device safely and for the purpose(s) for which it is intended. "Directions for Use" also include indications for use and appropriate contraindications, warnings, precautions, and adverse reaction information. Directions for Use requirements applicable to prescription devices appear throughout 21 CFR Part 801.[25]

### 1.7    Fair Balance

For advertising and promotional materials, this term means that advertisements must communicate fairly and in a balanced manner information relating to side effects and contraindications and information relating to effectiveness of the product.[26] In other words, information about side effects and contraindications must be comparable in depth and detail with claims for safety and effectiveness.

---

[22] Device Labeling Guidance 3/8/91 (G91-1) – Blue Book Memo.
[23] 21 CFR § 801.4; Device Labeling Guidance 3/8/91 (G91-1) – Blue Book Memo.
[24] *Id.*
[25] Device Labeling Guidance 3/8/91 [G91-1] – Blue Book Memo.
[26] 21 CFR §§ 202.1(e)(5) and (6).

### 1.8    Prescription Device

By definition under 21 CFR § 801.109, this is a device which, because of any potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe except under the supervision of a practitioner licensed by law to direct the use of the device, and hence for which "adequate directions for use"[27] cannot be prepared.

### 2.    *General Device Labeling:  21 CFR Part 801*

General labeling requirements for medical devices have been established in 21 CFR Part 801. Guidance on "Indications for Use," "Contraindications," "Warnings," "Precautions," and "Adverse Reactions" paraphrase applicable provisions in the labeling requirements for prescription drugs.[28]

A premarket notification must normally only contain proposed labeling sufficient to describe the device's intended use, as discussed in the "Blue Book" 510(k) Memorandum #K86-3 dated June 30, 1986.[29] Accordingly, a 510(k) finding of substantial equivalence does not connote approval of the proposed labeling. However, in the case of devices with special labeling requirements and devices for which inclusion of specific directions for use, contraindications, warnings, etc., in the labeling may be critical to a finding of equivalence, CDRH's Office of Device Evaluation (ODE) 510(k) labeling review includes an evaluation of compliance of the proposed labeling or portions thereof, as appropriate.

In contrast, specific labeling is approved as part of a PMA. While, FDA will approve a PMA on the basis of draft final labeling if the only deficiencies concern editorial or similar minor deficiencies in the draft final labeling, PMA approval depends on incorporation of the specific labeling changes exactly as directed and the manufacturer is required to submit to FDA a copy of the final printed labeling before marketing.[30] Labeling changes that affect the safety or effectiveness of a device require a PMA supplement and can be done without FDA approval via a Special PMA Supplement only when such modifications are based on newly acquired information and evidence of a causal relationship between the product and a safety signal. New information "must reveal risks of a different type or greater severity or frequency than previously included in submissions."[31,32] Importantly, routine review of patient labeling for all original PMAs and panel-track supplements will be conducted by the FDA Division of Device User Programs and Systems Analysis (DDUPSA) when human factors for the usability of the device need to be considered.[33]

---

[27] 21 CFR § 801.5.
[28] 21 CFR Part 201; Device Labeling Guidance 3/8/91 [G91-1] – Blue Book Memo.
[29] Guidance on the CDRH Premarket Notification Review Program 6/30/86 [K86-3]: 510(k) Memorandum #K86-3.
[30] FDA Device Advice: Device Regulation and Guidance. PMA Labeling
  http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/HowtoMarketYourDevice/PremarketSubmission
  s/PremarketApprovalPMA/ucm050390.htm.
[31] 21 CFR § 814.39 PMA Supplements.
[32] Modifications to Devices Subject to Premarket Approval (PMA)-The PMA Supplement Decision. Dec 11, 2008
  http://www.fda.gov/medicaldevices/deviceregulationandguidance/guidancedocuments/ucm089274.htm#4e.
[33] FDA Memorandum of Understanding Regarding Patient Labeling Review (Blue Book Memo #69-3).

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

### 3.   *The Meaning of Intended Use*

To determine whether or not a new device has the same intended use as a predicate device, CDRH assesses any difference in label indications based on the safety and effectiveness questions they may raise. As described in Section II.C., "same intended use" is a key determinant in assessment of substantial equivalence.  CDRH considers such points as condition or disease to be treated or parts of the body or types of tissue involved, etc. If a new device is determined to have the same intended use, CDRH may then proceed to determine whether or not it is substantially equivalent. Devices that do not have the same intended use cannot be substantially equivalent.[34]

### 4.   *Promotion and Intended Use*

Products are cleared or approved for certain intended uses.  Change in Intended Use may require a new clearance or approval.  New Intended Use can be created by:

> (1)   Labeling, advertising, or promotional claims;
> (2)   Oral statements;
> (3)   Manifestations of objective intent;[35]
> (4)   Expressions;
> (5)   Circumstances of distribution; and
> (6)   Offering with knowledge of use.[36]

### 5.   *Labeling and Advertising (General Device Labeling: 21 CFR Part 801)*

The distinction between labeling and advertising, both of which draw attention to the article to be sold, is often superficial or nebulous. Both are used for a similar purpose, i.e., to provide information about the product.  Thus, according to an appellate court decision, "[m]ost, if not all, labeling is advertising. The term 'labeling' is defined in the FDCA as including all printed matter accompanying any article. Congress did not, and we cannot, exclude from the definition printed matter which constitutes advertising."[37]

While advertising and promotion are not defined in the FDCA and FDA regulations for medical devices, FDA interprets any activity used by the sponsor to create an interest in the company's products, including the Internet, as advertising.[38]  It is noteworthy that FDA has defined prescription-drug advertising as including "advertisements in published journals, magazines, other periodicals, and newspapers, and advertisements broadcast through media such as radio, television, and telephone communication systems."[39]

Jurisdiction over medical device advertising is split between the FDA and the Federal Trade Commission (FTC).  The FTC has primary oversight responsibility for the advertising of non-restricted devices. The FTC prohibits advertising that is false and misleading and requires

---

[34] Guidance on the CDRH Premarket Notification Review Program 6/30/86 [K86-3]: 510(k) Memorandum #K86-3.
[35] 21 CFR §§ 201.128, 801.4.
[36] 21 CFR § 801.4.
[37] *United States v. Research Laboratories, Inc.*, 126 F.2d 42, 45 (9th Cir. 1942), *cert. denied*, 317 US 656 (1942).
[38] FDA Docket No. 2005N-0354.
[39] 21 CFR § 202(l)(1).

Peggy Pence, Ph.D., RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

substantiation of all claims that are made in advertisements.[40]  With regard to the advertising of medical devices, the FTC has defined substantiation as requiring balanced, scientific evidence in the form of well-controlled clinical studies.

Except in extraordinary circumstances, FDA cannot require prior approval of the content of any advertisement except in the case of any printed matter which FDA determines to be labeling as defined in Section 201(m) of the FDCA.[41]  In practice, many items that could meet the definition of "advertising" also meet the definition of "labeling" and are regulated by FDA as labeling.

### 6.   *Misbranding*

Section 502 of the FDCA (21 U.S.C. § 352) contains provisions on misbranding and false or misleading labeling.  A device is misbranded if:

(1)   Its labeling is false or misleading in any particular;[42]
(2)   Its advertising is false or misleading in any particular;[43]
(3)   It is dangerous to health when used in the dosage or manner or with the frequency or duration prescribed, recommended, or suggested in the labeling;[44]
(4)   Its labeling does not bear adequate warnings;[45]
(5)   There is a failure to furnish any materials or information requested by or under Section 519 of the FDCA on reports and records;[46] and
(6)   There is a failure to have a necessary 510(k) clearance.[47]

Pursuant to the FDCA § 201(n), a device is misbranded when there is a failure to reveal material facts.

In summary, prescription medical devices such as Masimo's Radical-7, Pronto, and Pronto-7 are misbranded if their labels do not bear information for use including indications, effects, routes, methods, frequency and duration of administration (as applicable), and any relevant hazards, contraindications, side effects and precautions under which practitioners licensed by law to administer the devices can use them safely and for the purpose for which they are intended, including all purposes for which they are advertised or represented,[48] or if there is a failure to obtain the necessary 510(k) clearance.

A medical device may be misbranded not only if the actual label contains false or misleading representations, but also if the device's advertising fails to reveal facts material to the representations made or consequences that may result from the use of the product under the conditions of use prescribed in the labeling or advertising or under such conditions of use as are

---

[40] 15 U.S.C. § 45.
[41] Device Labeling Guidance 3/8/91 [G91-1] – Blue Book Memo.
[42] FDCA § 502(a).
[43] FDCA § 502(j).
[44] 21 U.S.C. § 352.
[45] FDCA § 502(f)(2).
[46] FDCA § 502(t).
[47] FDCA § 502(o).
[48] Device Labeling Guidance 3/8/91 [G91-1] – Blue Book Memo.

Ex_1_Page_22

customary or usual.[49]  Labeling and advertising must therefore present a fair balance of information relating to the side effects and effectiveness of the product.

### 7.    *False or Misleading Labeling*

The phrase "false or misleading" is not confined in meaning to untrue, forged, fraudulent, or deceptive.  The word "misleading" in the FDCA means that labeling is deceptive if it creates or leads to a false impression in the mind of the reader.  A "false impression" may result not only from a false deceptive statement, but may also be instilled in the mind of the consumer by ambiguity, misdirection, or failure to inform the consumer of facts that are relevant to those statements actually made**.  In other words, the label that remains silent as to certain consequences may be as deceptive as the label that contains extravagant claims.**[50]

Examples of false or misleading labeling include, among others:
  (1)   Unsubstantiated claims of therapeutic value;
  (2)   Expression of opinion or subjective statements; and
  (3)   Failure to reveal material facts, consequences that may result from use, or the existence of difference of opinion.[51]

### 8.    *Warnings*

Product labeling is a primary cornerstone of managing product safety, because communication of serious risk is critical to prevent or mitigate product risk.   Thus, labeling content, including warning statements when required to protect users, is a key factor in determining whether there is reasonable assurance that a device is safe and effective for its intended use.

Warning statements on "Instructions for Use" should be delineated by underlining, bold print, boxing, etc.  The purpose of "Warnings" is to describe serious adverse reactions and potential safety hazards, the limitations of device use due to such concerns, and steps that should be taken if they occur.  A causal relationship need not have been proved.

A warning is insufficient if the reader does not understand or appreciate the consequences of failure to comply with the Warning.   Hazard alert research has shown that giving a clear idea of the risk has a significant effect on readers.[52]

### 9.    *Dear Doctor, or Dear Health Care Professional, Letters*

The Center for Drug Evaluation and Research, Manual of Policies and Procedures MAPP 6020.10 is entitled  "Dear Health Care Professional" (DHCP) letters and applies specifically to those DHCP letters that concern information about significant hazard to health and/or important changes in package labeling.[53]  FDA issued a new Draft Guidance in November 2010 titled "Dear Health Care

---

[49] 21 U.S.C. § 321(n).
[50] Device Advice – Labeling Requirements: Misbranding, US FDA/CDRH.
[51] *Id.*
[52] *Id.*
[53] Manual of Policies and Procedures MAPP 6020.10: NDAs: "Dear Health Care Professional" Letters, effective date 7/2/03, issued by CDER, FDA.

Provider Letters: Improving Communication of Important Safety Information."[54]  This guidance provides recommendations to industry and FDA staff on the content and format of DHCP letters, which are correspondence, usually in the form of a mass mailing from the manufacturer or distributor, to alert physicians and other health care providers responsible for patient care about important new information regarding a human drug or biologic (hereafter "drug").

While the cited policy and guidance are designed for drugs, the policies discussed are equally applicable for medical devices.  For example, the overall concepts of the July 2007 Guidance for Industry and Staff titled "Writing *Dear Doctor* Letters for Recalls of Implantable Cardioverter Defibrillators (ICDs)"[55] are reflective of the general policies discussed in the referenced drug policy and guidance documents. Moreover, the latter guidance states that the recommendations in the guidance draw from "FDA's own research, risk communication principles, and other efforts to standardize the information in *Dear Doctor* letters."[56]

The drug policy makes clear that the FDA may or may not be involved in reviewing DHCP letters before they are mailed.  In other words, a company may send out a Dear Health Care Professional letter without approval from the FDA in the event that the company believes that a significant health hazard may endanger patients or that an important labeling change needs to be seen by physicians or other health care professionals. Nevertheless, as stated in the new Draft Guidance, FDA believes that effective communication of important new information in DHCP letters can best be accomplished if FDA and the manufacturer work together.

**F.     Quality System Regulation (QSR) and Design Controls**

The 1976 Medical Device Amendments to the FDCA provided for FDA to prescribe Good Manufacturing Practice (GMP) requirements to ensure that medical devices are consistently manufactured according to written specifications and are safe and effective for their intended use. The original GMP regulation became effective on December 18, 1978.  In 1990, FDA initiated efforts to revise the regulation due to a large number of device failures and recalls resulting from design defects.  The Safe Medical Devices Act of 1990 (SMDA) amended Section 520(f) of the FDCA, providing FDA with the authority to require design controls as part of the GMP regulation. On October 7, 1996, FDA revised the GMP regulation with publication of the Quality System Regulation (QSR), which became effective June 1, 1997.  The QSR[57] requires medical device manufacturers to implement and comply with procedures covering the following broad areas: quality system requirements; design controls; document controls; purchasing controls; identification and traceability; production and process controls; acceptance activities; nonconforming product; corrective and preventive action; labeling and package control; handling, storage, distribution, and installation; records; servicing; and statistical techniques.  Of particular importance to the subject matter of this report and thus discussed below are the quality system requirements, design controls, and complaint files (latter addressed in the QSR under Subpart M, Records).

---

[54] (Draft)  Guidance for Industry and FDA Staff: Dear Health Care Provider Letters: Improving Communication of Important Safety Information, issued November 2010, CDER/CBER, FDA.
[55] Guidance for Industry and FDA Staff: Writing *Dear Doctor* Letters for Recalls of Implantable Cardioverter Defibrillators (ICDs), issued July 19, 2007 by CDRH, FDA.
[56] *Id.*
[57] 21 CFR Part 820.

*Peggy Pence, Ph.D., RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

### 1.   *Quality System Requirements*

The manufacturer is required to establish and maintain a quality system appropriate for the medical devices it designs and manufactures.[58]  It is the responsibility of executive management to establish the quality policy and commitment to achieving quality at all levels of the organization.[59]  Among management's other responsibilities is the requirement to establish a quality plan that defines the practices, resources, and activities necessary to meet quality requirements.[60]  The suitability and effectiveness of the quality system must be reviewed frequently enough to ensure that the company's quality system is in compliance with QSR requirements.  Effectiveness of the quality system is required to be monitored through the conduct of periodic audits, the results of which must be reviewed by management with executive responsibility.[61]  Further, the QSR emphasizes that appropriately educated and adequately trained and experienced personnel are necessary to assure that an effective quality system is not only established but maintained.[62]

### 2.   *Design Controls*

Design control requirements apply to all Class II and Class III medical devices and certain Class I devices.[63]  The purpose of the QSR design control requirements is to ensure that the design of a medical device is monitored and controlled such that all specified design requirements are achieved.  The phases of design controls[64] include the following:

- Design input:  physical and performance requirements of the device for its intended use, including the needs of the user and patient;
- Design output: results of the design effort at each design phase and at the end of design development, including the device, labeling and packaging, associated specifications and drawings, and production and quality assurance specifications and procedures;
- Design review: conduct of formal, documented reviews of design results at appropriate intervals during device design development;
- Design verification: testing to verify the design output meets design input requirements;
- Design validation: (i) testing device performance under actual or simulated conditions of use, in order to establish by objective evidence that device specifications satisfy user needs and intended use(s); (ii) includes risk analysis, where appropriate;
- Design transfer: transition of device design from research and development to production specifications;
- Changes in device design: procedures for the identification, documentation, validation or where appropriate verification, review and approval of design changes before implementation.

---

[58] 21 CFR § 820.5.
[59] 21 CFR § 820.20(a).
[60] 21 CFR § 820.20(d).
[61] 21 CFR § 820.22.
[62] 21 CFR § 820.25.
[63] 21 CFR 820.30(a).
[64] 21 CFR 820.30(c) through (i).

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

### 3. *Complaint Files*

Device manufacturers are required to establish and maintain procedures for receiving, reviewing, and evaluating complaints. A "complaint" is defined as "any written, electronic, or oral communication that alleges deficiencies related to the identity, quality, durability, reliability, safety, effectiveness, or performance of a device after it is released for distribution."[65]  Complaint handling procedures must ensure that all complaints are processed in a uniform and timely manner, that oral complaints are documented upon receipt, and that complaints are evaluated to determine whether the complaint represents an event that is required to be reported to FDA as a Medical Device Report.  Any complaint that is an MDR-reportable event must be promptly reviewed, evaluated, and investigated.[66]  Note that Medical Device Reporting requirements are discussed below in Section II.G.

Notably, all complaints must be reviewed and evaluated to determine if an investigation is necessary.  If an investigation is not done, the reason it was not done and the name of the individual responsible for the decision not to investigate must be maintained in the complaint files.  Any complaint involving the possible failure of a device, its labeling or packaging to meet specifications must be reviewed, evaluated, and investigated, unless investigation has already been done for a similar complaint and another investigation is not necessary.[67]

### G. Manufacturer Serious Adverse Event Reporting Requirements

### 1. *Historical Perspective*

Since 1984, domestic manufacturers of medical devices have been required to report to the FDA all device-related deaths, serious injuries, and certain malfunctions.  The statutory authority for the Medical Device Reporting (MDR) regulation is Section 519(a) of the Federal Food Drug & Cosmetic Act (FDCA).  On September 14, 1984 (49 FR 36326), FDA issued Medical Device Reporting (MDR) regulations for manufacturers and importers under the FDCA and the Medical Device Amendments of 1976 (Public Law 94-295).  To correct weaknesses noted in the 1976 amendments and to better protect the public health, Congress enacted the Safe Medical Devices Act of 1990 (SMDA) (Public Law 101-629). SMDA imposed significant new reporting requirements on the medical device industry, including user facilities and distributors of medical devices.  To implement SMDA and changes mandated by the Medical Device Amendments of 1992 (Public Law 102-112) (amending certain provisions, Section 519 of the FDCA, relating to reporting of adverse events), FDA published the final MDR regulation for user facilities and manufacturers in the Federal Register on December 11, 1995.  The new MDR regulation became effective on July 31, 1996.

The FDA Modernization Act of 1997 (FDAMA) (Public Law 105-115) was signed on November 21, 1997, and FDAMA changes to medical device adverse event reporting (MDR) became effective on February 19, 1998.  On January 26, 2000, changes to the implementing regulations, 21 CFR Parts 803 and 804, were published in the Federal Register to reflect these amendments in the FDCA.  Also, Part 804, Medical Device Distributor Reporting, was removed.  The MDR Rule changes became effective March 27, 2000.

---

[65] 21 CFR § 820.3(b).
[66] 21 CFR § 820.198.
[67] *Id.*

## 2.   *Postmarket Vigilance/Surveillance – Medical Device Reporting (MDR) Regulation: 21 CFR Part 803*

The purpose of Medical Device Reporting is to protect the public health by ensuring that devices are not adulterated or misbranded and are safe and effective for their intended use. The MDR regulation provides a mechanism for the FDA and manufacturers to identify and monitor significant adverse events in order that safety problems may be detected and corrected in a timely manner.  While the requirements of the regulation can be enforced through legal sanctions authorized by the FDCA, accomplishing the objectives of the regulation is dependent on the compliance and cooperation of manufacturers and other affected entities such as user facilities, importers, and distributors.

