# JS-6

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES *ex rel*. MICHAEL RUHE, KRISTINE SERWITZ, and VICENTE CATALA, and MICHAEL RUHE, individually, VICENTE CATALA, individually, and KRISTINE SERWITZ, individually,<br><br>          Plaintiffs,<br><br>     vs.<br><br>MASIMO CORPORATION,<br><br>          Defendant. | Case No.: CV 10-08169-CJC(VBKx)<br><br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I.   INTRODUCTION

Plaintiff-Relators Michael Ruhe, Vicente Catala, and Kristine Serwitz (collectively, "Relators") bring this *qui tam* action individually and in the name of the United States against Defendant Masimo Corporation ("Masimo") under the federal False

Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*.  Relators allege that Masimo knowingly made false statements in connection with its "Pronto" line of medical devices and that those statements were material to claims for reimbursement submitted to federal payer programs such as Medicare.  Before the Court is Masimo's motion for summary judgment.  (Dkt. No. 117.)  After considering all the evidence presented by the parties and the arguments of their counsel, the Court GRANTS Masimo's motion.  To be liable under the False Claims Act, a defendant must do more than simply be enthusiastic about its products and resilient to criticism about them.  The defendant must be *knowingly* misleading about the products.  Here, however, Relators' evidence does not demonstrate any knowingly misleading statements or conduct by Masimo in connection with its medical devices.  At most, Relators have shown that Masimo was aware of isolated complaints and anecdotal feedback from physicians regarding the performance of the devices.  Such evidence falls far short of demonstrating the knowing fraud required for liability under the False Claims Act.

## II.    BACKGROUND

Relators are former sales representatives who left Masimo in 2010.  Masimo manufactures and develops medical devices, known as pulse oximeters, that measure characteristics of the blood "non-invasively," that is, without the need to draw a blood sample.  (Dkt. No. 145, Def.'s Mem. of P. & A. in Supp. of Mot. Summ. J. ["Def.'s Mem."] at 2.)  The first pulse oximeters were developed in the 1980s to non-invasively measure oxygen saturation in the blood ("$SpO_2$").  (Dkt. No. 128 ["Dr. Goodman Decl."] ¶¶ 26, 43.)  Before the advent of pulse oximeters, every time a physician wanted to measure a patient's blood oxygen levels a blood sample had to be drawn and sent to a laboratory for analysis.  (Dr. Goodman Decl. ¶ 26.)  Pulse oximeters take these measurements by analyzing wavelengths of light through a sensor clipped to the patient's finger.  (Dr. Goodman Decl. ¶ 26.)  Masimo's founders developed advancements in

sensor technology for pulse oximeters that give the devices the ability to accurately measure SpO$_2$ even when the patient is moving or has low blood flow.  (Def.'s Mem. at 2.)  Masimo calls this proprietary sensor technology Signal Extraction Technology ("SET").  (Dkt. No. 165 ["Kiani Decl."] ¶ 4.)  Masimo's latest devices, which are the subject of this action, non-invasively measure an additional blood constituent known as total hemoglobin ("SpHb" or "hemoglobin").  These devices are marketed under the names Radical-7, Pronto, and Pronto-7 (collectively, the "Pronto Devices").  (Kiani Decl. ¶ 5.)

## A.   510(k) Clearance Process

Under Food & Drug Administration ("FDA") regulations, there are two avenues through which a manufacturer can get a new medical device approved for marketing in the United States.  The two methods are the premarket approval ("PMA") process and the "510(k)" clearance process.  (Dkt. No. 168 ["Graham Decl."] at 8–9.)  The more onerous PMA process requires, among other things, a full report of all information known to the applicant regarding investigations demonstrating whether the device is safe and effective. *See* 21 U.S.C. § 360e(c)(1)(A).  In contrast, under the 510(k) process the applicant is required to demonstrate only that the device is substantially equivalent in terms of safety and effectiveness to an existing FDA-approved device.  21 C.F.R. § 807.92(a)(3).  The FDA recommends various testing and performance standards to evaluate the safety and efficacy of medical devices, including standards devised by the International Organization of Standardization ("ISO").  Although the FDA does not require conformance with such standards, demonstrating conformance is one way that a manufacturer can establish substantial equivalence for 510(k) clearance.  (Graham Decl. at 13.)  The FDA's guidance document regarding 510(k) submissions for pulse oximeter devices recommends that manufacturers comply with ISO 80601:2011 in conducting

performance testing.[1]  *See* FDA, *Pulse Oximeters – Premarket Notification Submissions [510(k)s]: Guidance for Industry and Food and Drug Administration Staff*, Mar. 4, 2013 ["Pulse Oximeter Guidance"].  To demonstrate accuracy of a pulse oximeter device, the manufacturer commissions one or more controlled clinical studies.  A study investigator or technician uses the device to take a series of measurements on healthy volunteers.  These measurements are then compared to measurements from laboratory analysis of blood samples taken at the same time.  (Pulse Oximeter Guidance at 5.)  Each of these comparisons is a "data point."  The difference between the device measurement and the blood sample measurement is compared for each data point and the average of all the discrepancies is taken and expressed as an Average Root Mean Square ("ARMs") value.  (Graham Decl. at 11–12.)  These study results and other voluminous data are submitted to the FDA, which employs experts and statisticians to review the data and independently determine, based on the totality of the information regarding the device, whether it is substantially equivalent to a predicate device in terms of safety and effectiveness.  (Graham Decl. at 13–14.)