Reporting device problems to the FDA is a critical communication link to ensure the safety and effectiveness of marketed medical devices.  FDA continually evaluates the Manufacturer and User Facility Device Experience Database (MAUDE), which includes reports of adverse events involving medical devices, to detect potential hazards, or safety signals.  The sooner the FDA learns about a problem, the sooner the Agency can take action to evaluate actual or potential risk and ensure that any necessary corrective action is initiated to protect patient safety.  Sometimes a single report can initiate this action.[68]

### 2.1 Applicable Definitions

The FDA defines the terms that are used in the MDR regulation.  Some of the terms that are significant for purposes of this Report include:

2.1.1   *MDR reportable event (or reportable event)*:  An event that user facilities (e.g., hospital, ambulatory surgical facility, outpatient treatment facility) become aware of that reasonably suggests that a device has or may have caused or contributed to a death or serious injury; or an event that manufacturers become aware of that reasonably suggests that one of their marketed devices:
i.   May have caused or contributed to a death or serious injury, or
ii.   Has malfunctioned and that the device or a similar device marketed by the manufacturer or importer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

2.1.2   *Malfunction* means the failure of a device to meet its performance specifications or otherwise perform as intended.  Performance specifications include all claims made in the labeling for the device.  The intended performance of a device refers to the intended use for which the device is labeled or marketed, as defined in 21 CFR § 801.4.

2.1.3   *Become aware* means that an employee of the manufacturer has acquired information that reasonably suggests a reportable adverse event has occurred.
1) For an event that is required to be reported within 30 calendar days, a

---

[68] Improving Patient Care by Reporting Problems with Medical Devices. *A MedWatch Continuing Education Article*. Uniformed Services University of the Health Sciences and FDA. September 1997.

manufacturer is considered to have become aware of the event when any of its employees becomes aware of the reportable event.

2) For an event reportable within 5 work days, the manufacturer is considered to have become aware of the event when any of its employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.

2.1.4   *Reasonably suggests* means any information, including professional, scientific, or medical facts, observations, or opinions, that may reasonably suggest that a device has caused or may have caused or contributed to a MDR reportable event.

2.1.5.   *Caused or contributed* means that a death or serious injury was or may have been attributed to a medical device, or that a medical device was or may have been a factor in a death or serious injury, including events occurring as a result of failure, malfunction, improper or inadequate design, manufacture, labeling, or user error.

2.1.6.   *Serious injury* means an injury or illness that:
1) Is life-threatening;
2) Results in permanent impairment of a body function or permanent damage to a body structure; or
3) Necessitates medical or surgical intervention to preclude   permanent impairment of a body function or permanent damage to a body structure.

2.1.7   *Permanent* means irreversible impairment or damage to a body structure or function, excluding trivial impairment or damage.

2.1.8   *"The term 'user error'* means any error made by the person using the device. A user error may be the sole cause or merely contribute to a reportable event. As with the 1984 regulation, there is the requirement for reports of certain adverse device events caused by user error. For example, device injuries attributed to user error may show that the device is misbranded within the meaning of section 502(f) of the FD&C Act [21 U.S.C. 352(f)] in that the device fails to bear adequate directions for use or adequate warnings. Reports of adverse events that result from user error may alert FDA to the need for improved labeling to prevent future injuries. (Refer to the FR preamble, page 63583, Final Rule, December 11, 1995.)"[69]

With these definitions in place, I will now address the manufacturer reporting requirements for the investigation, evaluation and reporting of serious adverse events.

---

[69] Medical Device Reporting for Manufacturers, Prepared by Division of Small Manufacturers Assistance Office of Communication, Education, and Radiation Programs, FDA CDRH, March 1997.

*Peggy Pence, Ph.D., RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

### 3.   *Overview of Manufacturer Reporting Requirements*

Part 803 of the Code of Federal Regulations Title 21 (21 CFR Part 803) is the implementing regulation for Medical Device Reporting. This Part establishes the requirements for medical device reporting for medical device manufacturers, importers, user facilities, and distributors. Regulations from this Part that are applicable to my analysis and professional opinions herein include the following:

(1) **Deaths and serious injuries that a manufacturer's device has or may have caused or contributed to must be reported to the FDA**;
(2) **Certain device malfunctions must also be reported**;
(3) The device manufacturer is required to establish and maintain adverse event files;
(4) The device manufacturer is required to submit supplemental/follow-up reports when new (required) information is obtained that was not available when the initial Medical Device Report was submitted to FDA.

### 4.   *Reporting of Adverse Events*

A manufacturer is required to investigate, evaluate and submit reports of adverse events to the FDA pursuant to 21 CFR § 803.10(c); § 803.20(a), (b)(3); §803.50(a), (b); §803.52; §803.53; §803.56.

#### 4.1  *30-Day Reports*

A manufacturer must submit reports of individual adverse events no later than 30 calendar days after the day that the manufacturer becomes aware of information from any source that reasonably suggests that a device may have caused or contributed to a death, serious injury, or a malfunction that, should it recur with the device in question or a similar device, would be likely to cause or contribute to a death or serious injury.[70]

#### 4.2  *5-Day Reports*

In the case of a reportable event that requires remedial action to prevent an unreasonable risk of substantial harm to the public health, the manufacturer must submit reports of individual adverse events no later than five (5) work days after the day the manufacturer becomes aware of the event. The manufacturer may become aware of the need for remedial action from any information, including any trend analysis.

Additionally, the FDA may make a written request for the submission of a 5-day report.  In such case, the manufacturer must submit, without further requests, a 5-day report for all subsequent events of the same nature that involve substantially similar devices for the time period specified in the written request, which time period may be extended if FDA determines it is in the interest of the public health.[71]

---

[70] 21 CFR § 803.10(c)(1); § 803.20(b)(3); § 803.50(a).
[71] 21 CFR § 803.10(c)(2); § 803.20(b)(3); § 803.53.

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

### 4.3  Mandatory Reporting Information Requirements

The manufacturer must submit such mandatory reports using the FDA Form 3500A.[72]  On this form, the manufacturer must provide all information required that is reasonably known to the manufacturer.

4.3.1  *Reasonably known* is considered to include the following information:
  a)  Any information that the manufacturer can obtain by contacting a user facility or other initial reporter;
  b)  Any information in the manufacturer's possession;
  c)  Any information that the manufacturer can obtain by analysis, testing, or other evaluation of the device.[73]

4.3.2  The manufacturer is responsible for obtaining and submitting to FDA information that is incomplete or missing from reports submitted by user facilities and other initial reporters.[74]

4.3.3  The manufacturer is responsible for conducting an investigation of each event and evaluating the cause of the event.   If the manufacturer cannot submit complete information on a report, it must provide a statement explaining why this information was incomplete and the steps taken to obtain the information.[75]

4.3.4  If the manufacturer later obtains any required information that was not available at the time the initial Medical Device Report was filed, it must submit this information in a supplemental report.[76]

### 5.  *When is a Manufacturer Excused from Submitting an MDR?*

A manufacturer does not have to report an adverse event if it has information that would lead a person who is qualified to make a medical judgment reasonably conclude that a device did not cause or contribute to a death or serious injury.[77]   Persons qualified to make a medical judgment include physicians, nurses, risk managers, and biomedical engineers.   The manufacturer must keep in its MDR event files the information that the qualified person used to determine whether or not a device-related event was reportable.

A manufacturer is not required to submit a Medical Device Report if it determines that the information received is erroneous in that a device-related adverse event did not occur.[78]  The manufacturer must retain documentation of such report in its MDR files for the time periods specified below under "Records Retention."[79]

---

[72] 21 CFR § 803.20(a).
[73] 21 CFR § 803.50(b)(1).
[74] 21 CFR § 803.50(b)(2).
[75] 21 CFR § 803.50(b)(3).
[76] *Id.*
[77] 21 CFR § 803.20(c)(2).
[78] 21 CFR § 803.22(b)(1).
[79] 21 CFR § 803.18(c).

When a manufacturer receives reportable event information for a device it does not manufacture, it is not required to submit a Medical Device Report, but the manufacturer must forward this information to the FDA with a cover letter explaining that it did not manufacture the device in question.[80]

### 6. *The Submission of a MDR is Not an Admission of a Causal or Contributory Relationship*

21 CFR § 803.16 makes clear that the manufacturer's submission of an MDR or release of that report by FDA is not necessarily an admission that the device, or the manufacturer or its employees, caused or contributed to the reportable event.  The manufacturer does not have to admit and may deny that the report or information submitted under 21 CFR Part 803 constitutes an admission that the device, the manufacturer or its employees, caused or contributed to the reportable event. This regulation underscores the purpose of Medical Device Reporting, even when the manufacturer is in doubt that its device caused or contributed to a reportable event, i.e., to ensure that signals are not overlooked but can be identified and acted upon by the company and the FDA in a timely manner.

### 7. *Requirements for Written MDR Procedures and Recordkeeping*

#### 7.1 *Standardized Procedures*

The manufacturer must develop, maintain, and implement written MDR procedures to identify, communicate, and evaluate adverse events.  There must be a standardized review process for determining when an event meets the criteria for reporting under 21 CFR Part 803, and the information must be submitted to the FDA timely. Records must be maintained for all information that was evaluated to determine if an adverse event was reportable, and all Medical Device Reports and information submitted to FDA must be maintained.  The company must have systems that ensure timely access to these records for follow-up and inspection by FDA.[81]

#### 7.2 *Establishing and Maintaining MDR Event Files*

The manufacturer of a medical device is required to establish and maintain MDR event files.  All MDR event files must be clearly identified and maintained to facilitate timely access.[82]

"MDR event files" are written or electronic files and must contain:

1) Information in the manufacturer's possession or references to information related to the adverse event, including all documentation of deliberations and decision-making processes used to determine if a device-related death, serious injury, or malfunction was or was not reportable under 21 CFR Part 803; and
2) Copies of all MDR forms, as required by 21 CFR Part 803, and other information related to the event that the manufacturer submitted to FDA.

---

[80] 21 CFR § 803.22(b)(2).
[81] 21 CFR § 803.17.
[82] *Id.*

Peggy Pence, PhD, RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

A manufacturer may maintain MDR event files as part of its complaint file, under 21 CFR Part 820, if the MDR reportable events are prominently identified as such.

### 7.3   *Records Retention*

The medical device manufacturer must retain an MDR event file relating to an adverse event for a period of two (2) years from the date of the event or a period of time equivalent to the expected life of the device, whichever is greater.[83]

## 8.   *Global Harmonization Task Force (GHTF) Guidances: Postmarket Vigilance*

The Global Harmonization Task Force (GHTF) was conceived in 1992 to address the growing need for international harmonization in the regulation of medical devices, with two principal aims: (i) enhancing patient safety and (ii) increasing access to safe, effective, and clinically beneficial medical technologies worldwide.  Note that GHTF was disbanded and transitioned its unfinished work to its successor organization in 2012: IMDRF, International Medical Device Regulators Forum.  During its approximately 20-year existence, GHTF was a partnership between regulatory authorities and the regulated medical device industry and was comprised of five Founding Members: United States, European Union, Canada, Australia, and Japan.  Beginning in 2006, membership expanded to include three Liaison Body members:  International Organization for Standardization (ISO), International Electrotechnical Commission (IEC), and Asian Harmonization Working Party (AHWP). A primary purpose of the GHTF was to encourage convergence in regulatory practices related to ensuring the safety as well as the effectiveness/performance and quality of medical devices.  This was accomplished through the development and dissemination of harmonized guidance documents concerning basic regulatory practices. These documents were developed by different GHTF Study Groups and provide a model for the regulation of medical devices and adoption/implementation by national regulatory authorities.

The GHTF Study Group 2 (SG2) was responsible for developing guidance documents concerning medical device vigilance such as medical device reporting and postmarket surveillance. Specifically, SG2 was charged first with reviewing current adverse event reporting, postmarket surveillance and other forms of vigilance for medical devices and performing an analysis of different requirements amongst countries with developed device regulatory systems and then using this information to develop harmonized guidances for data collection and reporting systems. A number of the finalized SG2 guidance documents provide medical device industry standards of practice applicable to the subject matter of this Report, e.g.: (i) Adverse Event Reporting Guidance for the Medical Device Manufacturer or its Authorized Representative;[84] (ii) Manufacturer's Trend Reporting of Adverse Events;[85] and (iii) Medical Devices Post Market Surveillance: Global Guidance for Adverse Event Reporting for Medical Devices.[86]

---

[83] 21 CFR § 803.18(c).
[84] GHTF FINAL DOCUMENT: Adverse Event Reporting Guidance for the Medical Device Manufacturer or its Authorized Representative. June 29, 1999.
[85] GHTF FINAL DOCUMENT: Manufacturer's Trend Reporting of Adverse Events. January 2003.
[86] GHTF FINAL DOCUMENT: Medical Devices Post Market Surveillance: Global Guidance for Adverse Event Reporting for Medical Devices. November 30, 2006.

Peggy Pence, PhD, RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

Timothy A. Ulatowski, former Director, Office of Compliance, Center for Devices and Radiological Health (CDRH), U.S. Food and Drug Administration, advised device manufacturers at the 2009 AAMI/FDA Conference on Medical Device Standards and Regulation to keep apprised of the GHTF, as its new standards and guidance documents could influence FDA regulation, stating that "Companies need to become more aware because we're all moving in this direction." "GHTF is becoming the global nomenclature."[87]

### 9. *Underreporting of Adverse Events*

The FDA relies on the MedWatch postmarketing surveillance program to monitor drug (and biologics) adverse reactions through a database known as the Adverse Event Reporting System (FAERS) and the MAUDE database for Medical Device Reporting. Despite these mandatory and voluntary reporting programs, postmarket adverse event underreporting is pervasive throughout the system. The FDA recognizes that only a small percentage of the total burden of adverse events is captured through MedWatch and "generally assumes that only 1 in 10 adverse (drug) events is reported."[88] Although device-related adverse events are at least as common as drug-related events in the hospital, in-hospital device use and device-related problems are poorly documented.[89,90] This vast under-recognition of device-related problems may help to explain why the rate of postmarket adverse event reporting is even bleaker for medical devices, with congressional reports estimating that as few as 1 in 100 medical device reportable events are actually reported.[91] Bright and Shen estimated that, at the national level, 14% of adverse medical device effects were reported to CDRH in 2003. However, since this estimate was based on hospital discharge records, the true rate of underreporting for this population is unknown but certainly less than 14%.[92]  Reasons for underreporting of adverse events include, among others, that healthcare providers may be too busy or fail to see that reporting would be useful, may be unaware of the FDA medical device adverse event reporting program, or fear blame for the medical device adverse event.[93]

---

[87] Ulatowski: GHTF to Guide FDA Regulations, Guidances. *The QMN Weekly Bulletin*. April 17, 2009; Vol 1 No 16.
[88] Drazen JM et al. Current adverse event reporting systems. Adverse Drug Event Reporting: The Roles of Consumers and Health-Care Professionals: Workshop Summary, Forum on Drug Discovery, Development, and Translation. *National Academy of Sciences* 2007.
[89] Ensuring the Safety of Marketed Devices. CDRH's Medical Device Postmarket Safety Program. Jan. 18, 2006. Appendix B, Epidemiological aspects of postmarket medical device safety, estimates of the frequency of adverse medical device events, lack of documentation in healthcare records of device use and device-related problems, underreporting of adverse medical device events.
[90] Samore MH et al. Surveillance of medical device-related hazards and adverse events in hospitalized patients. *JAMA* 2004;291:325-334.
[91] Ensuring the Safety of Marketed Devices. CDRH's Medical Device Postmarket Safety Program. Jan. 18, 2006. Appendix B, Epidemiological aspects of postmarket medical device safety, estimates of the frequency of adverse medical device events, lack of documentation in healthcare records of device use and device-related problems, underreporting of adverse medical device events.
[92] Bright RA and Shen J. Use of a free, publicly-accessible data source to estimate hospitalizations related to adverse medical device events. Draft manuscript, 2005.
[93] Ensuring the Safety of Marketed Devices. CDRH's Medical Device Postmarket Safety Program. Jan. 18, 2006. Appendix B, Epidemiological Aspects of Postmarket Medical Device Safety.

## H.    Recalls

FDA defines "recall" as a "firm's removal or correction of a marketed product that the Food and Drug Administration considers to be in violation of the laws it administers and against which the agency would initiate legal action, e.g., seizure."[94]  "Removal means the physical removal of a device from its point of use to some other location for repair, modification, adjustment, relabeling, destruction, or inspection."[95] A "correction" is defined as "the repair, modification, adjustment, relabeling, destruction, or inspection (including patient monitoring) of a device without its physical removal from its point of use to some other location."[96,97]

Recalls may be initiated by a medical device manufacturer, or they may be conducted by the manufacturer at FDA's request or by FDA order under statutory authority.[98]  Recalls initiated by the manufacturer or conducted upon FDA's request are considered voluntary recalls.  Those conducted in response to FDA order are mandatory recalls. In practice, almost all medical device recalls are voluntary.

A manufacturer's decision to conduct a voluntary recall is based on a determination that the product is violative under the FDCA and that the FDA would be likely to initiate legal action.  In making such determination, the manufacturer should consider if a violation of the adulteration and misbranding provisions of the FDCA exists.  Under 21 CFR Part 7, a field correction can be done as appropriate if a manufacturer determines a recall is necessary.  To continue the marketing and sale of violative product may constitute prohibited acts under the FDCA.


## III.    MASIMO CORPORATE AND PRODUCT BACKGROUND

Masimo Corporation, located in Irvine, CA, was founded in 1989 by Mr. Joe Kiani.  A global medical technology company, Masimo has focused its product development and commercialization efforts on the manufacture of noninvasive patient monitoring technologies, including medical devices and a variety of sensors.  Masimo is particularly recognized for its 1995 development of measure-through motion and low perfusion pulse oximetry, which achievement was based on its proprietary Signal Extraction Technology® (SET).  Masimo subsequently expanded that technology to develop its Rainbow® SET pulse CO-Oximetry™ products, which both provide pulse oximetry and also measure blood constituents and physiologic parameters.  Three of these Masimo CO-Oximetry products are the subject of this report:  Radical-7; Pronto; and Pronto-7.  My opinions in regards to Masimo's responsibilities and the regulatory-related opinions offered by Masimo's experts concerning the development and commercialization of these products are given below. Supporting information is provided for each opinion.

---

[94] 21 CFR § 7.3(g).
[95] 21 CFR 806.2(i).
[96] 21 CFR 806.2(d).
[97] 21 CFR § 7.3(h).
[98] FDCA § 518, 21 U.S.C. § 360h.

## IV.  OPINIONS WITH SUPPORTING CITATIONS AND APPLICABLE STANDARDS

**A.    OPINION #1:**  The lack of issuance of a Form FDA 483 following FDA's For-Cause inspection of Masimo Corporation on February 2-11, 2011, should not be interpreted that deficiencies did not exist.

Masimo's expert Mr. Peter Hutt opined in his report dated July 26, 2013, that "[t]he failure of FDA to take any formal or informal enforcement action after reviewing promotional materials for the Pronto and Pronto-7 devices and the complaint file associated with these products during the agency's 2011 inspection of Masimo means the agency did not find any deficiencies."[99] The lack of any enforcement action by FDA at this time cannot be interpreted to mean that deficiencies did not exist. Indeed, FDA has discretion to and may act in the future. Of special note, "FDA is currently evaluating the evidence submitted to FDA by Relators' counsel  and Masimo Corporation regarding the Pronto and Pronto 7. FDA has not yet made a final decision regarding possible actions to be taken in response to such evidence."[100]

Moreover, FDA's findings are based only on the information reviewed by the FDA investigators. The exhibits included in the EIR that Mr. Hutt relies on do not reflect the universe of materials Masimo used. Notably, for this reason Mr. Hutt's opinion is at variance with documentation in Masimo's records.

For one example, in a communication from Dr. Marcelo Lamego to Joe Kiani, Dr. Lamego acknowledged *there were regulatory issues that would be of concern to an auditor*.  Specifically, regarding "Quality," he wrote the following:  "When we started P7, our arrangement was that all the quality and regulatory issues would be handled by Corp. After the consultant finished her visit, the *conclusion was that in case of an auditing, P7 would face several issues regarding incomplete documentation*."[101] (Emphasis added.)