## B.    The Pronto Devices' 510(k) Submissions

From 2008 to 2011, Masimo submitted five 510(k) submissions for the Pronto Devices that were reviewed and cleared by the FDA.  The first 510(k) at issue concerned three devices, the Radical-7, Rad 87, and Rad 57t.  (Graham Decl. Exh. C.)  These devices all used Masimo's SET and Rainbow MX-1 circuit board technology from its pulse oximeter devices.  (Graham Decl. Exh. C at 228.)  Masimo sought clearance to market the devices with indications for use for the continuous non-invasive monitoring of SpO₂, pulse rate, and SpHb.  (Graham Decl. Exh. C at 228.)  With the 510(k) application, Masimo submitted performance testing data along with a detailed explanation of the data

---

[1]  The FDA's draft guidance for pulse oximeter 510(k) submissions, issued in July 2007, contained substantially the same recommendations as the final guidance.  (*See* Graham Decl. at 12 n.6.)

collection methods, subject population, and study methodology.  (Graham Decl. Exh. D.)
This validation study data consisted of 492 data points collected on 59 different
volunteers.  The data showed an SpHb ARMs accuracy value of +/- 0.96 grams per
deciliter ("g/dL") at one standard deviation, which Masimo rounded up to +/- 1 g/dL in
its proposed accuracy specification.  (Graham Decl. Exh. D.)  On May 12, 2008, the FDA
notified Masimo that it found the devices substantially equivalent to their predicate
devices and cleared them for marketing with the requested indications for continuous
monitoring of $SpO_2$, pulse rate, and SpHb, and with an SpHb accuracy specification of
+/- 1 g/dL.  (Graham Decl. Exh. E.)

Masimo's second 510(k) submission was for a device it ultimately marketed as the
Pronto.  The Pronto used the same Rainbow MX-1 circuit board, and Masimo's 510(k)
submission for the device relied on the same validation testing data as the Radical
predicate devices.  However, Masimo sought clearance to market the Pronto with an
indication for non-invasive "spot checking" of $SpO_2$, pulse rate, and SpHb.  (Graham
Decl. Exh. F.)  The FDA reviewed the submission and cleared the Pronto on October 10,
2008, with an indication for spot checking $SpO_2$, pulse rate, and SpHb.  (Graham Decl.
Exh. H.)  In April 2009, Masimo submitted a third 510(k) seeking to market the Pronto
with indications for use in blood donation facilities and ambulatory surgery centers.  The
FDA cleared this submission on July 9, 2009.  (Graham Decl. Exhs. I–J.)

On July 31, 2009, Masimo submitted a fourth 510(k), seeking clearance to market
a device with somewhat different wavelengths and detectors it called the Pronto-7 (the
"Initial Pronto-7").  Up to this point, all of Masimo's devices included a function for
measuring $SpO_2$.  The Initial Pronto-7, however, only measured SpHb, and did not
include an $SpO_2$ parameter.  (*See* Graham Decl. Exh. K.)  On December 28, 2009, the
FDA found the Initial Pronto-7 not substantially equivalent to the predicate devices
because it was not able to measure $SpO_2$.  (Graham Decl. Exhs. N–O.)  The FDA advised

Masimo that it could submit another 510(k) if the $SpO_2$ function was added back into the proposed product.  (Graham Decl. Exh. O.)  Masimo accordingly submitted a fifth 510(k) application on February 5, 2010 for the device with the $SpO_2$ parameter reinstated (the "Pronto-7").  (*See* Graham Decl. Exh. P.)  The SpHb validation testing data submitted with the Pronto-7 application was collected on 70 individuals with different levels of skin pigmentation at three locations, Loma Linda Medical Center, Mayo Clinic Jacksonville, and University of California, Irvine.[2]  (Graham Decl. Exh. M.)  The clinical report included 3,519 unique data points and showed SpHb ARMs accuracy of +/- 0.8 g/dL in the 6–18 g/dL range, which Masimo rounded up to +/- 1 g/dL for the purpose of its proposed accuracy specification.  (Graham Decl. Exh. M.)  On June 23, 2010, the FDA cleared the Pronto-7 for marketing in the United States with Masimo's proposed accuracy specification.  (Graham Decl. Exh. R.)