I found a number of significant deficiencies during my review of the materials listed in Appendix B and referenced as footnotes in this report.  Those deficiencies are described by the subsequent opinions in this report, along with information that substantiates those opinions. Additionally, my report rebuts Mr. Hutt's opinion that the promotional claims made by Masimo for the Pronto and Pronto-7 in its promotional materials were consistent with the FDA-cleared indications for use statement.[102] Mr. Hutt's opinion implies Masimo did not engage in improper marketing, when in fact it did.

**B.    OPINION #2:**  Masimo improperly marketed its subject products by promoting them for intended uses beyond those covered by its applicable 510(k)s and cleared for marketing by FDA. Specifically, as regards measurement of total hemoglobin concentration (SpHb), Masimo promoted the products for diagnosis instead of the 510(k)-cleared indication for hemoglobin monitoring or spot checking.

---

[99] Expert Report of Peter Barton Hutt, July 26, 2013, page 3, paragraph 10.
[100] Declaration of Joshua Simms, August 27, 2013.
[101] RESPONDENT514247 at 249: Email series August 15-23, 2010, between Joe Kiani and Marcelo Lamego RE: Pronto-7.
[102] Expert Report of Peter Barton Hutt, July 26, 2013, page 17.

1.      **Improper Promotion Beyond FDA-Cleared Uses**

Medical device manufacturers are limited to promoting products only for the indications for use and intended use for which FDA 510(k)-clearance or PMA approval has been obtained. Consequently, it is understood that by promoting medical devices, companies are conveying the products and uses for which they are promoting them as FDA-cleared. Masimo engaged in improper marketing by exceeding the scope of its FDA clearances.

Mr. Peter Hutt in his expert report of July 26, 2013, opines that "the Pronto and Pronto-7 products meet the FD&C Act and FDA regulatory definition of a diagnostic device."[103]  In my professional opinion, none of the subject products was cleared for a diagnostic indication for use.  Nor does the relevant documentation, discussed below in Section IV.B.*1.1*, support Mr. Hutt's opinion.  Accordingly, Masimo's promotion of the subject devices for diagnostic purposes (Please reference Section IV.B.*1.2.2* below.) constituted marketing conduct that violated industry standards.  Masimo's marketing materials and promotional claims, written statements, use of sales representatives, and circumstances of distribution all created a new intended use of the subject devices for diagnostic testing and making treatment decisions in lieu of laboratory testing.  The bases for my opinion are provided in Sections IV.B.*1.1 and 1.2* below.

1.1      *Regulatory History: 510(k)-Cleared Indications for Use*

Exhibit 1 provides the regulatory history of the subject products in tabular format and shows that for the subject products (Radical-7, Pronto, and Pronto-7), the 510(k)-cleared indications for use included only "continuous noninvasive *monitoring*" (Radical-7) or "non-invasive *spot checking*" (Pronto and Pronto-7) of functional oxygen saturation of arterial hemoglobin (SpO$_2$), pulse rate, and total hemoglobin (SpHb), i.e., these products were not cleared or approved to be marketed for diagnostic purposes, in particular, as regards total hemoglobin measurements. (Emphasis added.) [Note that the Radical-7 510(k)-cleared indications for use also included continuous noninvasive monitoring of carboxyhemoglobin saturation and methemoglobin saturation.]  The information and regulatory history of the subject devices, discussed below, substantiates that the 510(k)-cleared indications did not include use of total hemoglobin measurements for "diagnosis" of disease (e.g., anemia) or for treatment decisions.  It is also important to note that according to the regulatory classification of the subject devices, they are "Cardiovascular *Monitoring* Devices." (Emphasis added.)

As discussed previously in this report, devices are classified according to level of risk.  The level of clinical risk associated with an intended use of "diagnosis" is greater than the level of clinical risk associated with the clinical application of "monitoring."  For example, a device, such as any of the subject devices, that *monitors* the status of anemia by measuring total hemoglobin concentration in someone who has already been diagnosed with anemia, presents a lower risk than a device that measures total hemoglobin concentration for the purpose of diagnosing anemia. "Diagnosis" represents a different intended use than "monitoring" and can change the product's regulatory classification, as FDA advised Masimo during its review of Masimo's 510(k) submission number K092356. (Please reference Section IV.B.*1.1.4* below.)

---

[103] Expert Report of Peter Barton Hutt, July 26, 2013, page 15, paragraph 57.

Peggy Pence, Ph.D., RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

### 1.1.1  Rainbow SET® Radical-7 Pulse CO-Oximeter 510(k) Number K080238

The 510(k) for the Radical-7 device was submitted to the FDA on January 30, 2008, and the device was cleared for marketing on May 12, 2008.  Of note, this 510(k) and clearance for marketing included the following two devices, in addition to the Radical-7: Masimo Rainbow SET Rad 87 Pulse CO-Oximeter (Rad 87) and Rainbow SET Rad 57t Pulse CO-Oximeter (Rad 57t).  The Radical-7, Rad 87, and Rad 57t all have the noninvasive monitoring Masimo Rainbow SET technology.

Prior to clearance of these devices, on April 10, 2008, FDA requested additional information from Masimo, including data demonstrating whether certain substances in blood may cause erroneous SpHb readings.[104]  Masimo provided the following response, which impugns Mr. Hutt's opinion noted above:

> "The labeling requirements of ISO 9919 are sufficient to address interference substances because the **devices are not being relied upon for the purpose of diagnosis.  In accordance with the devices' indications for use, Masimo SpHb devices are mainly used for monitoring, checking, and providing trends of a patient's total hemoglobin level**..."[105]

### 1.1.2  Rainbow SET RadCheck Pulse CO-Oximeter 510(k) Number K082052
### (Note: The RadCheck was subsequently renamed "Pronto."[106])

The RadCheck 510(k) was submitted to FDA on July 16, 2008, and claimed substantial equivalence to the Rainbow SET® Rad 57t Pulse CO-Oximeter (K080238), which is "indicated for the continuous noninvasive *monitoring* of functional oxygen saturation of arterial hemoglobin ($SpO_2$) and pulse rate (measured by an $SpO_2$ sensor) and total hemoglobin concentration (measured by an SpCO/SpMet/SpHb sensor)."  The reason for the RadCheck 510(k) submission was to revise "the intended use/indications for use of *continuous monitoring* of the Rad 57t…to *spot checking* for the RadCheck."[107]  Notably, no additional clinical testing was performed for the RadCheck.  According to the RadCheck 510(k) submission, "The performance testing for the Masimo Rainbow SET RadCheck Pulse CO-Oximeter and Accessories (RadCheck) is the same as for the Masimo Rainbow SET Rad 57t Pulse CO-Oximeter and Accessories (Rad 57t) in K080238.  Both the RadCheck and the Rad 57t include the same MX-1 board with Rainbow technology.  They both *provide the same measurements* ($SpO_2$, pulse rate, and SpHb) *with the same accuracies*.  Thus the performance testing in the K080238 filing for the cleared Rad 57t also is applicable for the RadCheck in this filing."[108]  (Emphasis added.) The device was cleared for marketing on October 10, 2008, based on substantial equivalence established by providing the FDA with the same

---

[104] RESPONDENT506499: Email 4/10/2008, from Neel Patel, FDA, to Marguerite Thomlinson, Masimo, Subject: K080238 Masimo Set Radical 7, Rad 87, and Rad 57t.
[105] RESPONDENT506489 at 490: Letter, April 22, 2008, from Marguerite Thomlinson, Masimo, to FDA, Subject: 510(k) Number K080238 Meeting Minutes for Teleconference on 4/22/08.
[106] "..the RadCheck and the Pronto are the same devices," as noted on RESPONDENT501589 at 672, Masimo Pronto Special 510(k), 4/10/09.
[107] RESPONDENT501329 at 349:  Rainbow SET RadCheck Pulse CO-Oximeter and Accessories 510(k), Section 10 – Executive Summary.
[108] RESPONDENT501329 at 588:  Rainbow SET RadCheck Pulse CO-Oximeter and Accessories 510(k), Section 20 – Performance Testing – Clinical.

performance data as was provided for the predicate device for an intended use of "*monitoring*" SpO$_2$, pulse rate, and total hemoglobin concentration, i.e., *not for diagnosis* as Masimo itself confirmed it its response to FDA provided above.

### 1.1.3  Rainbow SET Pronto Pulse CO-Oximeter 510(k) Number K091057

Masimo submitted a "Special 510(k): Device Modification" to FDA on April 10, 2009.  The reason for this submission was to *clarify labeling and intended use*.[109]  Specifically, the device name was changed to "Pronto" and examples of clinical and non-clinical settings for use of the device were added to the "Intended Use/Indications for Use":  "e.g., hospitals, hospital-type facilities, home, clinics, physician offices, blood donation facilities, and ambulatory surgery centers."  Additionally, total hemoglobin was clarified to be total hemoglobin *concentration*, and functional saturation of arterial hemoglobin (SpO$_2$) was clarified to be functional saturation of arterial *oxygen* hemoglobin (SpO$_2$).[110]  (Emphasis added.)  Notably, this 510(k) filing included a declaration, signed by Marguerite Thomlinson, Manager of Regulatory Affairs at Masimo, stating that "[t]he intended use and indications for use of the Masimo Rainbow SET Pronto Pulse CO-Oximeter and Accessories as stated in this premarket notification have not changed from those of the predicate device, the Masimo Rainbow SET Radcheck Pulse CO-Oximeter and Accessories (K082052).  The revisions in the indications for use are only for the purpose of clarification of the indications for use."[111]  Thus, Masimo confirmed that the Pronto was not for the purpose of diagnosis, in keeping with the information provided above for the predicate device history.

It is important to note that Masimo's declaration, submitted to FDA, contradicts the opinion of Ms. Ann Graham, as expressed in her expert report of July 31, 2013.  Specifically, Ms. Graham stated that "Masimo submitted a new 510(k) for the Rainbow SET Pronto Pulse Co-Oximeter and Accessories, K091057, due to Masimo's intent to market the Pronto with a new intended use."  Ms. Graham stated further that "Masimo intended to expand the indications for use to include blood donation facilities and ambulatory surgery centers" and that "FDA issued its substantial equivalence letter, permitting Masimo to market the Pronto with the new indications for use in blood donation facilities, ambulatory surgery centers, homes, clinics, and physician offices."[112]

It is further important to note that if Masimo had submitted this 510(k) for a new intended use, it could not have relied upon the predicate device, i.e., the Masimo Rainbow SET RadCheck Pulse CO-Oximeter, for a finding of substantial equivalence.  As discussed in the regulatory background information in this report, the intended use of the candidate device must be the same as that of the predicate device for FDA to make a determination of substantial equivalence.  Moreover, this 510(k) submission was a Special 510(k), further refuting Ms. Graham's opinion.  As FDA advises, "Modifications to the indications for use of the device or any labeling change that affects the intended use of the device will not be accepted as a Special 510(k)."[113]

---

[109] RESPONDENT501589 at 591: Rainbow SET Pronto Pulse CO-Oximeter and Accessories 510(k), 4/10/09, Cover Letter.
[110] RESPONDENT501589 at 614: Rainbow SET Pronto Pulse CO-Oximeter and Accessories 510(k), 4/10/09, Section 12: Substantial Equivalence Discussion.
[111] RESPONDENT501589 at 606: Rainbow SET Pronto Pulse CO-Oximeter and Accessories 510(k), 4/10/09, Indications for Use and Intended Use Statement.
[112] Expert Report of Ann A. Graham, July 31, 2013, page 20, Section F.3.
[113] FDA Website: How to Prepare a Special 510(k).

The Pronto was cleared on July 9, 2009, for noninvasive spot checking of $SpO_2$, pulse rate, and SpHb.  Masimo began marketing the device in the United States in July 2009.[114]

### 1.1.4.  Masimo Rainbow Pronto 7 Pulse CO-Oximeter 510(k) Number K092356

On July 31, 2009, Masimo submitted a 510(k) for the Pronto 7 Pulse CO-Oximeter.  The reason for this submission was to clarify labeling and intended use.[115]  The proposed indications for use included "noninvasive spot checking of pulse rate and total hemoglobin concentration (SpHb)" but did not include spot checking of $SpO_2$.[116] On October 23, 2009, the FDA reviewer, Mr. Neel Patel, wrote to Ms. Marguerite Thomlinson at Masimo, advising her that he had reviewed the 510(k) and required additional information.  Among the inquiries was the following:

> "The Pronto-7 is intended for spot checking of total hemoglobin and pulse rate.  There are currently no marketed devices which only provide non-invasive measurement of total hemoglobin.  It is not clear how the device will be used.  Please discuss how you intend the device to be used and how the device may potentially be used beyond its intended use."[117]

On November 10, 2009, Ms. Thomlinson responded as follows:

> "As stated in the initial submission, the predicate device for the Pronto 7 is the previously cleared Pronto (K091057).  Both the predicate and the Pronto 7 have the same indications for use and intended use.  Both devices are intended for spot checking of total hemoglobin and pulse rate."[118]

Further discussion ensued regarding the classification of the Pronto 7.  Mr. Patel noted, "Previous devices including SpCO, SpMet, and SpHb have been primarily classified under 870.2700 due to SpO2 measurement.  However, as this device only provides SpHb and pulse rate, we need to determine the appropriate regulation for the device."[119] Ms. Thomlinson replied that "we think the 870.2700 classification is appropriate for the Pronto 7 because Masimo could have easily submitted the Pronto 7 with SpO2 measurement, but we chose not to do so at this time. And we will be incorporating the SpO2 measurement fairly soon, which will make the Pronto 7 almost identical to its predicate (K091057 – the Pronto) in performance and intended use."[120]

On December 28, 2009, Masimo provided the following information to FDA concerning this issue, in addition to a discussion of factors for FDA's consideration in reviewing the Pronto 7 classification:

> "Upon receiving the FDA clearance for Pronto (predicate – K091057), we began marketing it in the US in July 2009.  Soon thereafter, we observed clinicians using it primarily to

---

[114] RESPONDENT500583: Letter, December 28, 2009, Masimo to FDA RE: 510(k) submission no. K092356.

[115] RESPONDENT501697 at 704: Masimo Rainbow Pronto-7 Pulse CO-Oximeter 510(k), Cover Letter.

[116] RESPONDENT501697 at 706: Masimo Rainbow Pronto-7 Pulse CO-Oximeter 510(k), Indications for Use statement.

[117] RESPONDENT507563: Email October 23, 2009, from Neel Patel, FDA, to Marquerite Thomlinson, Masimo.

[118] RESPONDENT502814: Letter, November 10, 2009, from Masimo to FDA RE: 510(k) submission no. K092356.

[119] REPONDENT501680: Email series October 23, 2009, to November 23, 2009, between Neel Patel and Marguerite Thomlinson.

[120] *Id.*

*Peggy Pence, Ph.D., RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

measure Total Hemoglobin (SpHb).  We set out to design a product to meet this need, while maintaining the same intended use and without raising new risks and efficacy issues compared to the predicate.  We also sought to design a simpler, more cost-effective device for clinicians. The resulting product, Pronto 7, is specifically intended for use by trained clinicians for the non-invasive spot-checking of pulse rate and SpHb in situations where blood oxygen saturation (SpO$_2$) measurement is not needed."[121]

"We plan to activate SpO$_2$ parameter in a new version of Pronto 7 and submit it for your review soon.  Upon the clearance of such product we expect to charge a premium for the added parameter."[122]

Subsequently, Masimo received a letter dated December 31st (stamped "2010," apparently inadvertently, instead of "2009") advising the company that the Pronto-7 was determined to be not substantially equivalent (NSE) to the predicate or other legally marketed devices.  This decision was based on the Pronto-7's new indication for non-invasive measurement of total hemoglobin concentration.  The Agency determined that "[t]his measure alone may lead to clinical decisions that would alter the diagnostic effect, impacting safety and effectiveness, and is therefore a new intended use.  Therefore, this device is classified by statute into class III (Premarket Approval), under Section 513(f) of the Federal Food, Drug, and Cosmetic Act (Act)."[123]

In short, the product's regulatory history contradicts Mr. Hutt's opinion that the product was FDA-cleared as a diagnostic. It also refutes his opinion suggesting Masimo properly marketed and labeled its products,[124] because Masimo promoted for uses beyond the scope of its clearance.

### 1.1.5  FDA Meeting to Clarify NSE Letter for K092356

A teleconference with FDA was held on January 6, 2010, at the request of Masimo to obtain clarification on the following text in the NSE letter issued for K092356.

"This decision is based on the fact that your device has a new indication for non-invasive measurement of total hemoglobin concentration.  This measure alone may lead to clinical decisions that would alter the diagnostic effect, impacting safety and effectiveness, and is therefore a new intended use."[125]

The feedback FDA provided to Masimo in this teleconference left Masimo with no doubt that the SpHb measurement could not be promoted for diagnostic purposes.  The excerpts below from the FDA Meeting Minutes provide unequivocal confirmation of FDA's position.

- FDA clarified the basis for the NSE determination as follows:
  "The result of *unbundling of the non-invasive total hemoglobin (SpHb) parameter* is interpreted as a *new intended use* of the device.  Although the indication statement for

---

[121] RESPONDENT500583: Letter, December 28, 2009, Masimo to FDA RE: 510(k) submission no. K092356.
[122] *Id.*
[123] RESPONDENT507548: NSE Letter, Dec 31 2010 (sic), RE: K092356.
[124] Expert Report of Peter Barton Hutt, July 26, 2013, pages 15-17.
[125] RESPONDENT501695: January 6, 2010, Meeting Minutes: Clarification of NSE letter for K092356, from Neel Patel, FDA, to "The Record."

the proposed device only *removed measured parameters from the predicate device indication statement, this changed the clinical context of intended use*.  In the *predicate device, SpHb was considered as a screen* in clinical settings where it can provide a trend measurement between scheduled blood samplings or provide support to other measured parameters such as non-invasive arterial hemoglobin saturation (SpO2).  In contrast, *the intention use of the proposed device is interpreted as a stand-alone diagnostic test that may be used instead of a laboratory determination of hemoglobin concentration*. However, *ARDB does not consider that the hemoglobin assessment in predicate multiparameter oximeter has been demonstrated to be suitable as an independent diagnostic test*.  If oximeter technology is proposed as an alternative to laboratory testing to determine hemoglobin concentration, *new questions of safety and effectiveness need to be addressed*."[126]

- In response to Masimo's acknowledgment that SpHb is used as a sole diagnostic test for clinical decision making in some settings and Masimo's inquiry concerning how this use would affect oximeter-based technological development, FDA provided the following guidance:
  - "…health care providers may use a medical product as they deem in the best interest of their patients consistent with the practice of medicine.  However, *hemoglobin measurement in the context of multiparameter oximeter monitor was not cleared to the same standards of an independent laboratory diagnostic test*.  ARDB further indicated that **hemoglobin assessment by oximetry should not be promoted as a substitute for a laboratory diagnostic test**."[127]
  - "…ARDB encouraged Masimo to *submit a preIDE package* if they intend *to pursue marketing of a device with its primary intended use to noninvasively measure hemoglobin*."[128]

Additionally, Masimo inquired of FDA if the proposed device could be cleared if $SpO_2$ was added back into the product.  ARDB indicated that a new 510(k) would be needed if Masimo would like FDA to evaluate the device as an oximeter analogous to the predicate.[129]  Masimo chose to pursue the latter regulatory route.

Although the record reflects that FDA provided Masimo with information that the 510(k)-clearance would not allow Masimo to promote the device as a diagnostic test, Masimo promoted the device for this purpose in disregard of FDA's direction.  The record I reviewed supporting this opinion is provided in part in Section IV.B.*1.2*.  It is noteworthy that the following Masimo personnel participated in this telephonic meeting with FDA:  Michael O'Reilly, MD, Executive Vice President of Medical Affairs; Paul Jansen, Executive Vice President of Marketing; Yongsam Lee, Chief Information Officer; and Marguerite Thomlinson, Manager of Regulatory Affairs.[130]

---

[126] RESPONDENT501695 at 695-696: January 6, 2010, Meeting Minutes: Clarification of NSE letter for K092356, from Neel Patel, FDA, to "The Record."
[127] RESPONDENT501695 at 696: *Id.*
[128] *Id.*
[129] *Id.*
[130] RESPONDENT501694: Email series January 15-22, 2010, between Neel Patel, FDA, and Marguerite Thomlinson, Masimo, RE: K092356 Pronto-7-Masimo Response.