Masimo submitted its sixth and final 510(k) application to the FDA on May 17, 2011.  The sixth submission was to obtain clearance for changes to the Pronto-7 that included replacing one of the infrared LEDs with a visible LED.  (Graham Decl. Exh. S.) Masimo also submitted additional validation testing data.  The additional data was collected at fourteen different locations throughout the country and included 11,335 data points taken on 1,445 volunteers of varying demographics.  (Graham Decl. Exh. T.)  The data showed SpHb ARMs accuracy between +/- 0.8 g/dL and 1.2 g/dL in the 6–18 g/dL range at different locations in Normal Mode, resulting in a specified ARMs accuracy of +/- 0.99 g/dL.  (Graham Decl. Exh. T.)  Masimo again requested clearance at an accuracy specification of +/- 1 g/dL.  The FDA cleared the device with the +/- 1 g/dL accuracy specification on December 30, 2011.  (Graham Decl. Exh. U.)

//

---

[2]  This was the same data set Masimo had submitted with the Initial Pronto-7 510(k) submission.

### C.      Post-Clearance Marketing and Sales

As "point-of-care" devices, the Pronto Devices give physicians the ability to obtain real-time test results on-site in the clinical setting rather than having to send a sample out to a laboratory for analysis.  (Dr. Goodman Decl. ¶ 20.)  Although point-of-care devices are generally less accurate than laboratory methods, this trade-off is generally accepted by physicians for the speed and convenience offered by such devices.  (Dr. Goodman Decl. ¶ 20.)  The Pronto and Pronto-7 were cleared with an indication for "spot checking" hemoglobin, which the FDA explained meant the devices are intended to be used as a supplement to blood sampling but not as the sole diagnostic test for determining hemoglobin levels.  (*See* Graham Decl. Exh. O.)  The FDA also advised Masimo that "health care providers may use a medical product as they deem in the best interest of their patients consistent with the practice of medicine."  (Graham Decl. Exh. O.)

Masimo's 510(k) submission to the FDA for the Pronto-7 included approximately 50 pages of proposed marketing materials.  (Dkt. No. 174 ["Lee Decl."] Exh. 15 at 1503.) The marketing materials claim that the Pronto-7 "[f]acilitates timely patient assessment," "[r]educes the need to wait for lab results," and "[r]educes painful needle sticks and time-consuming blood draws."  (Lee Decl. Exh. 15 at 1505.)  The marketing materials recite the FDA-cleared SpHb accuracy of +/- 1 g/dL at one standard deviation.  (Lee Decl. Exh. 15 at 1506.)  Masimo's submissions also contained the product manuals for the Pronto Devices, which detail the many "confounding factors" that can affect accurate readings and explain that the accuracy of measurements taken in a clinical setting may differ from the validation results.  (Dkt. No. 119, Statement of Uncontroverted Facts in Supp. of Masimo's Mot. Summ. J. ["Def.'s SUF"] 33.)[3]  The FDA cleared Masimo's 510(k) submission containing the marketing materials and manuals.  (*See* Graham Decl. Exh. R.)

---

[3]  Unless otherwise indicated, references to the parties' statements of uncontroverted facts are to facts that are not substantively disputed.

Once sales of the Pronto Devices began, Masimo's CEO would regularly make trips into the field to ensure that the devices were properly marketed and to receive feedback directly from healthcare providers.  (Kiani Decl. ¶ 14.)  If a provider was not satisfied with a Pronto Device, Masimo offered a money-back guarantee and would refund the purchase.  (Kiani Decl. ¶ 14.)

Following release of the Pronto Devices, numerous third-party clinical researchers conducted studies comparing the devices to existing devices for measuring hemoglobin and published their findings in medical journals.  The devices most similar to the Pronto Devices were point-of-care devices that measured hemoglobin invasively, such as the HemoCue.  Masimo was aware of studies demonstrating that the Pronto Devices' performance was at least as good as, and sometimes better than, the performance of the HemoCue device.  (Kiani Decl. ¶ 16.)  For instance, a study conducted by a professor at Loma Linda University Medical Center and published in the International Journal of Laboratory Hematology tested the performance of the Pronto-7 and the HemoCue on 440 individuals and compared the results.  (Kiani Decl. Exh. 29 at 153.)  The study found hemoglobin accuracy performance of +/- 1.1 g/dL for the Pronto-7 and +/- 1.6 g/dL for the HemoCue.  (Kiani Decl. Exh. 29 at 155.)  After the Pronto-7 entered the market, Masimo received awards for its invention, including the 2011 TechAmerica High-Tech Innovation Award, a GOLD in the 2011 Medical Design Excellence Award Competition during the Medical Design & Manufacturing East Conference and Exposition, the 2011 iF Product Design Award in medicine and health care, and the American Business Award for Best New Product or Service in Health and Pharmaceuticals.  (Kiani Decl. ¶ 9.)