### 1.1.6 Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter 510(k) Number 100403

In follow up to the NSE letter for the initial 510(k) submission for the Pronto-7 and the January 6, 2010, telephonic meeting with FDA, discussed above, Masimo submitted 510(k) number K100403 to FDA on February 5, 2010, to obtain clearance to market the Pronto-7 Pulse CO-Oximeter.[131] The reason for this submission included revised user interface, output interfaces and power source for the Pronto-7, in addition to different wavelengths and multiple detectors as compared to the predicate Pronto device.[132,133]   The Pronto-7 was cleared for marketing on June 23, 2010, for noninvasive spot checking of $SpO_2$, pulse rate, and SpHb.[134]

On December 23, 2010, Masimo sent an Urgent Voluntary Medical Device Recall letter, dated December 21, 2010, to all affected customers via FedEx.  Masimo initiated this recall on the Pronto-7 Rainbow 4D Reusable Sensor due to incorrect readings of actual finger temperature with a resultant incorrect SpHb measurement.  At the time of the recall, there were reportedly 497 such sensors in worldwide distribution.[135]   Masimo announced the lifting of the voluntary recall on August 8, 2011, while 510(k) number K111403 (discussed below) for the Pronto-7 with new finger sensors was pending 510(k)-clearance.[136]

### 1.1.7 Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter 510(k) Number 111403

Following the recall of the Pronto-7 Rainbow 4D Reusable Sensor, discussed above, Masimo was in the investigative phase and working on a possible sensor design change in February 2011.[137] Subsequently, on May 17, 2011, a new 510(k) was submitted (K111403) based on the same technology of the predicate device, specifically, the Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter and Accessories (Pronto-7, K100403). This "Special 510(k): Device Modification"[138] introduced two new sensor sizes (medium and small) and also an optional Maximum Sensitivity Mode to extend the SpHb detection range. This Pronto-7 device was cleared for marketing on December 30, 2011, for noninvasive spot checking of functional saturation of arterial oxygen hemoglobin (SpO2), pulse rate, and total hemoglobin concentration (SpHb).[139]

In light of the foregoing, contrary to Mr. Peter Hutt's opinion, FDA never cleared Masimo's product as a diagnostic or to be promoted as Masimo repeatedly did. Instead, the scope of its clearance was limited. As a result of the foregoing, it would be inaccurate and inappropriate for Masimo to claim or suggest any of the following: its devices were FDA-approved or cleared

---

[131] RESPONDENT499336: Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter and Accessories 510(k), 2/5/10, Cover Letter.
[132] RESPONDENT499336 at 363: Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter and Accessories 510(k), 2/5/10, Section 10 – Executive Summary.
[133] RESPONDENT499336 at 364: *Id.*
[134] RESPONDENT506537 at 537, 539: K100403 Substantial Equivalence letter, June 23, 2010.
[135] Class 2 Recall Pulse Oximeter, posted February 22, 2011, FDA website: Medical &Radiation Emitting Device Recalls.
[136] Press release, Masimo, August 8, 2011: Masimo Introduces Pronto-7™ Internationally and Lifts Voluntary Recall.
[137] RESPONDENT507567 at 575: May 2011 letter to Masimo from FDA Compliance Branch, Irvine, California, providing copy of the Establishment Inspection Report (EIR) for the February 2-11, 2011, inspection of Masimo corporation.
[138] MASIMO006896 at 903: Special 510(k) Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter and Accessories, Cover Letter, May 17, 2011.
[139] FDA website Releasable 510(k) Database:  K111403 510(k) Summary.

noninvasive diagnostic tests; were FDA-approved or cleared diagnostic tests for Anemia/SpHb; or FDA-approved or cleared as being substantially equivalent to a laboratory co-oximeter. Nevertheless, Masimo did so in substance and form.

### 1.2   *Examples in the Reviewed Materials of Promotion Beyond the Scope of Masimo's FDA Clearance*

Defendant's expert Ms. Ann Graham opines in her report dated July 31, 2013, that "Masimo's Radical 7, Pronto, and Pronto-7 devices were cleared by the FDA for marketing pursuant to the FDA's 510(k) process,"[140] and discusses the six relevant 510(k)s submitted to the FDA between 2008 and 2011.[141] These are the same six 510(k) submissions discussed above in this report. Similarly, Masimo's expert Mr. Peter Hutt opined in his report dated July 26, 2013, that "FDA has determined that the Pronto and Pronto-7 devices are substantially equivalent to a predicate device in terms of safety and effectiveness under the section 510(k) notification process."[142] Notably, I agree with Ms. Graham and Mr. Hutt that these three subject devices were cleared for marketing pursuant to the 510(k) process. Where I disagree is that the scope of the clearances limited Masimo's ability to promote the products as it did. Masimo's improper conduct arises from this difference in the intended use it proposed to FDA in the 510(k) submissions and the resulting indications for use/intended use for which these devices were cleared *versus* the intended use for which Masimo marketed these devices.

As discussed above, Masimo advised the FDA in correspondence related to the Radical 7 510(k) (K080238) that "…the devices are not being relied upon for the purpose of diagnosis." Further, "[i]n accordance with the devices' indications for use, Masimo SpHb devices are mainly used for monitoring, checking, and providing trends of a patient's total hemoglobin level..."[143] FDA's concern about the use of this line of Masimo devices for diagnosis instead of monitoring or spot checking, i.e., the intended uses for which the subject devices were cleared, was affirmed in the correspondence related to 510(k) number K092356, in particular, in the issuance of an NSE letter for this device. As discussed above, FDA determined that the removal of $SpO_2$ from the Pronto-7 device changed the clinical context of the SpHb measurement and in so doing created a new intended use of the device for noninvasive measurement of SpHb. FDA considered that the intended use of the predicate device was to provide a screen in clinical settings where the device can provide trend measurements or provide support for other measured parameters. Very importantly, FDA did not consider the hemoglobin assessment performed by the subject devices to have been demonstrated to be suitable as an independent diagnostic test. The hemoglobin assessment in these devices was not cleared to the same standards as an independent laboratory diagnostic test and, as FDA instructed, should not be promoted as a substitute for a laboratory diagnostic test.

In follow-up to receipt of the FDA meeting minutes, Paul Jansen documented his concern about what the FDA's position meant for the Pronto-7 510(k) submission then under review and also

---

[140] Expert Report of Ann A. Graham, July 31, 2013, page 17, Section F.
[141] *Id.*
[142] Expert Report of Peter Barton Hutt, July 26, 2013, page 3, paragraph 8.
[143] RESPONDENT506490: Letter, April 22, 2008, from Marguerite Thomlinson, Masimo, to FDA, Subject: 510(k) Number K080238 Meeting Minutes for Teleconference on 4/22/08.

claims on the Pronto, stating that a backup plan should be mapped out for a pre-IDE.[144] For both, he suggested a strategy to show the Pronto-7 "to be equivalent to the Stanbio and/or Hemocue device, meaning the 510(k) would add a product code on the lab side."[145] He further noted this would mean reporting accuracy data in lab stats (CV), not monitoring stats (bias, SD, ARMS).[146] It is important to note that Yongsam Lee, in replying to Mr. Jansen, confirmed Masimo's understanding of FDA's position, remarking that "[t]he IDE process is for the device with SpHb alone, which FDA has rejected from being in the oximeter classification. Therefore, FDA has indicated during the call that we should consult with FDA via the pre-IDE process for the device with SpHb alone."[147]

Masimo never applied for and was never granted IDE status. Thus, in this respect, the uses outside the product's cleared indications described herein were experimental.

### 1.2.1  *"Altering" or Changing the Context of the SpO₂ Function*

The month after clearance of the Pronto-7, Mr. Rick Fishel advised Joe Kiani and Paul Jansen that the Physician Office Sales team reported having seen potential SpHb customers who were expressing "concerns over the Pronto-7's SpO2 measurements *even though the focus measurement with the device is SpHb*….questions related to the SpO2 measurement inherently cause the customer to question the SpHb measurement."[148]  (Emphasis added.)  Mr. Fishel questioned, "[C]ould we create a display configuration option where the user elects not to display SpO2%...or where it would take an additional key push?"[149]  Mr. Jansen responded, correctly in my professional opinion, that he thought the regulatory read would be that such an action would be risky, given the prior FDA communications, and "we would need to pair this feature with a new submission that pursues a diagnostic indication based on equivalent accuracy to hemocue."[150] However, at Mr. Fishel's suggestion, Kevin Hammond and Gary Marston "met to develop a talk track for the team regarding SpO2."[151] Mr. Marston (Director, Strategic Marketing) noted that "the best option for the field is to make a software change with SpO2 optional *like the Pronto*. In lieu of the talk track."[152] (Emphasis added.)  The talk track is provided below:

"**Intro**
    The Pronto-7 is the first and only device[153] that provides quick, accurate, noninvasive hemoglobin measurement in less than a minute.  It uses multiple wavelengths of light to

---

[144] RESPONDENT127960: Email series March 24, 2010, between Paul Jansen and Yongsam Lee, copied to Joe Kiani, RE: FDA meeting minutes.
[145] *Id.*
[146] *Id.*
[147] *Id.*
[148] RESPONDENT109901: Email series July 12, 2010, initiated by Kevin Hammond to Jay Hachey and Rick Fishel, then between latter and Joe Kiani and Paul Jansen RE: 1022s for Pronto-7 and Question Concerning Pronto-7 SPO2 Display, respectively.
[149] *Id.*
[150] *Id.*
[151] RESPONDENT122559: Email series July 15, 2010, and August 3, 2010, Gary Marston to Paul Jansen, Rick Fishel, Kevin Hammond, reply from Kevin Hammond RE: Talk Track for the physician office reps regarding SpO2.
[152] *Id.*
[153] Of note, in materials exchanged with Montana's and Washington's WIC programs, Masimo made a similar representation that it was the sole provider of this technology, without revealing the limited scope of its FDA clearance and in direct contradiction of that limited scope. Further, by doing so, Masimo was promoting the product and conveying it was in compliance with FDA regulations and statutes because it cannot promote for non-cleared uses.

measure light absorption through the patient's finger providing hemoglobin, pulse rate, perfusion index and *non-diagnostic SpO2*.

**What do you mean non-diagnostic SpO2?**
As you know traditional SpO2 requires red and infrared light to measure SpO2. For noninvasive spot check hemoglobin testing only one is needed.  If you require a diagnostic pulse oximeter I have the industry standard Rad-5v pulse oximeter that can read through motion and low perfusion. *The Pronto-7 was optimized for quick, accurate, noninvasive spot-check hemoglobin testing* in less than a minute.

**Or**
If *precise SpO2 results* are clinical needed we can offer you the industry gold standard in pulse oximeter *Rad-5v* with SET technology that reads through motion and local perfusion.

**If pressed further they could add the following:**
*We will continue to improve the technology* and if you sign up for the Masimo Customer Assurance Program software updates and upgrades are included."[154]

(Emphasis added.)

This Masimo talk track supports two key conclusions relevant to this litigation.

1) The SpO2 function of the Pronto-7 did not offer precise results, in contrast to the opinion of Masimo's expert Dr. David Goodman, who opined as follows: "There is no reason why a pulse oximeter must use a red LED in order to accurately measure SpO2. Thus, Masimo's use of infrared wavelengths alone in earlier versions of the Pronto-7 and the combination of infrared and red wavelengths in the later versions of the Pronto-7 are entirely valid choices for measuring oxygen saturation levels.  I have seen no data suggesting that such choices affected the safety or effectiveness of the devices."[155] Dr. Goodman's latter statement is refuted both by Masimo's own admission in the above talk track about the limitations of the $SpO_2$ measurement without both red and infrared light and also the above-noted reports of the Physician Office Sales team who expressed concerns about the Pronto-7 $SpO_2$ measurements, to such an extent that Masimo's management constructed the above talk track in an attempt to address the problem.

2) The primary intended use of the Pronto-7 was for measuring hemoglobin.  Yet FDA had advised Masimo that the reason for the NSE letter issued for the initial Pronto-7 510(k) was due to the unbundling of the hemoglobin measurement and removal of the $SpO_2$ function from the device, as this changed the clinical context and created a new intended use, raising new questions of safety and effectiveness that would need to be addressed. Masimo's marketing of the Pronto-7 for this intended use, unsupported by its 510(k) clearance, was a violation of industry practice and improper.

---

[154] RESPONDENT122559: Email series July 15, 2010, and August 3, 2010, Gary Marston to Paul Jansen, Rick Fishel, Kevin Hammond, reply from Kevin Hammond RE: Talk Track for the physician office reps regarding SpO2.
[155] Expert Report of Dr. David E. Goodman, July 31, 2013, paragraph 45, page 21, lines 16-21.

Peggy Pence, *PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

Approximately one month later, Joe Kiani submitted several questions that had arisen with regard to the Pronto-7 to Marcelo Lamego, Chief Technical Officer (Masimo Labs/Cercacor) and Executive Vice President of Regulatory Affairs. Among these was the following: "When can we display SpHb and PI in page one and only on a key-push they get to second page for SpO2 and PR?"[156] Dr. Lamego advised Mr. Kiani, correctly in my professional opinion, that he did not think this should be implemented at all, noting that "this would raise more questions as far as regulatory/quality than the benefits (if any) it may offer."[157] However, Mr. Kiani responded that he had spoken with Yongsam Lee, Chief Information Officer, who did not believe this would cause any issues. If Dr. Lamego had questions, he was advised to talk with Yongsam Lee. Mr. Kiani directed, "Otherwise, please do this for the end of August release, if possible."[158]

Dr. Lamego noted his surprise with Yongsam Lee's recommendation, given the issues about which they had learned[159] and advised Mr. Kiani that the dual measurement screen was not likely to be available in the requested time frame because of multiple changes required to the software. Enabling or disabling $SpO_2$ from the main screen would be easier, he advised, and $SpO_2$ could be accessed through the patient history.[160] Dr. Lamego explained to Mr. Kiani that the concept of a two-page idea arose based on a lack of communication. Specifically, the regulatory team had previously been shown screen shots about $SpO_2$ selection and told that $SpO_2$ is always calculated and stored in patient history and that the operator could disable the $SpO_2$ from being displayed in the measurement screen if desired. "The answer back was that everything was fine and that we could implement it." Subsequently, the regulatory team contacted Masimo's regulatory attorney with the information that the device would stop measuring $SpO_2$ if it was disabled from the main screen, which is incorrect and how the two-page idea began.[161] Mr. Kiani instructed Dr. Lamego that "THE PATIENT HISTORY AREA IS FINE, BUT PLEASE PUT SPO2 and PR THERE."[162]

Mr. Kiani also requested that the $SpO_2$ be changed to show 100% only when the ratio is at the extreme and then for other ratios that would normally show 100, to show 99%. Although Dr. Lamego advised that this would not solve user perception about saturation and, also, the algorithm was under review for improving the spread in the high end, Mr. Kiani wanted the requested change made, remarking as follows: "Given that the red LED SpO2 is far away, this is worthwhile doing."[163] Consequently, Masimo's representations about accuracy in its marketing efforts were improper because they did not comport with device performance.

Within the next approximately one-week period, Paul Jansen gave a talk to new hires, which prompted Dave Zachman to request Mr. Jansen to review a message to the field, including the following information:  "A new version of Pronto-7 software will be available in about two weeks that will *remove the SpO2 reading from the display*."[164] (Emphasis added.) Mr. Jansen replied that

---

[156] RESPONDENT513284: Email series August 15-16, 2010, between Joe Kiani and Marcelo Lamego RE: Pronto-7.
[157] *Id.*
[158] *Id.*
[159] RESPONDENT514247 at 252: Email series August 15-23, 2010, between Joe Kiani and Marcelo Lamego RE: Pronto-7.
[160] RESPONDENT514247 at 250:  *Id.*
[161] RESPONDENT514247 at 249: *Id.*
[162] RESPONDENT514247 at 250: *Id.*
[163] *Id.*
[164] RESPONDENT506515: Email series August 28-30, 2010, between Dave Zachman and Paul Jansen RE: Pronto-7 SpO2 Readings.

there were plans to *improve the technology* but Masimo did not want to forecast the software upgrade changes until they were available. Notably, he remarked further that Web Ex training would be needed because of *some significant changes* that it would be important for the field to understand.  (Emphasis added.) Mr. Zachman noted in reply that everyone understood the $SpO_2$ technology is not SET but "are alarmed at the poor performance of the conventional red over infrared technology, especially in warm and still patients/prospects."[165] It is noteworthy that while Mr. Jansen referred to significant changes in the device, I reviewed no evidence that these changes were reviewed to determine if a new 510(k) submission was required. A 510(k) was not submitted for these changes.

Less than three months after Pronto-7 clearance for marketing, Rick Fishel reported to Joe Kiani that he and Paul Jansen had spoken with Marcelo Lamego and "confirmed that they are making a change to the [software] to accommodate the display of 'partial' page of user selectable P-7 measurements along with an icon on that page to allow the user to request display of the 'full' page of Pronto-7 measurements."[166]

A particularly significant document concerning the display of $SpO_2$ on the Pronto-7 is the draft announcement dated September XX, 2010, titled "Pronto-7 Software Update."[167] The purpose of this document was to announce the availability of new Pronto-7 software with an updated $SpO_2$ algorithm. New sensor software also was required to receive the full benefit of the updated algorithm. The new software was to be implemented immediately in all units, i.e., both demonstration and end user devices.[168]  With this update, the Pronto-7 could be configured to move the display of $SpO_2$, Pulse Rate, and/or PI to a second page of the device.  This configuration enabled the user to show only the SpHb parameter on the first page of the device and to view, or not, the additional parameters ($SpO_2$, Pulse Rate, and PI).  To view the additional parameters, the user must press the "Page 2" icon.[169]  It is important to note that this announcement included a "Known Issues Matrix," which provided a "list of known issues for the Pronto-7 and their respective status."[170] By Masimo's own admission, as documented in this matrix, the Pronto-7 had "Poor SpO2 Performance," the status of which was "In Process," and "Inaccurate SpHb Readings," the status of which was "Pending." Masimo marketed a device with known inaccuracies and known poor performance,[171] further refuting Dr. Goodman's opinion cited above in this section. Moreover, the device with the updated software was focused on providing SpHb measurement; thus, Masimo marketed a device that both produced inaccurate results and had a primary intended use for which FDA had urged Masimo to submit a preIDE package. Masimo violated the standard of care required of a reasonably prudent medical device manufacturer and marketed misbranded and adulterated devices.