After the first Pronto Device, the Radical 7, obtained FDA clearance in May 2008 and entered the market, physicians using the device requested reimbursement under the existing Current Procedural Terminology ("CPT") code for hemoglobin measurement (CPT 85018).  (*See* Dkt. No. 193 ["Jansen Decl."] Exh. 39.)  Because a non-invasive

hemoglobin test did not exist before the advent of the Pronto Devices, the existing CPT code did not differentiate between invasive and non-invasive tests.  (Jansen Decl. Exh. 40 at 6.)  In July 2008, Masimo submitted an application to the American Medical Association ("AMA"), the organization that designates CPT codes, requesting a new CPT code to reflect a non-invasive procedure for measuring hemoglobin.  (Jansen Decl. Exh. 40.)  Masimo's application included copies of the FDA clearance and the product manual for the Radical-7.  (Jansen Decl. Exh. 40, Attachs. A–D.)  The AMA granted the application and designated CPT code 88378 for the non-invasive measurement of hemoglobin.

### D.    Plaintiff-Relators

Relators were employed as sales representatives at Masimo from 2009 to 2010.  (Kiani Decl. ¶ 10.)  In September 2010, Relator Serwitz resigned from Masimo purportedly due to concerns over "ongoing performance issues with the Pronto and Pronto-7 devices."  (Lee Decl. Exh. 17 at 1558.)  Relators Ruhe and Catala submitted similar resignation letters on October 22, 2010.  (*See* Lee Decl. Exh. 17 at 1568.)  Masimo responded to all three letters requesting additional information so it could investigate their claims and encouraging them to contact the FDA with their concerns.  (Lee Decl. Exh. 17 at 1560.)  Masimo immediately launched an internal investigation into the former employees' claims about the accuracy of the devices.  (Kiani Decl. ¶ 10.)  Masimo also voluntarily notified the FDA of the allegations and forwarded copies of the resignation letters.  (Lee Decl. Exh. 17 at 1557.)  On February 2, 2011, FDA investigators arrived unannounced at Masimo's headquarters to perform an audit inspection.  (Kiani Decl. ¶ 11.)  The inspection was for the purpose of investigating Relators' allegations regarding the accuracy performance of the Pronto Devices.  (Kiani Decl. Exh. 27 at 124.)  Masimo gave the FDA unfettered access to all of its activities and documents, including marketing materials, technical bulletins, and customer complaints pertaining to the

devices.  (Lee Decl. Exh. 18 at 1590–92.)  FDA investigators issue "FDA–483" findings if any areas of concern are discovered in the course of an inspection.  The FDA concluded its inspection of Masimo's headquarters without issuing any FDA–483 findings or otherwise taking any enforcement actions.  (Lee Decl. Exh. 18 at 1589.)

On October 29, 2010, seven days after Relators Ruhe and Catala submitted their resignation letters, the Complaint in this action was filed seeking damages from Masimo under the *qui tam* provisions of the False Claims Act.  (*See* Dkt. No. 1.)  Pursuant to the procedures mandated by the FCA, the Complaint was filed under seal and served on the United States along with all material evidence and information, giving the Government the opportunity to decide whether to proceed with the action.  *See* 31 U.S.C. § 3730(b)(2).  The operative First Amended Complaint ("FAC") was filed on February 22, 2011.  (Dkt. No. 8.)  On November 1, 2011, the Government filed a notice of election informing the Court of its decision not to intervene.  (Dkt. No. 16.)  The FAC was unsealed and subsequently served on Masimo on January 19, 2012.  (Dkt. Nos. 17–18.)

## III.   LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is

"material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law. *Id*. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, where the non-movant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the non-moving party's case, *Celotex Corp.*, 477 U.S. at 325. Once this burden is met, the party resisting the motion must set forth, by affidavit or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position. Fed. R. Civ. P. 56(c)(1)(A)–(B). The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.*; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

F.2d 626, 630–31 (9th Cir. 1987).  The court does not make credibility determinations, nor does it weigh conflicting evidence.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992).  But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible.  Fed. R. Civ. P. 56(c).