Another draft announcement dated September XX, 2010, titled "Pronto-7 and Rainbow 4D Sensor Software Update" also included a matrix of "Known Software Issues and Status."  This matrix

---

[165] RESPONDENT506515: Email series August 28-30, 2010, between Dave Zachman and Paul Jansen RE: Pronto-7 SpO2 Readings.
[166] RESPONDENT508824: Email series September 16, 2010, between Rick Fishel and Joe Kiani, copied to Paul Jansen, RE: Feedback After Discussion with Marcelo Re: Temp Display on Pronto-7.
[167] RESPONDENT544119: September XX, 2010, announcement Re: Pronto-7 Software Update.
[168] *Id.*
[169] RESPONDENT544119 at 120: *Id.*
[170] RESPONDENT544119 at 122: *Id.*
[171] *Id.*

showed "Poor SpO2 Performance" with "Enhanced" status, while "Inaccurate SpHb Readings" remained "Pending."[172] It is particularly noteworthy that this document also describes the dual-page display discussed immediately above, but includes the following recommendation: "It is suggested to configure SpO2 'off' in the first display."[173] Thus, Masimo effectively changed the clinical context of the Pronto-7's intended use, such that the changed device with dual-page display had the same operative feature that was the basis for FDA's NSE determination for the initial Pronto-7 510(k) submission: unbundling of the SpHb parameter for a primary intended use interpretable as a stand-alone diagnostic test that may be used instead of a laboratory determination of hemoglobin concentration.[174]

Notably, on the final version of the above-discussed announcement, all the *pending* issues in the matrix of issues and status were removed.  There were questions related to many of the pending issues which could not be resolved before the deadline to send the memo to the sales force on the night of September 20, 2010.  Thus, Mel Chiba, Director of Business Development and Marketing, advised, "Once we are aligned on what these items are and *if/how it can be resolved*, an updated communication can be sent then. The key right now is to let them know what they're getting with the new software update."[175] (Emphasis added.) This demonstrates that by end of September 2010, the issue of inaccurate SpHb readings had not been resolved for the Pronto-7.  Additionally, if and how the issue could be resolved had not been determined for this marketed device.  Yet I reviewed no evidence to indicate that a notification was sent to customers advising them of the SpHb inaccuracy issue. Marketing materials claimed accuracy and were thus false and misleading. Accordingly, Masimo marketed misbranded devices.  Masimo should not have continued marketing or allowed defective devices to remain in the field in light of the foregoing concerns.

### 1.2.2  Marketing Misconduct

Masimo marketed the Pronto-7 for a primary intended use that had not been cleared or approved by FDA.  Indeed, FDA had urged Masimo to submit a preIDE package if they intended to pursue marketing of a device with its primary intended use to noninvasively measure hemoglobin.[176] Masimo failed to ever submit a preIDE or IDE to FDA and therefore never had IDE status. Instead, disregarding direct guidance from FDA, Masimo marketed the Pronto-7 with a primary intended use of measuring hemoglobin noninvasively, as shown by the examples and testimony provided below. There are also numerous examples, including those provided below, of improper marketing of the subject devices for diagnostic purposes and as a substitute for laboratory testing.

A significant example of marketing misconduct is where, after FDA told Masimo not to market the device as an alternative to an invasive hemoglobin measurement in January 2010, Masimo did exactly that two months later with the re-released Pronto and five months later with Pronto-7, as shown by the marketing materials, RESPONDENT097761 and RESPONDENT513115, among others.

---

[172] RESPONDENT543431 at 431, 434:  September XX, 2010, announcement Re: Pronto-7 and Rainbow 4D Sensor Software Update.
[173] RESPONDENT543431 at 432: *Id.*
[174] RESPONDENT501695: January 6, 2010, Meeting Minutes:  Clarification of NSE letter for K092356, from Neel Patel, FDA, to "The Record."
[175] RESPONDENT543435: Email series September 20, 2010, initiated by Mel Chiba to Jay Hachey and Paul Carter, then Jay Hachey to Paul Carter and Paul Jansen, latter to Jay Hachey and Paul Carter, RE:  revisions on Flash Update.
[176] *Id.*

In contrast to these examples, it is important to note that the product Operator's Manual (Pronto-7),[177] reviewed by FDA in the 510(k), specified that the device "should be considered an early warning device. For measurements of high or low SpHb readings, *blood samples should be analyzed by laboratory instruments* to completely understand the patient's condition." Further, "[i]f patient hypoxemia is indicated, *blood samples should be analyzed by laboratory devices* to completely understand the patient's condition."[178,179] (Emphasis added.)   Marketing materials presented a different message.

- The Pronto™ sales sheet, titled "Noninvasive & Immediate Hemoglobin Testing," suggested for use in daily sales calls, introduces the Pronto as the "first and only noninvasive device for total hemoglobin (SpHb™) testing."[180] Among the listed benefits that the device may provide are the following: *Immediate* intervention and counseling; *Reduces need for next-day lab report* interpretations; *Reduces the need* for painful needle stick and *time-consuming lab visit* – saves time and money."[181] (Emphasis added.) The only reasonable interpretation of the listed benefits is that the device can be used as a substitute for invasive lab testing.

- The Pronto-7 Brochure titled "*Masimo Total Hemoglobin*" presents a discussion of anemia, noting that anemia can be diagnosed by hemoglobin testing, but traditional invasive lab testing provides delayed results and requires a painful needle stick and time-consuming blood draws.  The Pronto-7 is presented as "*A New Solution for Hemoglobin Testing*," facilitating timely *diagnosis* and *treatment decisions* and *reducing the need to wait for lab results*.  For the patient, it *prevents* needle sticks and time-consuming *blood draws* and enables *immediate* face-to-face *counseling with the clinician*.[182] (Emphasis added.) This Brochure leaves no doubt the device is intended for diagnosis and as a substitute for laboratory testing.

- Similarly, a marketing piece for field representatives to leave behind at sales calls points out that anemia is underdiagnosed and undertreated.  Like the Brochure, this piece states that traditional invasive lab testing provides delayed results and requires painful needle stick and time-consuming blood draws. "For the first time ever, the Masimo Pronto-7™ offers noninvasive, quick, and accurate spot-check testing of hemoglobin, $SpO_2$, pulse rate, and perfusion index."[183] In the manner the information is presented, it is interpretable as offering the Pronto-7 as a substitute for invasive lab testing.

---

[177] As the Montana WIC documents illustrate, these manuals were provided to customers within the context of being presented as a diagnostic device and substitute for lab blood draw tests.

[178] RESPONDENT499329 at 388:  Masimo Pronto-7 510(k) Number K100403, Operator's Manual  - Safety Information, Warnings, and Cautions.

[179] RESPONDENT127900: Email series November 1-2, 2010, initiated by Guillermo Gonzalez to Paul Jansen, subsequent correspondence including Anand Sampath, Michael OReilly, Joe Kiani, Steve Jensen, Yongsam Lee, and Paul Carter, RE: Dr. Szmuk Sickle Cell Study.

[180] RESPONDENT001555 at 555-556: Email with attachment January 13, 2009, from Gary Marston to multiple sales personnel, RE: Pronto Sales Sheet.

[181] RESPONDENT001555 at 556: *Id.*

[182] RESPONDENT116460 at 460-461: Pronto-7 Brochure, titled Masimo Total Hemoglobin, 2010.

[183] RESPONDENT121968: Email with attachment June 21, 2010, from Daniel Sun to Steve Jensen and Yongsam Lee, copy to Jay Hachey, Paul Jansen, and Gary Marston, RE: 1305A_Pronto-7 Leave Behind_Front_rev 4.pdf.

- The month after 510(k)-clearance of the Pronto-7, a Territory Manager in South Florida, wrote to Florida Community Health Centers, reporting that he had visited a couple of their clinics that expressed interest in "replacing the invasive Hemocue with our new Pronto-7 non-invasive co-oximeter."[184]   One of the 10 reasons he listed as to why they should be excited about this new technology was to "BE ONE OF THE FIRST doctors in the country to set the new **"Standard of Care"** with non-invasive hemoglobin testing!"[185] Further, he told them "This is the perfect *diagnostic* tool…."[186] (Emphasis added.)

- Marcelo Lamego provided a list of findings to Joe Kiani after a site visit where a Pronto-7 was being deployed. Masimo's objective intent to market the Pronto-7 as a substitute for laboratory measurement of hemoglobin is exemplified by the following strategy recommended by Dr. Lamego:

  > "Several insurance plans (HMOs) pay a fixed amount per subject per year and make special arrangements with particular labs to have all Lab work done through them. Therefore, it is very important to have the sales force convincing the labs that it makes sense biz-wise to loan devices to doctor offices since there is a potential cost reduction (if we price it right obviously) given that *doctors may not require other exams because they know ahead of time thb and sat*, and in addition, *the lab does not need to use disposables and man-hour performing the thb measurements themselves*."[187]   (Emphasis added.)

- John Birkle, West Region Manager, Physician Office Division, wrote to multiple potential customers, thanking them for their interest in the Pronto-7 *Noninvasive Hemoglobin Monitor*. Note that he did not use the device name per the 510(k) Summary:  Pronto-7 Pulse CO-Oximeter. (Emphasis added.) The promotion of the Pronto-7 as a substitute for lab testing is shown by the following statements, listed as key advantages of this exciting new technology:

  - "*Immediate* results……*Reduces the need to wait for next-day lab results*
  -  face-to-face counseling with patient – facilitates timely *anemia diagnosis* and *treatment decisions*"[188,189,190,191,192,193,194] (Emphasis added.)

---

[184] RESPONDENT132799 at 801: Email series July 23-28, 2010, Matt Atwood to Florida Community Health Centers, responses forwarded to Ric Duncan RE: From OW to WOW! The Pronto-7 Hemoglobin System.
[185] RESPONDENT132799 at 802: *Id.*
[186] *Id.*
[187] RESPONDENT514247 at 251: Email series August 15-23, 2010, between Joe Kiani and Marcelo Lamego RE: Pronto-7.
[188] RESPONDENT122714 at 714-715: Email series October 28-29, 2010, from John Birkle, Masimo, to Dr. Ed Lee with latter's reply, RE: Masimo Information Requested \*\*Noninvasive Hemoglobin\*\*.
[189] RESPONDENT122693: Email series October 28, 2010, from John Birkle, Masimo, to Hilda Yanover, Community Pediatrics Medical Group, with latter's reply, RE: Masimo Information Requested \*\*Noninvasive Hemoglobin\*\*.
[190] RESPONDENT122722: Email series October 28-29, 2010, from John Birkle, Masimo, to Reynaldo Makabali, with latter's reply, RE: Masimo Information Requested \*\*Noninvasive Hemoglobin\*\*.
[191] RESPONDENT122690: Email series October 28, 2010, from John Birkle, Masimo, to Dr. David Ege, with latter's reply, RE: Masimo Information Requested \*\*Noninvasive Hemoglobin\*\*.
[192] RESPONDENT122760 at 760-761: Email series October 28-29, 2010, from John Birkle, Masimo, to Kimberly Melton (Lakewood Peds), with latter's reply and Mr. Birkle's response, RE: Masimo Information Requested \*\*Noninvasive Hemoglobin\*\*.

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

- The Maine Center for Disease Control, WIC Nutrition Program, purchased Pronto units, cables, and sensors from Masimo, based on the understanding that Masimo is "the leader in the bloodless Hemoglobin industry and only company who serves this market in the country."[195] The Pronto was "the only product that met [their] specifications," which included *avoiding* painful needle sticks and time consuming *blood draws* and *reducing the need* to wait *for lab results*, among others. SpHb accuracy was noted to be 0.96 g/dl at one standard deviation with bias of .08 g/dl.[196] This purchase demonstrates Masimo's marketing of the subject device as a substitute for diagnostic laboratory testing.

- Masimo's objective intent to market the Pronto-7 for the specific purpose of measuring hemoglobin is exemplified by the omission from the Pronto-7 Technical Bulletin of any description of the accuracy of the device's oxygen saturation (SpO$_2$) measurement.

- Kevin Hammond, Vice President of Physician Office Sales,[197] acknowledged that Masimo marketed the subject products with an intended use of assessing hemoglobin and that was its primary focus.[198]

- Mr. Joe Kiani, Masimo's CEO, affirmed in his testimony that Masimo marketed the Pronto and Pronto-7 with a primary intended use to measure hemoglobin noninvasively.[199]

In light of the foregoing examples, I therefore respectfully disagree with Mr. Peter Hutt's opinions suggesting Masimo properly marketed and labeled its products.[200] Masimo did not.

**C.    OPINION #3:**    Masimo deviated from industry standards by improperly marketing its products as a result of failure to reveal material facts concerning product inaccuracies and, thus, Masimo marketed products dangerous to health when used in the manner recommended or suggested in the labeling.

Masimo marketed the Pronto-7 with full knowledge of product deficiencies, including both SpO$_2$ and SpHb accuracy issues. Please reference the discussion above in Section IV.B.*1.2.1*. Examples of these inaccuracies are given below.   Less than two months after 510(k)-clearance, a new software release was planned. Joe Kiani asked Dr. Lamego what the new software release would provide. Dr. Lamego replied that a key change was to fix "all known bugs including *improvements in spo2 and thb if possible*." (Emphasis added.) The new software release was targeted for end

---

[193] RESPONDENT122825 at 825-826: Email series October 28, 2010, from John Birkle, Masimo, to Dr. Stephen Kundell, with latter's reply and Mr. Birkle's response, including Technical Accuracy Bulletin, RE: Masimo Information Requested **Noninvasive Hemoglobin**.
[194] RESPONDENT122831 at 831-832: Email series October 28-29, 2010, from John Birkle, Masimo, to Dr. Hanaa Hanna, with latter's reply and Mr. Birkle's response, RE: Masimo Information Requested **Noninvasive Hemoglobin**.
[195] 000001 at 000129: State of Maine Pronto purchase information.
[196] *Id.*
[197] RESPONDENT503850: Email with attachments January 10, 2009, Kevin Hammond to Physician Office Team RE: SpHb US Physician Office.ppt; SpHb Accuracy Trend During Surgery.ppt; 2009 Presentation TM Success.ppt.
[198] RT 2/12 487:10-18.
[199] RT 2/19 1686:20-25.
[200] Expert Report of Peter Barton Hutt, July 26, 2013, pages 15-16.

August 2010, but this was not final "given all the fixes that the new release needs and all the quality/regulatory work that needs to be in place before SW release."[201] An algorithm release to explore techniques to unbias the calibration curve at the low end was also planned.[202] Yet the product was actively marketed, and I have found no evidence of any written communication to customers to apprise them of the product deficiencies and the associated impact for device safety and effectiveness. Instead, Masimo continued to make accuracy claims despite knowledge to the contrary. Masimo violated industry practices by its failure to reveal these material facts concerning the Pronto-7 inaccuracies.

Masimo's expert William Moore opined that "[t]he fact that some sales representatives took issue with the devices' performance is not unusual and is to be expected.  Data collected pre FDA-clearance and post FDA-clearance can be different for any number of reasons and does not suggest a particular device does not work. What it does suggest is that the conditions in the laboratory are not being replicated identically in the actual clinical use scenarios presented to the device.  Thus, the results may be different. For example, the equipment used to calculate the reference values in the laboratory may be different than the equipment used in a specific clinic/hospital.  In my experience, calibration can also be different between two laboratory devices, giving different readings.  Additionally, testing personnel are typically different, the patient is different, medical conditions and medications are different, the sensor is different, and so on.  Such factors can lead to different results. Accordingly, reports of device performance being different in clinical practice than the laboratory settings where devices may have been developed and initially tested is not a surprise."[203]  Mr. Moore's dismissal of the subject devices' performance issues is refuted by Masimo's own executives' acknowledgement of performance issues, discussed above in this report, and also by the examples given below. It is also pertinent to note that Masimo advised FDA as follows, in response to the Agency's question asking if the Pronto-7, subject of 510(k) number K111403, reports inaccurate results:  "As designed, we expect the Pronto-7 device to provide accurate measurements within its declared accuracy range (ISO 9919) when used in accordance with the instructions in the manual."[204] Reports of inaccurate results were frequently accompanied by confirmation that the instructions for use were followed.

In light of the known inaccuracy issues, Masimo should not have continued marketing or allowed defective devices to remain in the field.

### 1.   *SpO$_2$ Inaccuracies*

Less than one month following clearance for marketing of the Pronto-7, John Birkle, West Region Manager, issued an email to a number of Territory Managers about the Pronto 7 SpO$_2$ with the following information: "I'm sure you've seen a few *questionable SpO2 reading* on the Pronto 7…..we're currently using only one wave length of light…as such the *accuracy appears to be a bit compromised*.  To ensure this doesn't derail any of your SpHb demos, please give your prospects a heads up that we've just added SpO2 to the device and are currently tweaking it for better accuracy. We'll have a software update shortly to address this issue."[205]

---

[201] RESPONDENT513284: Email series August 15-16, 2010, between Joe Kiani and Marcelo Lamego RE: Pronto-7.
[202] *Id.*
[203] Expert Report of William M. Moore, July 30, 2013, Section III. B., pages 12-13, 3rd paragraph (page 12).
[204] MASIMO001308 at 316: Masimo letter to FDA, November 10, 2011, RE: K111403 – Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter and Accessories, Response to Request for Additional Information.
[205] RESPONDENT00158: Email July 19, 2010, John Birkle to multiple Territory Managers RE: Pronto 7 SpO2.

As discussed above, Masimo's draft announcement dated September XX, 2010, regarding the "Pronto-7 Software Update"[206] included a "Known Issues Matrix," which provided a "list of known issues for the Pronto-7 and their respective status."[207] By Masimo's own admission, as documented in this matrix, the Pronto-7 had "Poor SpO2 Performance," the status of which was "In Process" in the third month after 510(k) clearance of the device.[208]

### 2. *SpHb Inaccuracies*

During the testing of the Pronto-7 prior to 510(k)-clearance in June 2010, performance issues were observed. For example, Dr. Abe Kiani received a report from Gary Marston on performance testing of total hemoglobin at RAMS (Raleigh Associated Medical Specialists), which stated, "SD doesn't look great."[209]  While some nice results also were obtained,[210,211] outpatient product performance data collection being done for marketing purposes using the first algorithm and comparing the Pronto-7 results with HiCN and Coulter, showed notable deviations at some sites. Testing with the second algorithm was planned to include Hemocue for in-house testing.[212]

Following clearance of the Pronto-7 in June 2010, complaints and concerns about performance issues mounted.  Examples are given below:

- Outpatient data collected shortly after 510(k)-clearance of the Pronto-7, i.e., from June 28 to July 16, 2010, was circulated for review and included testing not only of the Pronto-7 but also the Pronto/DCI and Radical-7/DCI.   Noninvasive hemoglobin comparisons were done using the gold standard for hemoglobin determination, specifically, HiCN measurement which was performed at LABS.[213]  Based on these data, Dr. Abe Kiani wrote to Joe Kiani, stating "Marcelo has got to make this thing more accurate." Further, he noted, "I had a suggestion today that seemed to spark a thought in him that may improve it."  Mr. Kiani replied, "Cool!"[214]

- A month after Pronto-7 clearance for marketing, the Product Comparison Study Summary for Dr. Help's facility showed a precision of 1.26 and bias of 2.05.[215] Variance of the Pronto-7 measurements as compared to laboratory invasive testing ranged from 0.1 to 3.7 g/dL; six of nine measurements were greater than 1 g/dL and included variances of 1.5, 1.7, 2.7, 3.1, 3.3, and 3.7 g/dL.[216]

[206] RESPONDENT544119: September XX, 2010, announcement Re: Pronto-7 Software Update.
[207] RESPONDENT544119 at 122: *Id.*
[208] *Id.*
[209] RESPONDENT494230: Email series April 16, 2010, Gary Marston to Abe Kiani, to Jonathan Rosario with copy to Marcelo Lamego RE: Pronto 7 Product Performance Testing, RAMS, 04/16/2010.
[210] RESPONDENT494621: Email series May 5, 2010, Jay Hachey to Paul Jansen RE: SpHb DCI Study, 5/4/2010 with results.
[211] RESPONDENT495311: Email series June 27-28, 2010, between Paul Jansen and Tony Roberts RE: Please send the test results out on P7.
[212] RESPONDENT490576: Email series June 3, 2010, between Gary Marston and Paul Jansen RE: Pronto 7 Product Performance testing – Outpatient, May 2010, Summary.
[213] RESPONDENT487836 at 841: Email series August 9-11, 2010, initiated by Abe Kiani to Mark Holody, follow-on emails to multiple management personnel, last in series between Abe and Joe Kiani, RE: Data from Friday.
[214] RESPONDENT487836: *Id.*
[215] RESPONDENT465688: Masimo Noninvasive Pulse CO-Oximeter Product Comparison Study Summary, Facility: Dr. Help, Evaluation Date: 7/23/10.
[216] RESPONDENT465688 at 691: *Id.*

Peggy Pence, PhD, RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

- Approximately six weeks after device clearance, 17 Pronto-7s were installed at Nephrology Associates in Nashville, Tennessee, where they began using them in their EPO (Epogen®) clinics. Notably, this group averages 40 hemoglobin tests per day. Three out of four of the clinicians contacted the clinic operations manager on the first day of using the Pronto-7 to express concern about high total hemoglobin readings, because their patients with chronic kidney disease have hemoglobin values ranging between 9-12 g/dL, yet the Pronto-7 was consistently yielding measurements of 14-15 g/dL.[217]

Of nine values for which comparative, invasive laboratory values were available initially, all of the Pronto-7 measurements were high and five were outside of specification. Chris Pappas, the Territory Manager (TM) for this account, reported that "[t]he issue is she probably is going to stop using the devices altogether because they are all running high….and she is concerned patients that need EPO are not getting it."[218]

The completed data for 16 tests showed the Pronto-7 ran high for 100% of the tests. Chris Pappas wrote, "She said 'run low all you want, running high is very bad.'"[219] Six of the 16 tests (37.5%) were outside of specification, notably, 2.7 g/dL or more. One of the four devices used had freezing-up issues or would shut down unexpectedly.   Chris Pappas advised that "+/- 2 to 3 is not acceptable except on a [sic] extremely rare occasion." Further, "[t]he customer has told me this performance is not acceptable to their practice nor the market in general."[220] Recalling the issue with the Pronto in 2009, Chris Pappas remarked, "As we found out from our launch in early 2009, our 'spec' was not acceptable to the market. This was the primary reason we pulled the product and never got passed [sic] LMR status."[221]

It is important to note that no Medical Device Report (MDR) was submitted to FDA for these device malfunctions, as discussed below in Section IV.F. This was a deviation from standard industry practice and resulted in misbranding of these devices.