# IV.   ANALYSIS

The False Claims Act was enacted during the Civil War in response to widespread fraud by government contractors, who were billing the government for services not actually rendered and submitting inflated invoices for services and goods.  *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir. 1996).  The False Claims Act[4] imposes liability on any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly[5] makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent

---

[4]  In 2009, Congress enacted the Fraud Enforcement and Recovery Act ("FERA"), which included amendments to the False Claims Act.  These amendments were intended in part to supersede the Supreme Court's holding in *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662 (2008). *See* S. Rep. No. 111-10, at 10 (2009), *reprinted in* 2009 U.S.C.C.A.N. 430, 438 ("This section amends the FCA to clarify and correct erroneous interpretations of the law that were decided in *Allison Engine Co. v. United States ex rel. Sanders*.").  The Court's holding in *Allison Engine* required proof that the defendant made the false statement for the purpose of getting a false or fraudulent claim paid by the government and with the intention that the government itself pay the claim.  The statutory language, which previously imposed liability on persons who made a "false record or statement to get a false or fraudulent claim paid or approved by the Government," was amended by FERA to impose liability for making "a false record or statement material to a false or fraudulent claim."  *See* Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009).

[5]  The False Claims Act defines the terms "knowing" and "knowingly" to "mean that a person, with respect to information — has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1) (internal punctuation omitted).  Where "knowledge" is used in this Order it should be understood as shorthand for the statutory definition.

claim." 31 U.S.C. § 3729(a)(1).  The Act contains a *qui tam* provision allowing private persons to bring civil actions on behalf of the United States.  31 U.S.C. § 3730(b).  The Government is given the opportunity to review the pleadings and material evidence and elect to prosecute the action.  31 U.S.C. § 3730(b)(2).  If the Government elects not to intervene, the person who brought the action may proceed with the lawsuit and recover a portion of any damage award along with attorneys' fees and costs.  31 U.S.C. § 3730(b), (d)(2).  A civil action for False Claims Act liability requires four essential elements:  "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

The scienter element is "critical" to establishing liability under the False Claims Act.  *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998).  Scienter requires a showing that the defendant made statements that were " 'intentional, palpable lie[s],' made with 'knowledge of the falsity.' "  *Univ. of Phoenix*, 461 F.3d at 1175 (quoting *Anton*, 91 F.3d at 1265, 1267.  The intended purpose of the False Claims Act is to recover losses due to fraud on the government coffers.  *Mikes v. Straus*, 274 F.3d 687, 696 (2d Cir. 2001).  Mere regulatory violations, standing alone, do not give rise to False Claims Act liability.  *Anton*, 91 F.3d at 1267 ("A violation of a regulatory provision, in the absence of a knowingly false or misleading representation, does not amount to fraud.") (internal quotation marks omitted); *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1033 (D. Nev. 2006) ("[T]he FCA is not intended to be some wide-ranging statute to police all types of regulatory or contractual compliance."); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) ("[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations.  The FCA is a fraud prevention statute.").  Moreover, "[i]nnocent mistakes, mere negligent misrepresentations and differences in interpretations" do not constitute knowingly false statements under the Act.  *Anton*, 91 F.3d at 1267; *see also Nackman*,

145 F.3d at 1073 (the False Claims Act is not intended to "punish honest mistakes or incorrect claims submitted through mere negligence") (quoting S. Rep. No. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272).  To survive summary judgment, a False Claims Act plaintiff must "produce sufficient evidence to support an inference of knowing fraud."  *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995).

Relators' action is not the "archetypical" False Claims Act case in which the defendant submitted a claim to the government that was false or fraudulent because it overcharged for the services rendered or charged for services that were not actually performed.  *See Univ. of Phoenix*, 461 F.3d at 1170.  There is no allegation that claims were submitted for Pronto Device hemoglobin tests that were not actually performed.  Rather, Relators have brought this action on the theory that claims for Medicare reimbursement submitted by healthcare providers using the Pronto Devices were fraudulent because Masimo had previously made false or fraudulent statements in connection with the devices.  The statutory basis for Relators' theory is a provision of the Medicare Act which excludes from Medicare coverage healthcare expenses that are "not reasonable and necessary for the diagnosis or treatment of illness or injury."  42 U.S.C. § 1395y(a)(1)(A).  Relators allege that Masimo knowingly made false or fraudulent statements in connection with the Pronto Devices by doing the following:  (1) representing to the FDA that it used a "fully characterized device" in the validation studies; (2) adding a "bogus" $SpO_2$ function to the Pronto-7 in order to get the device cleared by the FDA; (3) marketing the Pronto Devices for off-label "diagnostic" purposes; (4) representing to the AMA that the Pronto Devices were cleared for use as hemoglobin diagnostic devices in order to obtain a CPT billing code; (5) selling the Pronto Devices knowing that they did not perform to the FDA-cleared accuracy specification of +/- 1 g/dL; and (6) selling the Pronto Devices with knowledge that they were so clinically inaccurate as to be effectively worthless from a medical perspective.