Abe Kiani traveled to Nephrology Associates, along with Chris Pappas, to follow up the problematic testing results discussed above. Testing was done using "Abe's personal P7 device."[222] Using this device, six of seven results were excellent and all ran low, although one result was 2.5 g/dL off the lab result and technically not within specification.  Additionally, they were unable to get results for one patient.  During this visit, a nurse from a clinic called in and reported a result of 13.7 g/dL on a patient she knew never had a hemoglobin measurement that high; thus, she ran the Stanbio and the patient's measurement was 10.4 g/dL, which was in line with the patient's reference lab

---

[217] RESPONDENT123293 at 294: Email series August 9-10, 2010, initiated by Gary Marston to Paul Jansen, follow-on emails to/from multiple executives, including Joe and Abe Kiani, RE: Pronto-7 Summary Slides 08_08_2010.ppt.
[218] RESPONDENT465686: Email series August 11, 2010, initiated by Abe Kiani to Chris Pappas, Kevin Hammond, and Gary Marston, follow-on emails include Mike Smits with final to Rick Fishel, RE: Neph assoc.
[219] RESPONDENT497649: Email August 12, 2010, from Chris Pappas to Kevin Hammond, Gary Marston, Abe Kiani, and Mike Smits, forwarded from Abe Kiani to Marcelo Lamego, RE: Nephrology Associates Data.
[220] *Id.*
[221] *Id.*
[222] RESPONDENT497670: Email series August 19, 2010, initiated by Stacy Bledsoe (tnkidney.com) to Chris Pappas, forwarded from latter and subsequently Abe Kiani to multiple Masimo management, RE: Pronto Comparisons.

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

results from two weeks prior. The representative from Nephrology Associates expressed remaining concerns, which included the following. Even though the device seemed to be better during the testing performed using Abe Kiani's Pronto-7, she questioned what Masimo's solution is for the random results that are 2.5-3 g/dL off.[223] As reported by Chris Pappas, "That wide of a swing is just not acceptable." There appeared to be "great inconsistency from device to device performance." Masimo's responses to these questions, among others, would determine whether Nephrology Associates would start using the devices again.[224]

- Dr. Marcelo Lamego wrote to Joe Kiani concerning the technology for the Pronto-7 approximately two months after 510(k)-clearance of the device: "We are doing everything we can do [sic] make the technology better (This is certainly the main issue by far). I hope in a few months these will be all resolved so that we can really celebrate the technology we developed together."[225]

- Approximately 10 weeks after 510(k)-clearance of the Pronto-7, the Practice Manager, Kathy Thorson, for the Nephrology Department at Western Washington Medical Group (WWMG) wrote to John Birkle with a *major concern*: "Most of our patients have been coming back with a high hemoglobin, and not needing a procrit shot (which is unusual for these patients). Yesterday we decided to do have a patient go to the lab and have her lab drawn. The hematocrit reading was 30.2 and her hemoglobin from Pronto read 12.1. What suggestions do you have for this discrepancy?"[226]

Disregarding the mounting performance issues, Mr. Birkle advised Ms. Thorson that "This is very unusual, especially for nephrology patients. I've attached our accuracy specification sheet for your review which shows our FDA-approved accuracy specs."[227] Importantly, this referral to FDA approval constitutes misbranding of the device. "Any representation that creates an impression of official approval of a device because of complying with the premarket notification regulations is misleading and constitutes misbranding."[228] Masimo cited to accuracy specifications, yet knew there were accuracy issues with the device. This was improper marketing and contradicts the opinions of Mr. Peter Hutt.[229]

On receiving this information concerning WWMG, Kevin Hammond, however, summarized the issue as follows: "The long and short of it is patients are not getting Procrit shots but are coming back as having needed them from the lab."[230] In violation

---

[223] RESPONDENT497670 at 670-671: Email series August 19, 2010, initiated by Stacy Bledsoe (tnkidney.com) to Chris Pappas, forwarded from latter and subsequently Abe Kiani to multiple Masimo management, RE: Pronto Comparisons.
[224] RESPONDENT497670 at 671: *Id.*
[225] RESPONDENT514247 at 249: Email series August 15-23, 2010, between Joe Kiani and Marcelo Lamego RE: Pronto-7.
[226] RESPONDENT124624 at 626: Email series September 2-7, 2010, between Kathy Thorson, Practice Manager, WWMG – Nephrology Dept. and John Birkle, forwarded to Kevin Hammond, who forwarded to Rick Fishel, Paul Jansen, and Gary Marston, RE: Pronto billing questions.
[227] RESPONDENT124624 at 625: *Id.*
[228] 21 CFR 807.97: Misbranding by reference to premarket notification.
[229] Expert Report of Peter Barton Hutt, July 26, 2013, pages 16-17.
[230] RESPONDENT124624: Email series September 2-7, 2010, between Kathy Thorson, Practice Manager, WWMG –

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

of the standard of care required of a reasonably prudent medical device manufacturer, I found no evidence that Masimo submitted a Medical Device Report to FDA for these events. In fact, Masimo has admitted that it did not provide FDA with any report of an MDR reportable event (as defined in 21 CFR 803.3) for the Pronto-7.[231]

- About 12 weeks after receiving 510(k)-clearance for the Pronto-7, corporate executives received "the most detailed feedback…seen to date on the Acute side."[232] Specifically, the variance for four of five Pronto-7 hemoglobin measurements compared to lab values was greater than 1 g/dL: 1.2, 1.8, 2.1, and 2.4 g/dL. As Scott Rasband reported, "All patients had very good perfusion and were perfectly still. I felt like I set the proper expectations with our accuracy specs and they flat out just said *it was not good enough*." In this case, all tests were consistently below the lab value. According to Mr. Rasband, "The nurse Holly and I discussed this and I said to her, would you rather have it be consistently low or high and her answer was 'I would rather have it be accurate.'"[233]

- As discussed above, Masimo's draft announcement dated September XX, 2010, regarding the "Pronto-7 Software Update"[234] included a "Known Issues Matrix," which provided a "list of known issues for the Pronto-7 and their respective status."[235] By Masimo's own admission, as documented in this matrix, the Pronto-7 gave "Inaccurate SpHb Readings," the status of which was "Pending" in the third month after 510(k) clearance of the device.[236]

- In the same time frame of the Pronto-7 Software Update announcement, discussed above, Masimo was advised of the interest of Roche and Fresenius in the Pronto-7 for the purpose of helping to determine need for and titrating Epogen® (EPO). Paul Jansen responded as follows:

  "There is no question we have a large business opportunity…if the product were to meet the customer's requirements. However, given the tight ranges for EPO drug eligibility and titration during patient management, along with the renal patient being one of the toughest populations for the product to perform to its stated spec, this is perhaps the toughest clinical application for the Pronto-7 to meet the customer's requirements. Therefore, it is not advisable to pursue this market at the current time."[237]

---

Nephrology Dept. and John Birkle, forwarded to Kevin Hammond, who forwarded to Rick Fishel, Paul Jansen, and Gary Marston, RE: Pronto billing questions.

[231] Case No. CV 10-8169 CJC JCG: Defendant Masimo Corporation's Objections and Response to Plaintiff-Relators' Requests for Admissions, Set One, Request for Admission No. 15.

[232] RESPONDENT508822: Email series September 10-14, 2010, initiated by Scott Rasband to Matthew Anacone, forwarded to Dave Zachman, who forwarded to Stephen Paul, who forwarded to Paul Jansen with copy to "Executives," RE: University of Utah P7 Evaluation Results.

[233] RESPONDENT508822 at 822-823: *Id*.

[234] RESPONDENT544119: September XX, 2010, announcement Re: Pronto-7 Software Update.

[235] RESPONDENT544119 at 122: *Id*.

[236] *Id*.

[237] RESPONDENT508828 at 829: Email series September 17-20, 2010, initiated by Olivier Berthon to Paul Jansen, copy to Jon Coleman, Paul Jansen reply also to Rick Fishel, latter replied to all, and finally Mr. Berthon to all, RE: Roche, Fresenius, University Hospital of Caen.

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

Rick Fishel confirmed that "[o]ur current testing suggests the P-7 does not YET meet those requirements. Since we are confident we can get in front of the key decision makers for entities such as Roche, Fresenius, DaVita, and any other large entity whose business is closely tied to EPO utilization, we are not pursuing those meetings until such time we feel our technology meets those requirements.  In the meantime, we are working and selling to nephrology office practices to ensure we understand the performance needs and are actively assessing how our performance measures up against those needs, but we are delaying our pursuit of the BIG BOYS **until our experiences at the office levels suggest we are ready for primetime.**"[238]

By Masimo's own admission, the Pronto-7 for the described purpose was experimental. Yet no Investigational Device Exemption (IDE) had been submitted to FDA for the clinical investigation of how the device performed in this critical clinical care environment. Nor did I review any evidence that physicians were informed that the tests they were running were experimental and not ready for primetime, nor that patients were informed that the devices being used to measure their hemoglobin levels for their physicians' use were experimental for this purpose. Masimo deviated from industry standards by failing to submit an IDE and conduct these evaluations under an IDE for this new intended use. Further, Masimo disregarded FDA's advice to submit a preIDE package if Masimo intended to pursue marketing of the Pronto-7 with its primary intended use to noninvasively measure hemoglobin.[239]

- Following the Pronto-7 upgrade, discussed above, John Birkle inquired of Michael Ruhe concerning his "initial feedback pertaining to accuracy, enhanced features/functionality, etc."[240] Mr. Ruhe made the following points in reply:

  - "…I'm now able to hide the SPO2 and HR measurements.
  - Reproducibility of Hb results seems to be very similar to old software in terms of frequency of 'outliers' and variation (swing). However, the bias seems to be a couple g/dL lower than before.  Based on back-to-back measurements (multiple tests taken on same patient, same finger) I've seen in the field since performing the upgrade, the P-7 still consistently swings +/-2.5-3.0 grams–more frequently than our accuracy claim suggests.  For example, I just tested myself five times on my demo unit. The Hb readings were as follows: 13.7, 11.2, 11.5, 11.9 and 13.2.  Not only are all these readings more than 2g/dL lower than I've <u>ever seen my Hb levels</u>, but there's a 2.0+ g/dL swing on two of the five readings.
  - …the breadth of these results are typical…when I see results like these consistently in the field, in terms of swing (+/- g/dL) and frequency of outliers, there's little doubt in my mind that the accuracy of the P-7 is not yet within the standard deviation bell curve our literature suggests.  Certainly not among the demo devices I've been issued."[241]

---

[238] RESPONDENT508828: Email series September 17-20, 2010, initiated by Olivier Berthon to Paul Jansen, copy to Jon Coleman, Paul Jansen reply also to Rick Fishel, latter replied to all, and finally Mr. Berthon to all, RE: Roche, Fresenius, University Hospital of Caen.
[239] RESPONDENT501695 at 696:  January 6, 2010, Meeting Minutes: Clarification of NSE letter for K092356, from Neel Patel, FDA, to "The Record."
[240] RESPONDENT00232: Email series September 27, 2010, between John Birkle and Michael Ruhe RE: P7 Upgrade.
[241] *Id.*

*Peggy Pence, Ph.D., RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

- Initial results from Scripps Carmel Valley Clinic showed "at least half of the results were 'off lab value' by >1g/dL." Dr. Esther Kim, Family Practice, "expressed her discontent over the results." She was particularly concerned about the results for one patient whose lab value was 8.1 g/dL, while the Pronto-7 reading was 10.6 g/dL (variance 2.5), and remarked that "could have been a big mistake."[242]

- Regarding international sales, an ME Distribution Manager for Masimo International SARL, reported to Jay Hachey that in addition to the current software update, a software update to enhance the performance of Pronto-7 was needed.  Among his concerns were sensitivity to interference, consistency, accuracy, and the need for a pediatric sensor. Regarding consistency, he remarked, "It happened with me several times and I heard that it happened with some colleagues…upon repeating the measurements with Pronto7 on the same person and same circumstances (sitting or standing, same finger, same room and position…etc.), Pronto7 gives different readings every time." As regards accuracy, "needless to say that we need to improve accuracy."[243] Mr. Hachey acknowledged, "We are continually looking for ways to improve the sensors performance in all of the areas listed…"[244]

- Masimo announced the availability of Rev B Pronto-7 Sensors on November 10, 2010, noting that "[t]he Rev B sensor has gone through a new manufacturing process that should enhance performance in measuring Total Hemoglobin."[245]

- Bay State Health provided Masimo with the formal analysis of their study comparing the Masimo vs. Hemocue vs. lab hemoglobin and reported that "…the masimo result [sic] are quite poor and are not adequate for clinical use. Based on our discussion before, we will want to return all the equipment and uses for a full refund."[246]

Please reference Section IV.E. below for additional discussion of Pronto inaccuracies.

**D.     OPINION #4:**  Masimo violated industry practices by improperly marketing products as a result of labeling that made unsupported or incomplete accuracy claims.

As Masimo's FDA expert testified, promotional materials such as technical bulletins "must be truthful and not misleading."[247]  Numerous examples demonstrating accuracy failures of the subject devices are provided in this report.  Provided below are examples of false and misleading labeling based on unsupported accuracy claims.  Masimo's own documentation reveals that the Pronto-7 was marketed before it could meet the claims for which it was promoted…for months.

---

[242] RESPONDENT00270: Email October 6, 2010, Michael Ruhe to John Birkle RE: Initial results at Scripps Carmel Valley Clinic – FP.
[243] RESPONDENT125162: Email series September 23 to October 7, 2010, Initiated by Jay Hachey to multiple recipients, reply from Mohammad Al-Sharif with Mr. Hachey response, RE: International Pronto-7 Sales Order Information.
[244] *Id.*
[245] RESPONDENT127545: November 10, 2010, announcement Re: Flash Update – Rev B Pronto-7™ Sensors and Helpful Tips for the Pronto-7.
[246] RESPONDENT545707: Email series November 24, 2010, initiated by Michael Germain, Bay State Health, to Todd Steinhoff, latter to Ric Duncan, copy to Kevin Hammond, RE: our equipment.
[247] RT 2/20 1913:25-1915:11.

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

- Concerning the technical bulletin for Pronto-7, Kevin Hammond, Vice President of Physician Office Sales, emphasized the value of the technical bulletin to the sales and marketing team for the physician market, stating, "getting this information in front of HemoCue users is clearly vital to providing the foundation in our accuracy discussion."[248] Paul Jansen urged, "In spite of your strong coaching, reps will be reps. We will need to remove discretion from the process." Mr. Hammond responded that "There is no intent to deceive by not handing out the tech bulletin. It is a very favorable piece. The issue isn't that our literature sends the wrong message, but that *the device isn't consistently meeting the message*."[249] (Emphasis added.) By admission of Masimo's own management, the Pronto-7 failed to meet its accuracy claims routinely.

- As discussed above in Section IV.C.*2*, after the Pronto-7 software update to enable a dual-page display with only the SpHb parameter shown on the first page, John Birkle inquired of Michael Ruhe concerning his "initial feedback pertaining to accuracy, enhanced features/functionality, etc."[250] Mr. Ruhe replied, among other points, that "….in terms of swing (+/- g/dL) and frequency of outliers, there's little doubt in my mind that the accuracy of the P-7 is not yet within the standard deviation bell curve our literature suggests. Certainly not among the demo devices I've been issued."[251]

**E.     OPINION #5:** Masimo failed to perform product recall according to the mandatory FDA reporting requirements when warranted based on product non-performance.

The formal market launch for the Pronto was in January 2009,[252] during Masimo's annual global training meeting for its sales force.[253] Masimo chose to commercialize the product initially using a limited market release (LMR) program, a strategy the company had used previously for the Radical-7 and Rad-87 to allow select hospitals internationally to be the first to pioneer the new technology and to "work closely with Masimo to implement the technology in their facilities and provide data on its impact on patient care."[254] Similarly, the purpose of the LMR for Pronto was "to obtain field and customer feedback regarding product performance and product operation in clinical environments."[255] In March 2009, the limited market release in hospitals was complete, with about 50 hospitals participating, and Masimo then initiated its LMR program for physician offices, which was expected to last from a few to several months. Full Market Release would occur after positive field and customer experience.[256]

---

[248] RESPONDENT123007: Email series August 22-23, 2010, Kevin Hammond to S&M – Physician Market, subsequent exchange between Kevin Hammond and Paul Jansen, RE: Pronto-7 Tech Bulletin.
[249] *Id.*
[250] RESPONDENT00232: Email series September 27, 2010, between John Birkle and Michael Ruhe RE: P7 Upgrade.
[251] *Id.*
[252] RT 2/12 345:20-22.
[253] RT 2/12 438:10-20.
[254] Masimo Press Release, September 15, 2008: Masimo Initiates Limited Release of First-ever Noninvasive and Continuous Hemoglobin Monitors.
[255] RESPONDENT001807 at 812: Email March 23, 2009, with PowerPoint attachment, Gary Marston to multiple sales team and executive recipients, RE: LMR Documents.
[256] *Id.*

Masimo's standard purchase agreement process was followed for the LMR process, using Pronto LMR purchase documents.[257]  Masimo agreed to provide the Pronto at no charge during the LMR and to provide Pronto Sensors at reduced pricing, with discounted early adopter pricing for the Pronto.[258] Upon Full Market Release, a final purchase, lease, or sensor rental documentation was required,[259] or return of the Pronto.[260] For current customers who had signed a lease, four options were available: 1) re-price the lease based on the new LMR Pronto purchase price; 2) purchase the Pronto at the early adopter Pronto price; 3) return the Pronto and Masimo would reverse the lease or purchase; or 4) continue using the Pronto as part of the LMR under the same terms and conditions.[261]

The Pronto was marketed through late June/mid July 2009, at which time the devices in the field were requested to be pulled and returned to corporate[262,263] in order for Masimo to implement some changes to the Pronto based on customer feedback.[264] Following the launch of the Pronto, device accuracy had been a persistent issue.  Examples of reports from the field include the following:

- Beth Ann Fabrega, Florida Territory Sales Manager, was contacted by a Dr. Garcia's practice administrator, who "instructed [her] to come and pick up the unit and all [Ms. Fabrega] could get out of her was 'Dr. Garcia was unhappy with the accuracy.'"[265] Regarding Dr. Silva, Gary Marston advised Ms. Fabrega, "[*W*]*e know the product is not performing to our specifications* so I would recommend delaying the installation."[266] (Emphasis added.)