(*See* Dkt. No. 177, Pls.' Mem. of P. & A. in Supp. of Opp'n to Mot. Summ. J. ["Pls.' Opp'n"] at 3–14.)  Relators' evidence fails to demonstrate any false statement or fraudulent conduct by Masimo; further, even assuming a showing of falsity or fraud has been made, Relators have not shown that it was *knowing* fraud on the part of Masimo.

## A.   Use of a "Fully Characterized Device"

Relators argue that the validation studies Masimo submitted to the FDA were premised on fraudulent data because the studies were not performed using a "fully characterized device."  (*See* Pls.' Opp'n at 7.)  ISO 14155-1 (8.2f), which is a testing protocol recommended by the FDA, instructs device testers to use "fully characterized devices which are the subject of the clinical investigation."  (*See* Dr. Goodman Decl. Exh. 15 at 221.)  Relators argue that the devices used in the studies were not "fully characterized" because they did not have the final product housing or display and the sensors did not have the "final calibration" at the time data was collected.  (*See* Pls.' Opp'n at 7.)

Masimo did not knowingly mislead the FDA because Masimo disclosed its validation study methodology to the FDA in its 510(k) submissions and the devices used in the validation studies were in fact fully characterized.  The validation data was collected using the final production sensor, the final production MX-1 circuit board, and the actual software to process the data in exactly the same way as the production device. (Dkt. No. 169 ["Sampath Decl."] ¶¶ 7, 13.)  Relators have presented no evidence that the production display or casing were in any way material to the validation study or the 510(k) submission.  Regarding the final calibration of the sensors, Masimo could not have knowingly misled the FDA because it disclosed in detail the process by which the data was collected and processed and the final calibration curve calculated.  (*See* Lee Decl. Exh. 15 at 1493–94.)  Specifically, Masimo's 510(k) submission explained that the

data would be processed in two phases.  In the first phase, raw data would be collected with an uncalibrated sensor and that data would then be used to calculate the calibration curve.  In the second phase, the raw data would be processed using the calibration curve, resulting in the final readings, just like the final production device.  (Lee Decl. Exh. 15 at 1493–94; Dr. Goodman Decl. ¶ 17.)

### B.   Adding a "Bogus" $SpO_2$ Function

Relators assert that Masimo knowingly misled the FDA by adding a "bogus" $SpO_2$ function to the Pronto-7 after having its initial 510(k) submission rejected.  Masimo could not have knowingly misled the FDA regarding the resubmission of its Pronto-7 device, however, because it was the FDA who advised Masimo that Masimo could file another 510(k) submission for the Pronto-7 if it added the $SpO_2$ function that had been present on previous devices.  (*See* Graham Decl. Exh. O.)  The fact that Masimo had to add the $SpO_2$ function in order to receive clearance through the 510(k) process was simply a product of the nature of the 510(k) process, which requires that the proposed device be "substantially equivalent" to a predicate device.  *See* 21 C.F.R. § 807.92(a)(3).  Masimo's submissions to the FDA exhibit nothing suggestive of knowing fraud.

### C.   Off-Label Marketing

Relators allege that Masimo marketed the Pronto Devices for "diagnostic" purposes, which they claim is an indication for use not cleared by the FDA.  Relators point to marketing materials containing statements that the Pronto-7 "[r]educes the need to wait for lab results" and "[d]ecreases risk of accidental needle sticks and exposure to blood-borne pathogens."  (Dkt. No. 149 ["Pence Decl."] at 49, 300.)

In the context of False Claims Act cases involving promotion of medical devices,

courts have recognized that "off-label use of a medical device is not the same as a medically unnecessary use of that drug or device." *United States ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 751 (S.D. Tex. 2010); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (" '[O]ff-label' usage of medical devices . . . is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine.").

Relators have presented no evidence to support an inference of knowing fraud by Masimo in its representations regarding the scope of FDA clearance for the Pronto Devices. It is undisputed that the FDA-cleared indications for use are recited verbatim in Masimo's product manuals for the devices. (*See* Lee Decl. Exh. 6 at 351; Exh. 8 at 425; Exh. 15 at 855 ("The Masimo Rainbow SET Pronto-7 Pulse CO-Oximeter and Accessories are indicated for noninvasive spot checking of functional saturation of arterial oxygen hemoglobin ($SpO_2$), pulse rate, and total hemoglobin concentration (SpHb).").) The product manuals also properly instruct physicians to obtain confirmatory laboratory tests according to their own medical judgment. (*See, e.g.*, Lee Decl. Exh. 15 at 846 ("The Pronto-7 should be considered an early warning device. For measurements of high or low SpHb readings, blood samples should be analyzed by laboratory instruments to completely understand the patient's condition.").) Masimo provided copies of its marketing materials to the FDA with its 510(k) submission, and the FDA cleared the submission. (Def.'s SUF 30.) Simply put, there is no evidence that Masimo misrepresented the scope of the clearances for the Pronto Devices. *See Medtronic*, 747 F. Supp. 2d at 777 ("Importantly, there is no allegation that Medtronic concealed or misstated the limits of the FDA's approval on the use of [the medical device].").[6]

---

[6] Relators' argument that Masimo knowingly misled the FDA regarding its marketing materials is contrary to the undisputed facts before the Court. Masimo's marketing materials were submitted to the FDA with its Pronto-7 510(k) submission and the FDA cleared the submission. The marketing materials were also among the documents the FDA inspected during its ten-day inspection of Masimo's headquarters and the agency did not take any enforcement action or raise any concerns about the materials.