- In February 2009, Mike Ruhe "lost a deal…due to device performance"[267] after the physician agreed to purchase and then asked to be hooked up to the device. At this point, "He got a reading in the 7 range and a second reading in the 10 range," and then cancelled his purchase. Mr. Ruhe later told John Birkle that the "first reading on the doctor was 10.5, second reading 14.1," and in an email from John Birkle to Kevin Hammond, Gary Marston, and Paul Jansen, Mr. Birkle stated that "what started as a 90%+ opportunity to sell [the physician] a Pronto today ended in accuracy concerns."[268]

---

[257] RESPONDENT001807 at 816: Email March 23, 2009, with PowerPoint attachment, Gary Marston to multiple sales team and executive recipients, RE: LMR Documents
[258] RESPONDENT001807 at 813: *Id.*
[259] RESPONDENT001807 at 818: *Id.*
[260] RESPONDENT001807 at 819: *Id.*
[261] RESPONDENT001807 at 826: *Id.*
[262] RESPONDENT111965: Email July 1, 2009, Ric Duncan to multiple recipients RE: LMR Status Sheet (Attachment: Big East LMR Customer Contact Status).
[263] RESPONDENT504774 at 775-776: Email series July 15-19, 2009, initiated by Rick Fishel to Kevin Hammond and Sales Management Team, subsequent emails between Paul Jansen and Gary Marston, RE: Limited Number of Ongoing Pronto Customers in Physician Office Market.
[264] RESPONDENT111965: Email July 1, 2009, Ric Duncan to multiple recipients RE: LMR Status Sheet (Attachment: Big East LMR Customer Contact Status).
[265] RESPONDENT503239 at 240: Email series February 24, 2009, between Kevin Hammond, Beth Ann Fabrega, and Gary Marston RE:  Dr. Silva and Dr. Garcia.
[266] RESPONDENT503239: *Id.*
[267] RESPONDENT503322: Email series February 13, 2009, between John Birkle, Kevin Hammond, Gary Marston, and Paul Jansen Re: Lost deal.
[268] *Id.*

Peggy Pence, PhD, RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

- Also in February 2009, when Mike Ruhe tried to close a sale with a Dr. Finley in Anaheim, California, the doctor had readings of 9.1 and 11.3, which "came as a shock/concern to him,"[269] as there was "No SIQ light"[270] and "no abnormal physical issues."[271] Mr. Ruhe planned to return the following week to attempt to sell Dr. Finley the device again, and asked John Birkle for his input on the accuracy issues. In a follow-up email to Kevin Hammond, Mr. Birkle stated that he didn't "know what to tell [Mr. Ruhe] at this point other than not to use the device due to erroneous and inconsistent readings."[272] This did not come as a surprise to Mr. Hammond, who replied, "I would agree that Mike has had more than his fair share of device accuracy issues."[273]

Thus, at the beginning of July 2009, *getting equipment back from LMR customers was a "number 1" priority* for the sales team, according to the Eastern Regional Manager, Ric Duncan, who, notably, also instructed the team that the words "recall" or "inaccurate" were "absolutely not to be used."[274] He further urged, "Your messaging on this is key! We don't want any of our competitors to get word of this and spin it in a negative light."[275]

In mid July, Michael Ruhe reported that he had "*pulled all [his] Pronto devices from the field as requested and returned them to corporate*."[276] (Emphasis added.) However, he was interested in replacing a device with Dr. Kiani at the OC Immune Institute in Huntington Beach, California, for reasons discussed on a conference call hosted by Kevin Hammond and Rick Fishel.[277] Jay Hachey questioned if "it would be OK to let customers continue to use them if they wanted," to which John Birkle replied. "Yes, we don't want to pull all the units."[278] By the end of July, John Birkle, West Region Manager, advised the West sales Team that one of the main priorities was "[i]f you have an LMR account that can keep the Pronto, get back to the account and position the device for them to keep."[279] Meanwhile, the Team was also working on the "refund issues."[280] On the same date of Mr. Birkle's communication to the West Team, Kevin Hammond issued a request to "go ahead an [sic] issue customer refunds (credit card refund and checks as appropriate, not company product credit) to the remaining customers on our list.  The only devices remaining in the field are those in which the rep is waiting on a CFB number, but they have been picked up and are in the reps possession while they wait."[281]  At that point, about 26 refunds needed to be issued.[282]  Kevin Hammond further confirmed, "…I have assured Finance that every device that needs to be returned

---

[269] RESPONDENT503253: Email series February 17, 2009, between Kevin Hammond and John Birkle Re: Dr Finley – Anaheim.

[270] *Id.*

[271] *Id.*

[272] *Id.*

[273] *Id.*

[274] RESPONDENT111965: Email July 1, 2009, Ric Duncan to multiple recipients RE: LMR Status Sheet (Attachment: Big East LMR Customer Contact Status).

[275] *Id.*

[276] RESPONDENT504037: Email series July 17, 2009, between Michael Ruhe and Jay Hachey, copy to John Birkle, subsequent emails between Jay Hachey and John Birkle, RE: Pronto device for OC Immune Institute – Dr. Kiani.

[277] *Id.*

[278] *Id.*

[279] RESPONDENT001185: Email July 27, 2009, from John Birkle to West Team RE: +++Current Expectations+++.

[280] *Id.*

[281] *Id.*

[282] RESPONDENT511462: Email series July 27, 2009, initiated by Kevin Hammond to multiple recipients, reply from Brenda Montgomery, RE: LMR Refunds.

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

will be on its way by weeks end….I met with Paul and Rick, and there is not necessarily a need to keep Prontos in the field outside of the two that are happy in their current leases. We can honor leaving any devices with customers at no charge that we have proactively approached and have agreed to work with us.  It is not necessary, but is something we certainly willing [sic] to do to avoid any further mixed messages."[283]

Thus, contrary to Mr. William Moore's opinion that "[t]he manner in which Masimo handled the Pronto and/or Pronto 7 release post FDA clearance is consistent with industry practice,"[284] it was not. Masimo's conduct in the foregoing regard also contradicts Mr. Peter Barton Hutt's opinions suggesting Masimo properly marketed and labeled its products.[285] It also contradicts his conclusion regarding the 2011 inspection[286] because there is no indication FDA considered Masimo's conduct in this respect. Finally, it rebuts the opinions of Dr. Aryeh Shander and Dr. Keith Ruskin regarding the acceptability of the products' accuracy variance.[287]

The removal of *most* of the Pronto devices from commercial distribution due to accuracy issues and failure to perform to specifications, as Masimo's own management acknowledged, constituted a voluntary recall in my professional opinion.  Accordingly, Masimo was required to make a report of its removal action to FDA, but failed to do so. By failing to remove all Pronto devices, and not communicating the nature of its actions and these concerns to FDA, Masimo improperly marketed its products.

F.    **OPINION #6:**  Masimo deviated from standard industry practice  by failing to document, review, and evaluate all complaints and submit Medical Device Reports (MDRs) to the FDA where indicated.

As required for a medical device manufacturer, Masimo, appropriately, has established procedures for receiving, reviewing, and evaluating customer complaints in a formally designated unit: Standard Operating Procedure SOP-1011, Customer Complaints, CO-004577.[288]  Associated with this SOP is FRM-1022, the  Customer Feedback Form,[289] often referred to in Masimo's documentation as 1022's.  This SOP requires that employees, whether from Clinical, Sales and Marketing, etc., communicate all customer complaints to Technical Support.[290] Quality Compliance at Masimo is charged with reviewing complaints to determine reportability as MDRs, in accordance with SQP-1003: Medical Device Reporting.[291]  Among the materials reviewed for this report, I

---

[283] RESPONDENT111960: Email series July 27, 2009, Initiated by Kevin Hammond, to Ric Duncan, Mike Smits, John Birkle, copy to Gary Marston, follow-on email from Ric Duncan to Sales Team, RE: LMR Refunds and Prontos remaining in the field.

[284] Expert Report of William M. Moore, July 30, 2013, page 12; also see Expert Report of Peter Barton Hutt, July 26, 2013, pages 13-15.

[285] Expert Report of Peter Barton Hutt, July 26, 2013, pages 15-16.

[286] Expert Report of Peter Barton Hutt, July 26, 2013, pages 3, 15, 16.

[287] Expert Report of Dr. Aryeh Shander, July 31, 2013, pages 2-3; Expert Report of Dr. Keith Ruskin, July 31, 2013, page 4; Also see Expert Report of Dr. James Nichols, July 26, 2013, pages 4-6; Mr. Hutt, July 26, 2013, page 11; Expert Report of Dr. David  E. Goodman, July 31, 2013, pages 18-20.

[288] MASIMO022673: SOP-1011, Customer Complaints CO-004577, Revision: U.

[289] MASIMO022673 at 674: *Id.*

[290] MASIMO022673 at 675: *Id.*

[291] RESPONDENT001742: Standard Quality Procedure, SQP-1003, Medical Device Reporting, DRO-20296, Revision: D.

found evidence demonstrating that Masimo failed to execute consistently requirements of these standard procedures, as discussed following.

For the Pronto-7, incidents of inaccurate $SpO_2$ readings were observed, notably, events that "should probably be captured on a 1022," as Kevin Hammond, Vice President of Physician Office Sales, assessed.[292]  For example, the $SpO_2$ of a healthy young female at a physician's offices displayed as 92%...."clearly not accurate and to throw cold water on us they pulled out their pulse ox to show us her 99%."[293]  Shortly thereafter, Mr. Hammond asked Rick Fishel for clarification about 1022s for Pronto-7 incidents, stating, "I understand it as we no longer need to document SpO2 issues, but we should continue to capture other things as they occur.  Sudha was under the impression that P7 1022s were no longer to be submitted for anything." Mr. Fishel replied, "You are correct."[294] This documentation demonstrates that Masimo failed to comply with its own SOP. As noted above, *all* complaints must be submitted to Technical Support and reviewed, evaluated, and investigated as required.[295]

For MDR reporting, Masimo's SQP-1003 covers complaints that "reasonably suggests [sic] that one of the Company's marketed devices, that has been approved the [sic] Food and Drug Administration (FDA)…or any medical devices for which the Company initiated or developed the device's specifications [m]ay have caused or contributed to a death or serious injury or [h]as malfunctioned and that the device or any other device marketed by the Company would be likely to cause or contribute to a death or serious injury if the malfunction were to recur."[296] "Reports to the FDA are only to be submitted by the Company when it has been determined by the Medical Device Report Board that the reporting requirements established under DEO-2673 – 21 CFR 803 – Medical Device Reporting have been met."[297] In preparation for writing this report, I reviewed FDA's MAUDE database and found no MDRs for the subject devices. By Masimo's own admission, the company did not provide FDA with any report of an MDR reportable event (as defined in 21 CFR 803.3) for the Pronto or Pronto-7.[298]  In my professional opinion, Masimo failed to report MDR reportable events to FDA as required.  This resulted in misinformation and incomplete information about the product being available to customers and to FDA.

Examples of events that required reporting are provided below.

- Approximately six weeks after Pronto-7 510(k)-clearance, 17 Pronto-7s were installed at Nephrology Associates in Nashville, Tennessee, where they began using them in their EPO (Epogen®) clinics. Three out of four of the clinicians contacted the clinic operations manager on the first day of using the Pronto-7 to express concern about high total hemoglobin readings, because their patients with chronic kidney disease have hemoglobin

---

[292] RESPONDENT109901 at 902: Email series July 12, 2010, initiated by Kevin Hammond to Jay Hachey and Rick Fishel, then between latter and Joe Kiani and Paul Jansen RE: 1022s for Pronto-7 and Question Concerning Pronto-7 SPO2 Display, respectively.
[293] *Id.*
[294] RESPONDENT506511: Email series July 27, 2010, between Kevin Hammond and Rick Fishel RE: 1022s for Pronto-7.
[295] MASIMO022673 at 677: SOP-1011, Customer Complaints CO-004577, Revision: U.
[296] RESPONDENT001742: Standard Quality Procedure, SQP-1003, Medical Device Reporting, DRO-20296, Revision: D.
[297] RESPONDENT001742 at 743: *Id.*
[298] Case No. CV 10-8169 CJC JCG: Defendant Masimo Corporation's Objections and Response to Plaintiff-Relators' Requests for Admissions, Set One, Request for Admissions No. 14 and No. 15.

Peggy Pence, Ph.D., RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

values ranging between 9-12 g/dL, yet the Pronto-7 was consistently yielding measurements of 14-15 g/dL.[299]

Of nine values for which comparative, invasive laboratory values were available initially, *all of the Pronto-7 measurements were high and five were outside of specification*.  Chris Pappas, the Territory Manager (TM) for this account, reported that "[t]he issue is she probably is going to stop using the devices altogether because they are all running high….and *she is concerned patients that need EPO are not getting it*."[300] (Emphasis added.)

- Approximately 10 weeks after 510(k)-clearance of the Pronto-7, the Practice Manager, Kathy Thorson, for the Nephrology Department at Western Washington Medical Group (WWMG) wrote to John Birkle with a *major concern*:  "Most of our *patients have been coming back with a high hemoglobin, and not needing a procrit shot* (which is unusual for these patients).  Yesterday we decided to do have a patient go to the lab and have her lab drawn. The hematocrit reading was 30.2 and her hemoglobin from Pronto read 12.1.  What suggestions do you have for this discrepancy?"[301]

  On receiving this information, Kevin Hammond summarized the issue as follows: "The long and short of it is *patients are not getting Procrit shots but are coming back as having needed them from the lab*."[302] (Emphasis added.)

- Dr. Stanley Schwartz and Dr. Dong, Moreno Valley, California, "experienced multiple inaccuracies as compared to lab values—two measurements as much as >4.0 g/dL off the mark."[303]

- Dr. Robert Lajvardi, La Mesa, California, "complained that on two occasions during the third week of June he had tested patients using the Pronto and received anemic readings between 9.0 and 10.0 g/dL. In both cases he referred patients out to lab for stat Hb readings. Lab values on both patients, which came back within several hours of Pronto reading, were NON-anemic—between 13.0 and 14.0 g/dL.  In other words, he received *two gross false positives* in the same week of use (between June 14 and June 18). Both patients were young Caucasian males—with no unusual characteristics or apparent reasons for incorrect Pronto readings."[304] (Emphasis added.)

- "This device was being used in a comparison study at Dr. Jafar Mahmood's office in Orlando FL. The device performed outside our specs and ran very "High" on patients. The data has been submitted to Gary Marston."[305]

[299] RESPONDENT123293 at 294: Email series August 9-10, 2010, initiated by Gary Marston to Paul Jansen, follow-on emails to/from multiple executives, including Joe and Abe Kiani, RE: Pronto-7 Summary Slides 08_08_2010.ppt.
[300] RESPONDENT465686: Email series August 11, 2010, initiated by Abe Kiani to Chris Pappas, Kevin Hammond, and Gary Marston, follow-on emails include Mike Smits with final to Rick Fishel, RE: Neph assoc.
[301] RESPONDENT124624 at 626: Email series September 2-7, 2010, between Kathy Thorson, Practice Manager, WWMG – Nephrology Dept. and John Birkle, forwarded to Kevin Hammond, who forwarded to Rick Fishel, Paul Jansen, and Gary Marston, RE: Pronto billing questions.
[302] RESPONDENT124624: *Id.*
[303] RESPONDENT00152: Customer Feedback FRM-1022 – Customer Complaint 6/30/10, reported by Mike Ruhe.
[304] RESPONDENT103937: Customer Feedback FRM-1022 – Customer Complaint 6/24/10, reported by Mike Ruhe.
[305] RESPONDENT508015: Customer Feedback FRM-1022 – Customer Complaint 9/6/10, reported by Beth Ann

By not investigating and reporting complaints and MDRs, Masimo was providing incomplete and inaccurate information about its products.

**G.     OPINION #7:**   Masimo improperly instructed customers on coding for billing for the subject devices.

If a company is promoting its products for a specific use, such as Masimo did in promoting the subject devices for diagnostic testing and as a substitute for laboratory testing, as discussed previously in this report, the expectation among customers is that the products have been reviewed by FDA for that specific use and the company has been granted clearance or approval to market for such use. The basis for this expectation is that a medical device (unless exempt) may not be introduced into interstate commerce until it has either been cleared through the 510(k) Premarket Notification process or approved by FDA through the Premarket Approval (PMA) process *for the intended use for which it is marketed*. A product which is promoted for an intended use not covered by the 510(k)-clearance or PMA approval is deemed a device that either lacks 510(k)-clearance or is an unapproved device, respectively, and such promotion is termed within the medical device industry as "off-label" promotion.

The Centers for Medicare and Medicaid Services (CMS), which administers the Medicare program, has stated that it will not accept a coverage determination request for a device that is not approved or cleared for marketing by the FDA.[306] One exception is for a device (i) for which there is an FDA-approved Investigational Device Exemption (IDE) and (ii) determined by FDA to be non-experimental/investigational, i.e., a Category B device.[307,308] Category B devices include, among others, devices under investigation to establish substantial equivalence to predicate device(s) and non-significant risk devices undergoing an investigation for which FDA required an IDE submission.[309] This exception does not apply to the Masimo subject devices.  As discussed previously in this report, Masimo did not submit an IDE to FDA for clinical investigation of these devices, and, thus, FDA never approved an IDE for these products.

There are two longstanding criteria that provide the basis for Medicare coverage and reimbursement for healthcare items and services: (1) "reasonable and necessary" for coverage decisions and (2) "usual and customary" charges as regards reimbursement. Specifically, Medicare does not cover services that are not medically reasonable and necessary to the overall diagnosis and treatment of the patient.  This includes screening tests and examinations for which the patient has no symptoms or documented conditions.[310] Because CMS is the largest single payer in the United States,[311] it is a de facto standard for private insurance coverage and reimbursement decisions.

---

Fabrega.
[306] CMS, Innovators' Guide to Navigating Medicare, Timing of Policy Decisions, page 5: *Id.*
[307] 42 CFR § 405.209.
[308] Implementation of the FDA/HCFA Interagency Agreement Regarding Reimbursement Categorization of Investigational Devices (Section A.), September 15, 1995:
http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm080302.htm
[309] *Id.*
[310] CMS, Items and Services That Are Not Covered Under the Medicare Program, Section 1:
http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-
MLN/MLNProducts/downloads/Items_and_Services_Not_Covered_Under_Medicare_BookletICN906765.pdf
[311] CMS, Innovators' Guide to Navigating Medicare, page 31:

Peggy Pence, *PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) required the adoption of and use of national standards to bill for healthcare services.[312]  The standards relevant to in vitro diagnostics (IVDs) include the Healthcare Common Procedure Coding System (HCPCS) and Current Procedural Terminology (CPT). The HCPCS codes are divided into two levels.  Level I is the set of codes known as CPT and maintained by the American Medical Association (AMA). The CPT code enables a specific payment to be made for IVD-related services.

It is common for companies to apply for a new code if an existing CPT code does not correlate to the desired reimbursement. Masimo applied for and obtained Code 88738, as discussed below, based on a code change request indicating that the new Masimo, transcutaneous test for detection of hemoglobin provides the same information as *in vitro* testing but more rapidly.  The criteria that AMA generally requires for a new code include, among others, that the procedure has received approval from the FDA *for the specific use* of the device and that the *clinical efficacy* of the procedure is *well established*.[313] (Emphasis added.)