The statements in the marketing materials are accurate and reasonable representations of the cleared uses of the devices, and, in any event, fall far short of the "intentional, palpable lie[s]" for which the False Claims Act imposes liability. *See Univ. of Phoenix*, 461 F.3d at 1175 (quoting *Anton*, 91 F.3d at 1265, 1267). It is undisputed that the Pronto Devices are the only devices able to non-invasively measure hemoglobin. Obtaining a hemoglobin measurement without using a Pronto Device necessarily requires an invasive procedure, that is, using a needle to take a blood sample and having that blood sample analyzed by a different device. (*See* Dr. Goodman Decl. ¶ 26.) Therefore, as a matter of simple logic, use of the Pronto Devices would necessarily decrease the number of blood samples taken and provide the benefits stated in the materials, such as "[d]ecrease[d] risk of accidental needle sticks." (*See* Pence Decl. at 300.) At the very most, Relators' evidence suggests "differences in interpretation[]" regarding the scope of the clearances for the devices, which does not amount to an actionable false or fraudulent statement under the FCA. *See Anton*, 91 F.3d at 1267.

## D. Accuracy of the Pronto Devices

Relators assert that Masimo falsely misled medical providers by continuing to sell the Pronto Devices with the FDA-cleared accuracy specification of +/- 1 g/dL despite post-clearance information purportedly showing variance in the accuracy performance of the devices. To support this assertion, Relators submitted evidence of customer feedback on device accuracy and internal discussions within Masimo about improving the accuracy of the devices. (*See* Pence Decl. at 52–58.) For instance, Relators cite an email from Masimo's CEO in which he stated, commenting on performance results of an ongoing clinical study, "SD [standard deviation] doesn't look great." (Pence Decl. at 53.) Relators also cite an internal email regarding a software update for the Pronto-7 in which a Masimo engineer stated that the update was intended to "fix all known bugs including improvements in spo2 and thb if possible." (Pence Decl. at 665) In this same vein,

Relators cite an email from a Masimo distribution manager to another manager stating, "[N]eedless to say that we need to improve accuracy." (Pence Decl. at 58.) The manager responded, "We are continually looking for ways to improve the sensors performance in all of the areas listed." (Pence Decl. at 58.)

Isolated complaints and anecdotal feedback about accuracy of the Pronto Devices do not support an inference that Masimo committed knowing fraud by continuing to sell the devices with a stated FDA-cleared accuracy specification of +/- 1 g/dL. Masimo has presented unrebutted testimony from physicians that variance in the accuracy performance of medical devices is both common and expected in the medical community. (Dr. Goodman Decl. ¶¶ 35–38; Dkt No. 122 ["Dr. Shander Decl."] ¶¶ 10–11.) Masimo in no way concealed or misrepresented the cleared accuracy specification for its devices. The parties do not dispute that the devices were cleared by the FDA with an SpHb accuracy specification of +/- 1 g/dL and that Masimo was required to market its devices consistent with the cleared specification. (*See* Def.'s SUF 32; Pls.' Opp'n at 20.) The product manuals for the Pronto Devices do in fact clearly and accurately state the FDA-cleared accuracy specification, and Relators provide no evidence to the contrary. (*See* Lee Decl. Exh. 18 at 1727.) Moreover, the manuals explain the methodology by which the stated accuracy specification was validated, including that the validation was done on healthy adult volunteers with SpHb levels between 6–18 g/dL, the specification was at one standard deviation encompassing 68% of the population, and accuracy has not been validated on subjects in motion or with low perfusion. (Lee Decl. Exh. 18 at 1728 n.3.) The manuals also notify healthcare providers that the accuracy of clinical measurements may differ from the validation results, (Def.'s SUF 33), and explicitly warn providers that hemoglobin measurement is inherently variable and many factors may affect the accuracy of hemoglobin test results. (Lee Decl. Exh. 18 at 1694 ("Variation in hemoglobin measurements may be profound and may be affected by sample type, body positioning, as well as other physiological conditions. As with most hemoglobin tests, Pronto-7 test

results should be scrutinized in light of a specific patient's condition.  Any results
exhibiting inconsistency with the patient's clinical status should be repeated and/or
supplemented with additional test data.").)  The manuals list these factors, which include
nail polish on the patient's finger, elevated levels of Bilirubin, low perfusion, motion
artifact, low $SpO_2$, peripheral vascular disease, and electromagnetic interference.  (Lee
Decl. Exh. 18 at 1696.)