Paul Jansen, on behalf of Masimo, submitted a "Coding Change Request Form For Laboratory Tests," dated June 30, 2008, to AMA.[314]  Among the questions asked on this application are whether the laboratory procedure involves the use of reagents or procedures that require approval from the FDA and, if so, whether FDA approval has been received.  Mr. Jansen appropriately answered that "[t]he test has received a 510(k) clearance from the FDA" on May 12, 2008, and provided AMA with the same data submitted in the 510(k).  A Category I CPT Code was requested. Category I is for procedures used in current medical practice and performed by many physicians in clinical practice in multiple locations.[315] Masimo provided the following rationale for the code change request:

> "Currently, CPT code 85018 is used to report quantitative hemoglobin (Hgb) determination" and "describes an *in vitro* test which requires obtaining a blood sample prior to measurement by laboratory CO-Oximetry. Use of the *in vitro* test can result in a delay before obtaining test results.  The request for a code is to describe the transcutaneous detection of Hgb and allow differentiation between transcutaneous Hgb measurement and invasive Hgb measurement."[316]

Masimo provided the following additional information to AMA, indicating that the transcutaneous Hgb measurement is suitable for diagnosis, in my professional opinion.  Specifically, Mr. Jansen wrote that "[t]he *only difference* between the test currently described by CPT and the test to be described by the new code is that the new test is transcutaneous." Further, he wrote that "results are available at the point of care allowing much more rapid *therapeutic intervention*" and "[a]llow clinicians to make *more rapid better informed decisions* about patients care." The new test "is similar in methodology (spectrophotometry) and clinical indications to the current in vitro tests, but

---

http://www.cms.gov/Medicare/Coverage/CouncilonTechInnov/downloads/InnovatorsGuide5_10_10.pdfhttp://www.cms.gov/Medicare/Coverage/CouncilonTechInnov/downloads/InnovatorsGuide5_10_10.pdf

[312] Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, August 21, 1996, § 262.

[313] CPT® Process – How a Code Becomes a Code: http://www.ama-assn.org/ama/pub/physician-resources/solutions-managing-your-practice/coding-billing-insurance/cpt/cpt-process-faq/code-becomes-cpt.page.

[314] No Bates number: Coding Change Request Form For Laboratory Tests, 1st page.

[315] AMA Applying for CPT® Codes: http://www.ama-assn.org/ama/pub/physician-resources/solutions-managing-your-practice/coding-billing-insurance/cpt/applying-cpt-codes.page

[316] No Bates number: Coding Change Request Form For Laboratory Tests, 3rd page, question 8.

*Peggy Pence, Ph.D., RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

does not require an invasive blood draw, hazardous waste removal, risk of inadvertent needed [sic] sticks, and induced anemia (preventable) in certain populations."[317] In answer to the Request Form question as to whether there are any practice guidelines or policy statements regarding the use of this test to *diagnose or manage* patients with specific diseases, Mr. Jansen responded affirmatively, specifically, that "CMS requires that the blood Hgb be measured (and that the Hgb levels must be <10gm/dl) before ESA's are administered."[318] (Emphasis added.)

It is important to note that this code request was submitted approximately nine weeks following clearance of the Radical-7, a continuous noninvasive *monitoring* device, and in the same month the device became available.[319] Thus, to respond to the question on the Request Form concerning how long the test had been offered and how widely it is used, Mr. Jansen forecast that by "the time of the October CPT Meeting it is expected that there will be approximately 500 devices used by more than 100 hospitals and physicians offices."[320] For a Category I code to be added, the documentation must substantiate that the test is widely used and accepted.[321]  Mr. Jansen signed, July 22, 2008, that to the best of his knowledge, "the information provided to AMA accurately depicts *current laboratory practice*."[322] (Emphasis added.)

The information provided to AMA, specifically, that transcutaneous testing is the only difference between the Masimo devices and in vitro testing by laboratory CO-Oximetry, was false and misleading. Referencing Section IV.B.*1.1.1* which discusses the Radical-7 510(k) submission, the information Masimo provided to FDA for 510(k)-clearance was different than the information the company provided to AMA to obtain the CPT code for the subject devices.  During the 510(k) review process when FDA requested Masimo to provide performance data based on CLSI (Clinical and Laboratory Standards Institute) clinical laboratory standards, Masimo replied that "the devices in this submission *are not required to follow these standards* because *they are not in vitro clinical laboratory devices*."[323] (Emphasis added.) Further, Masimo stated that "*the devices are not being relied upon for the purpose of diagnosis.  In accordance with the devices' indications for use, Masimo SpHb devices are mainly used for monitoring, checking, and providing trends of a patient's total hemoglobin level…*"[324]

Thus, the Masimo subject devices were not evaluated for substantial equivalence to in vitro diagnostic testing and, accordingly, FDA did not issue a substantial equivalence determination that these devices are as safe and effective as in vitro diagnostic testing for hemoglobin determination. Moreover, the Operator's Manual for the Radical- 7, the Pronto, and the Pronto-7 specify that the devices should be considered *early warning* devices.[325] (Emphasis added.) As a trend towards patient hypoxemia is indicated or for measurements of high or low SpO$_2$, users of the devices are

---

[317] No Bates number: Coding Change Request Form For Laboratory Tests, 5th page, question 14.
[318] *Id.*, 8th page, question 26.
[319] *Id.*, 6th page, question 19.
[320] *Id.*
[321] *Id.*
[322] *Id.*, 9th page.
[323] RESPONDENT506489 at 490: Letter, April 22, 2008, from Marguerite Thomlinson, Masimo, to FDA, Subject: 510(k) Number K080238 Meeting Minutes for Teleconference on 4/22/08.
[324] *Id.*
[325] RESPONDENT500633 at 726: Radical 7/Rad 87/Rad 57t-SpHb 510(k), Operator's Manual – Safety Information, Warnings, Cautions and Notes; RESPONDENT139240 at 243: Pronto® Operator's Manual – Safety Information, Warnings and Cautions; RESPONDENT549243 at 246: Pronto-7™ Operator's Manual - Safety Information, Warnings and Cautions.

*Peggy Pence, Ph.D., RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

advised that blood samples should be analyzed by laboratory instruments to completely understand the patient's condition.[326] Similarly, for measurements of high or low SpHb readings, blood samples should be analyzed by laboratory instruments to completely understand the patient's condition.[327]

The information Masimo provided AMA was also incomplete. In this regard, my report contradicts the opinions of Dr. Joel Brill. He states in his report at page 15 that Masimo submitted information and provided answers to all required questions. Masimo did not, in fact, provide the FDA related information it had, specifically, the limited nature of its clearance.

As explained more fully above, Masimo represented to FDA that its device was not an independent diagnostic test. Nevertheless, Masimo did not include this information in its communications with AMA regarding its CPT code request. As a result, Masimo sought and obtained a code used to promote its product, and to which entities could bill, that otherwise should not have existed per AMA guidelines discussed above.

As discussed previously in this report in Section IV.B.*1.2,* Masimo engaged in improper marketing of the subject devices for diagnostic purposes and as a substitute for laboratory testing. As noted above in this section, CMS will not pay for devices used off-label (except in specific circumstances). Based on my experience and according to industry practice, it is improper to promote claims submissions for off-label, use, i.e., uses outside the scope of FDA clearance. Thus, claims may not have been paid if the use of the device had been known to be off-label, i.e., a use for which Masimo did not have 510(k)-clearance or PMA approval.

Masimo provided its customers with guidance on how to code and bill for their devices.[328] Masimo instructed customers to use CPT 88738 and submit claims for reimbursement to Medicare and commercial payers in the same manner they would for any lab test, appropriately noting that the test must be deemed medically necessary. Masimo further instructed that billing CPT Code 88738 does not preclude the performance of and billing for a Complete Blood Count (CBC) test using CPT Code 85025 or 85027 on the same patient and same day, if the treating physician deems both tests medically necessary. In such case, the modifier "91" should be added to CPT Code 88738.[329]

Masimo collected Explanation of Benefits (EOB) information from its customers. Among the information collected is documentation showing Medicare paid $7.19 per test.[330,331] Masimo implemented the "CPT 88738 EOB Project" in order to collect test data for billing purposes. As John Birkle instructed several Territory Managers, "you should plan on spending time personally in the account to *test patients* with the *sole intention* of the account billing not only CMS Medicare,

---

[326] RESPONDENT500633 at 726: Radical 7/Rad 87/Rad 57t-SpHb 510(k), Operator's Manual – Safety Information, Warnings, Cautions and Notes; RESPONDENT549243 at 246: Pronto-7™ Operator's Manual - Safety Information, Warnings and Cautions.
[327] RESPONDENT139240 at 243: Pronto® Operator's Manual – Safety Information, Warnings and Cautions; RESPONDENT549243 at 246: Pronto-7™ Operator's Manual - Safety Information, Warnings and Cautions.
[328] RESPONDENT116455: Reimbursement for Noninvasive Hemoglobin (SpHb®) Spot-Check Testing, 2010.
[329] *Id.*
[330] RESPONDENT00008 at 009: Email October 11, 2010, Michael Ruhe to Rody Azar RE: EOB – Medicare – San Diego – Dr. Lajvardi.
[331] RESPONDENT519381 at 383: Email series July 28, to September 28, 2010, Kristine Serwitz to Kevin Hammond, John Birkle, and Gary Marston, subsequently to Leslie Russell, Chris Todd, RE: Colorado Reimbursement.

Peggy Pence, PhD, RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

but also commercial payors….More to follow on this critically important topic."[332]  Heidi Hawkins, one of the Territory Managers involved in the EOB Project, wrote about a potential problem in launching the new noninvasive SpHb technology. Anticipating clinicians to say, "'I run CBC's…this procedure is redundant since I will want to run a CBC anyway because I want that other information,'" the proffered solution was as follows:

> "*Don't fight their desire to <u>want</u> (vs. need) to run a CBC*.  They will want to do this in the beginning for a few reasons one of which is to *build trust with the product*. In the second phase of a sale when we are working on increasing their sensor usage & they have some experience in their corner, we can educate them about why they may no longer need to order as many CBC's as they once had. Simply reassure them that *they will still get reimbursed even if they choose to perform both tests*."[333] (Emphasis added.)

Thus, the documentation shows that the "CPT 88738 EOB Project" caused claims to be filed for tests that were not medically necessary but were done solely for account billing of test patients. Masimo's conduct in this regard was improper.


# V.    SUMMATION OF OPINIONS

## A.    Summary List of Opinions

For ease of reference, the seven specific opinions discussed in detail in this report are reproduced below.  Following these opinions, I provide a summary discussion of the opinions of Masimo's experts that are rebutted by my opinions.

**OPINION #1:**  The lack of issuance of a Form FDA 483 following FDA's For-Cause inspection of Masimo Corporation on February 2-11, 2011, should not be interpreted that deficiencies did not exist.

**OPINION #2:** Masimo improperly marketed its subject products by promoting them for intended uses beyond those covered by its applicable 510(k)s and cleared for marketing by FDA. Specifically, as regards measurement of total hemoglobin concentration (SpHb), Masimo promoted the products for diagnosis instead of the 510(k)-cleared indication for hemoglobin monitoring or spot checking.

**OPINION #3:**  Masimo deviated from industry standards by improperly marketing its products as a result of failure to reveal material facts concerning product inaccuracies and, thus, Masimo marketed products dangerous to health when used in the manner recommended or suggested in the labeling.

**OPINION #4:**  Masimo violated industry practices by improperly marketing products as a result of labeling that made unsupported or incomplete accuracy claims.

---

[332] RESPONDENT00089: Email December 28, 2009, John Birkle to Heidi Hawkins, Michael Ruhe, Kristine Serwitz, Corkie Matson, Vicente Catala, RE: ***Q1 2010 Duties & Responsibilities***, with attachments per each Territory Manager.
[333] RESPONDENT00089 at 93-94: *Id.*

Peggy Pence, PhD, RAC, FRAPS
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

**OPINION #5:**  Masimo failed to perform product recall according to the mandatory FDA reporting requirements when warranted based on product non-performance.

**OPINION #6:**  Masimo deviated from standard industry practice  by failing to document, review, and evaluate all complaints and submit Medical Device Reports (MDRs) to the FDA where indicated.

**OPINION #7:**  Masimo improperly instructed customers on coding for billing for the subject devices.

**B.      Summary Rebuttal of Masimo's Experts' Opinions**

- My opinions in this report rebut the opinion of Mr. William Moore that "[t]he manner in which Masimo handled the Pronto and/or Pronto 7 release post FDA clearance is consistent with industry practice."[334] To the contrary, Masimo deviated from industry practice in multiple ways, including for example: improperly marketing its products by claiming accuracy that could not be met and marketing for an intended use that was not 510(k)-cleared or approved by FDA; failing to review and evaluate all product complaints and report MDRs when events met reporting requirements; failing to conduct a recall according to standard industry practice and report to FDA; failing to reveal material facts concerning product inaccuracies; marketing products dangerous to health when used in the manner recommended or suggested in the labeling; and instructing customers on billing practices that were improper. All of the opinions in my report rebut Mr. Moore's opinion.

- My Opinion #1 in this report rebuts Mr. Peter Barton Hutt's opinion that the FDA's failure to seek enforcement action after its 2011 inspection of Masimo means the agency did not find any deficiencies.[335] FDA's findings are based only on the information reviewed by the FDA investigators. Of special note, "FDA is currently evaluating the evidence submitted to FDA by Relators' counsel  and Masimo Corporation regarding the Pronto and the Pronto 7. FDA has not yet made a final decision regarding possible actions to be taken in response to such evidence."[336]

- My Opinion #2 in this report rebuts Mr. Peter Barton Hutt's opinion that the Pronto and Pronto-7 were diagnostic medical devices.[337] To the point, FDA expressly informed Masimo that the products were not cleared to the same standard as an independent laboratory diagnostic test and, therefore, Masimo could not promote the devices as a diagnostic test or substitute for a laboratory diagnostic test.

- My opinions in this report rebut Mr. Peter Barton Hutt's opinions suggesting Masimo properly marketed and labeled its products.[338] For example, my report rebuts Mr. Hutt's

---

[334] Expert Report of William M. Moore, July 30, 2013, page 12.
[335] Expert Report of Peter Barton Hutt, July 26, 2013,  pages 3, 17; Also see Expert Report of Ann A. Graham July 31, 2013, at page 27.
[336] Declaration of Joshua Simms, August 27, 2013.
[337] Expert Report of Peter Barton Hutt, July 26, 2013, pages 3, 6, 15.
[338] Expert Report of Peter Barton Hutt, July 26, 2013, pages 15-17.

*Peggy Pence, Ph.D., RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

opinion that the promotional claims made by Masimo for the Pronto and Pronto-7 in its promotional materials were consistent with the FDA-cleared indications for use statement.[339] Mr. Hutt's opinion implies Masimo did not engage in improper marketing, when in fact it did. My report addresses these matters in Opinions #1-5 and #7.

- My Opinions #5-6 in this report rebut Mr. Peter Barton Hutt's statements suggesting Masimo satisfied industry standards concerning medical device reporting, recalls and reports of correction or removal.[340]

- My Opinion #2 rebuts the opinion of Ms. Ann Graham that "Masimo submitted a new 510(k) for the Rainbow SET Pronto Pulse Co-Oximeter and Accessories, K091057, due to Masimo's intent to market the Pronto with a new intended use," specifically, that "Masimo intended to expand the indications for use to include blood donation facilities and ambulatory surgery centers" and that "FDA issued its substantial equivalence letter, permitting Masimo to market the Pronto with the new indications for use in blood donation facilities, ambulatory surgery centers, homes, clinics, and physician offices."[341] The revisions in the indications for use were only for the purpose of clarification of the indications for use,"[342] not for a new intended use or new indications for use. Thus, Masimo itself confirmed that the Pronto was not for the purpose of diagnosis, in keeping with the predicate device history.

- My report rebuts the opinions of Dr. Aryeh Shander and Dr. Keith Ruskin that all devices have some range of error in their measures.[343,344] To the point, Masimo reported to FDA that, "[a]s designed, we expect the Pronto-7 device to provide accurate measurements within its declared accuracy range (ISO 9919) when used in accordance with the instructions in the manual."[345] Masimo's representations of accuracy and failure to disclose the information about inaccuracies it had available to it were improper. Similarly, my report rebuts the opinion of Dr. Shander that the standard deviation variation was not significant enough to result in a different course of treatment to the extent it overlooks the fact that the accuracy issues Masimo experienced made its device improper as marketed. Opinions #2-6 stated in my report address these matters.

---

[339] Expert Report of Peter Barton Hutt, July 26, 2013,  page 17.
[340] Expert Report of Peter Barton Hutt, July 26, 2013, pages 13-14.
[341] Expert Report of Ann A. Graham, July 31, 2013, page 20, Section F.3.
[342] RESPONDENT501589 at 606: Rainbow SET Pronto Pulse CO-Oximeter and Accessories 510(k), 4/10/09, Indications for Use and Intended Use Statement.
[343] Expert Report of Dr. Aryeh Shander, pages 2-3, 5.
[344] Expert Report of Dr. Keith Ruskin, page 4.
[345] MASIMO001308 at 316: Masimo letter to FDA, November 10, 2011, RE: K111403 – Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter and Accessories, Response to Request for Additional Information.

*Peggy Pence, PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

- My report rebuts the statement of Dr. Aryeh Shander suggesting it would be proper to use Pronto-7 Hb measurement to "defer the patient's surgery and provide therapy,"[346] because that is precisely the kind of diagnostic decision-making FDA instructed Masimo it could not do, specifically, because the devices were not cleared to the same standard as an independent laboratory diagnostic test. While FDA does not regulate the practice of medicine and a clinician is generally free to safely use devices as they choose, Masimo was not permitted to market the product for diagnostic use and therapeutic decision-making. The report examines these issues in Opinions #2 and #7.

- My report rebuts the opinions of Dr. James Nichols who suggests that the changes Masimo made during the development of its devices were appropriate with respect to gaining FDA clearance.[347] Significant changes were made to the Pronto-7 which, in my professional opinion, warranted submission of a 510(k) submission or potentially a PMA application. Similarly, my report rebuts the opinion of Ann Graham that a manufacturer is not required to submit all data and information collected on a device in support of a 510(k). Data with the potential to impact safety and effectiveness of a device and complaints that meet the standard for MDR reporting require disclosure to FDA according to industry standards.[348] Finally, I agree with the opinion of Mr. William Moore that devices may need "continued post-market refinement and modification following FDA-clearance" and that devices may be modified to address issues that arise.[349] In this case, however, Masimo failed to take the appropriate steps according to industry standards, including submission of a 510(k) or even PMA application, e.g., for implementing the two-page display on the Pronto-7 in order to focus on SpHb measurement. Further, it left devices in the field that were known to provide inaccurate results, including use in critical clinical care patients. For the same reasons, my report rebuts the opinion of Dr. Goodman and addresses the report of Mr. Hutt.[350,351] The Opinions #2 – 6 within my report address these issues.

[346] Expert Report of Dr. Aryeh Shander, July 31, 2013, page 3.
[347] Expert Report of Dr. James Nichols, July 26, 2013, pages 4-6.
[348] Expert Report of Ann A. Graham, July 31, 2013, page 10.
[349] Expert Report of William M. Moore, July 30, 2013, page 9.
[350] Expert Report of Dr. David E. Goodman, July 31, 2013, pages 18-20.
[351] Expert Report of Peter Barton Hutt, July 26, 2013, page 11.

*Peggy Pence PhD, RAC, FRAPS*
*Expert Witness Rebuttal Report – August 30, 2013*
*Masimo Corporation Qui Tam Litigation*

I reserve the right to amend or supplement this Report in the event that additional pertinent information becomes available or additional issues are raised in reports of other experts. In particular, I note that recent developments have uncovered information not previously provided for review. I would like to see the sales contracts and information provided to the various customers such as those produced by Montana WIC, records and testimony from Patricia Millbank and others who raised concerns to Ms. Simone Reynolds about FDA submissions, study reporting and data, quality issues, and records concerning Masimo's use of outside consultants, inspections, and related matters. Finally, I believe I can render a full opinion and properly rebut Masimo's experts, particularly on the clinical study issues raised, with the benefit of this information.

Peggy Pence, PhD, RAC, FRAPS

September 6, 2013
Date