Even if Relators could establish that the Pronto Devices are inaccurate to a material
degree, they have presented no evidence that Masimo did not have a good faith belief that
its devices were accurate.  Masimo tracks every potential sale of its Pronto Devices, and
if the sale is not completed records the reason why the potential purchaser decided not to
buy the device.  Of the 2,189 instances a provider decided not to purchase a Pronto
Device, only 4% were due to concerns about accuracy.  (Dkt. No. 171 ["Leung Decl."] at
4, Exhs. 1–2.)  Multiple clinical studies conducted by independent researchers have
studied the performance of the Pronto Devices and found them to perform comparable to
or better than alternative point-of-care hemoglobin measurement devices.  (*See* Kiani
Decl. Exhs. 24–25, 29.)  Masimo has received numerous awards for innovation and
product design for the Pronto-7.  (Kiani Decl. ¶ 9.)  Relators' evidence is simply not
sufficient to raise a triable dispute that Masimo knowingly made false statements about
the accuracy of the Pronto Devices.[7]  *See Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th
Cir. 1992) (holding that liability under the FCA requires a statement "known to be false,"
which "does not mean 'scientifically untrue'; it means 'a lie' ").[8]

---

[7]  Relators also failed to provide any competent evidence on the essential issue of what level of accuracy
would be required for the devices to be "reasonable and necessary for the diagnosis or treatment of
illness or injury" and therefore reimbursable under Medicare.  *See* 42 U.S.C. § 1395y(a)(1)(A).
Masimo, on the other hand, submitted a declaration from a physician testifying that deviations up to +/-
1.8 g/dL or greater would not detract from the clinical utility of the devices.  (*See* Dr. Goodman Decl.
¶ 33.)

[8]  Relators' reliance on the Declaration of Simone Reynolds, (Dkt. No. 180), is entirely misplaced.  The
majority of Ms. Reynolds' declaration is inadmissible hearsay without any foundation.  The statements

### E.   CPT Billing Code

Relators assert that Masimo falsely represented the scope of the FDA clearance for its Radical-7 device to the AMA in order to obtain a CPT code for non-invasive hemoglobin measurement.  (Pls.' Opp'n at 21.)  As described above, however, Masimo submitted actual copies of the FDA 510(k) clearance and product manual with its application to the AMA, both of which stated the exact language of the cleared indications for use for the device.  Relators have not shown any triable issue of fact that Masimo knowingly misled the AMA in obtaining a CPT code.

### F.   "Worthless Services" Doctrine

Finally, Relators assert that Masimo is liable under the "worthless services" doctrine.  Some courts have found False Claims Act liability where federal funds are used to pay for services and "the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all."  *Mikes*, 274 F.3d at 703; *see also United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001).  In a worthless services claim involving a medical procedure, the plaintiff must demonstrate that the procedure has "no medical value."  *Mikes*, 274 F.3d at 702.

The only evidence Relators submit in support of their worthless services argument is an email from a physician, Dr. Michael Germain, stating that he would like to return the Pronto Devices he purchased.  (*See* Pls.' Opp'n at 23.)  However, Dr. Germain did not find the devices worthless.  He simply deemed them not appropriate for his particular proposed study (on the variability of hemoglobin during the inter-dialytic time period in dialysis patients) and elected to use a different hemoglobin measuring device.  (Pence

---

that are not inadmissible hearsay are merely cumulative of existing evidence regarding Masimo's internal discussions about the accuracy of its devices.

Decl. at 58; Dkt. No. 194 ["Dr. Germain Decl."] ¶¶ 3–5.)  Masimo, on the other hand, presented overwhelming evidence of its good faith belief in the medical value of the Pronto Devices as well as their value to members of the medical community.  (*See* Dr. Goodman Decl. at 16–17; Dr. Shander Decl. ¶¶ 9, 15; Kiani Decl. Exhs. 24–25, 29.)  Relators have not shown any genuine dispute regarding the medical value of the Pronto Devices.

# V.    CONCLUSION

For the foregoing reasons, Masimo's motion for summary judgment is GRANTED.[9]

DATED:     October 2, 2013

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[9]  The Court DENIES Relators' request under Federal Rule of Civil Procedure 56(d) for leave to conduct additional discovery to oppose Masimo's summary judgment motion.  (Dkt. No. 197.)  Relators seek discovery of documents showing Masimo sales to state agencies receiving federal funds under the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC").  (*See id.* at 5–7.)  Such documents relate to damages, an issue not relevant to the Court's ruling on Masimo's motion.